EXHIBIT
A



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-60812-AHS

JULIE DURAN,
Plaintiff,
vs.
BRAGG LIVE FOOD PRODUCTS, LLC,
Defendant.
________________________________/

Greenberg Traurig, PA
777 South Flagler Boulevard
Suite 300
West Palm Beach, Florida
Friday, 10:01 a.m.-2:53 p.m.
December 8, 2023

VIDEOTAPED DEPOSITION OF JULIE DURAN

Taken on Behalf of the Defendant before Lisa Gerlach, FPR, Notary Public in and for the State of Florida at Large, pursuant to Notice of Taking Deposition in the above cause.

Appearances:

Counsel for the Plaintiff:
CARLY KLIGLER, ESQUIRE
Hilgers Graben, PLLC
777 South Flagler Drive
Suite 800 West
West Palm Beach, FL 33401-6161
ckligler@hilgersgraben.com

Counsel for the Defendant:
MARK BIDEAU, ESQUIRE
VANESSA PALACIO, ESQUIRE
Greenberg Traurig, PA
777 South Flagler Drive
Suite 300E
West Palm Beach, FL 33401-6167
bideaum@gtlaw.com
palaciov@gtlaw.com

Also Present:

Chris Gendron, Videographer

Linda Boardman, Bragg Live Food Products, LLC

INDEX


| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Julie Duran | | |
| | Direct by Mr. Bideau | 6 |
| | Cross by Ms. Kligler | 141 |
| | Redirect by Mr. Bideau | 147 |
| Certificate of Oath | | 158 |
| Certificate of Reporter | | 159 |
| Witness Review Letter | | 160 |
| Errata Sheet | | 161 |

PLAINTIFF'S EXHIBITS

None

DEFENDANT'S EXHIBITS

| | | |
|---|---|---|
| Exhibit 1 | Notice of Taking Videotaped Deposition | 29 |
| Exhibit 2 | Plaintiff's Amended Responses to First Set of Interrogatories | 48 |
| Exhibit 3 | Plaintiff's Responses to First Set of Interrogatories | 49 |
| Exhibit 4 | Letter Sending Bragg's ACV Cleanse, (Bottle retained by Mr. Bideau) | 63 |
| Exhibit 5 | Plaintiff's Initial Disclosures | 102 |
| Exhibit 6 | Complaint and Jury Demand | 106 |
| Exhibit 7 | Bragg Website Page | 119 |
| Exhibit 8 | Plaintiff's Amended Responses to First Set of Requests For Production | 125 |
| Exhibit 9 | Photo, Bragg's ACV Cleanse Bottle | 125 |

| | | |
|---|---|---|
| Exhibit 10 | Plaintiff's Responses and Objections to First Set of Interrogatories | 126 |
| Exhibit 11 | Notice of Filing and First Amended Complaint | 129 |

THE VIDEOGRAPHER: Good morning. We're going on the record at 10:01 a.m. on December 8, 2023. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video-recorded deposition of Julie Duran, taken in the matter of Julie Duran vs. Bragg Live Food Products, LLC. The location of the deposition is Greenberg Traurig, PA, 777 South Flagler Drive, Suite 300, West Palm Beach, Florida.

My name is Chris Gendron. I'm the videographer. The court reporter is Lisa Gerlach, from the firm Veritext Legal Solutions.

Will counsel, please, introduce themselves and state whom they represent? After which, the court reporter will, please, swear in the witness.

MS. KLIGLER: Carly Kligler from Hilgers

Graben, PLC, here on behalf of the plaintiff, Julie Duran and others similar situated.

MR. BIDEAU: Mark Bideau and Vanessa Palacio from Greenberg Traurig on behalf of Bragg Live Food Products, LLC. With me today is my client, Linda Boardman.

THEREUPON,

JULIE DURAN,

A Witness herein, acknowledged after having been duly sworn and testified upon her oath as follows:

THE WITNESS: Yes.

DIRECT EXAMINATION

BY MR. BIDEAU:

Q. Please state your full name.

A. Julie Duran.

Q. Ms. Duran, my name is Mark Bideau. We met just before the deposition started. I'm going to be taking the deposition today. I represent Bragg Live Food Products. Okay?

A. Yes.

Q. I'll refer to them as Bragg; all right?

A. Okay.

Q. Have you ever had your deposition taken before?

A. Yes, I believe so.
Q. Okay. In what context?
A. Well, I'm not sure it was a deposition.
Q. What was it?
A. For an insurance claim, so I don't know if that was a deposition.
Q. Were you questioned by some lawyers or an insurance company under oath?
A. Yes.
Q. Was a court reporter there?
A. It was on video.
Q. Well, in any event, the way this is going to work today -- I'll give you a little instruction. I'm sure Ms. Kligler has given you some indication of what's going to happen today.
But I'm going to be asking you a series of questions about the lawsuit you filed against Bragg. If, at any time, you don't hear one of my questions, it doesn't make any sense to you, or you don't understand it, please let me know. I'll do the best I can to rephrase it.
Okay?
A. Yes.
Q. I will try very hard not to talk over you. I'd ask you to give me the same courtesy. Let me

finish my question before you answer, because, although it's being recorded, what really matters is the record that's being taken down by the court reporter. And she's good, but the one thing she really can't do is take down what two people are saying at one time.

So I'll do my best not to talk over you and I'd ask you to give me the same courtesy. Okay?

A. Okay.

Q. I don't know how long we'll be here, but if at any time you feel the need to take a break, that's fine. Just let me know. I'll be happy to give you a break. We have some soft drinks and water around here. If you want one at any point, let me know.

All I would ask is that you answer the question that's pending and then we can take a break. All right?

A. Okay.

Q. I suspect we'll go at least through lunch, so we did have lunch brought in. You're certainly welcome to have that. There's not a lot of places to eat in this building anymore or around here, so let's see what we can do.

Are you taking any prescriptions or supplements or any medication today?

A. No.
Q. Is there any reason why you can't give truthful and accurate testimony today?
A. No.
Q. Any impact on your memory -- any memory problems that might impact your ability to remember events, other than the normal memory issues that might come up?
A. No.
Q. You said you don't think you have been deposed before; correct?
A. I don't know.
Q. You were at least questioned in connection with an insurance claim?
A. Correct.
Q. Were you the person making the claim or just the witness?
A. No. Making the claim.
Q. Have you ever testified at trial before?
A. No.
Q. Ever testified in a courtroom?
A. No.
Q. Or an arbitration proceeding?
A. Not that I'm aware of.
Q. You were a proposed class representative in a

case against a company called Goli.
Do you recall that?
A. Yes.
Q. Did you give any sworn statements or any testimony in that case?
A. I don't recall. Could you clarify?
Q. Sure. Did you give any depositions in a room like this with a court reporter?
A. No.
Q. Did you give any sworn statements to any lawyers representing Goli? I don't want to know about any conversations you might've had with your own lawyers, but did you give any statements or conduct any interviews to lawyers who represent Goli?
A. No.
Q. Were there any court proceedings that took place in that case that you attended?
A. No.
Q. Did you play any role or do anything in connection with that case?
A. Can you clarify on that?
Q. Sure. Did you answer questions in that case in writing?
A. Can you expand? I'm not sure.
Q. Sure. Did you answer any interrogatories in

the case?
A. I believe so.
Q. Did you attend any meetings with representatives of Goli?
A. No.
Q. Did you attend any court proceedings in the case?
A. No.
Q. You didn't have a deposition like this in the case; right?
A. No.
Q. Other than interactions with your own counsel in that case, did you do anything else -- take any other actions in connection with that case?
A. Not that I'm aware of.
Q. There was another class plaintiff in that case.
Do you know who she was?
A. Personally?
Q. Yes.
A. No.
Q. Did you ever meet her?
A. No.
Q. Do you know why you came into that case as a class rep?

A. Because I've taken the product.
Q. Did you replace the prior class representative or were there just two of you?
A. I believe two of us.
Q. Did you have any conversations with her at all about the case?
A. No.
Q. Did you have -- other than with your counsel, did you have any conversations with anyone about the Goli case?
A. Briefly.
Q. Who?
A. My friend, Sam.
Q. Who is your friend, Sam?
A. That's how I met Carly.
Q. Who is Sam?
A. He's a personal trainer.
Q. What's his name, last name?
A. Hudson.
Q. Where is he a personal trainer?
A. He's independent.
Q. Do you and Ms. Kligler share him as a -- I don't mean share him -- but do you have the same personal trainer?
A. He's my friend.

Q. He's your friend?
A. Yes.
Q. And her personal trainer?
A. Yes.
Q. Got it. Okay.
Where does he live?
A. Somewhere in Palm Beach.
Q. In the Town of Palm Beach or just Palm Beach County?
A. Palm Beach County.
Q. Does he have an office somewhere?
A. Not that I'm aware of.
Q. Does he live near you?
A. I don't know the distance, no.
Q. Do you know what town he lives in?
A. Somewhere in Palm Beach County. Lantana maybe.
Q. Okay. Where do you live?
A. In West Palm Beach. Well, Greenacres. It depends on who you ask. The county says West Palm Beach. My address has Greenacres.
Q. You said that's how you met Ms. Kligler.
Could you explain that to me? How did you meet Ms. Kligler?
A. Sam asked me if I take apple cider vinegar,

and he told me to contact Carly.
Q. When did you have that conversation?
A. Earlier this year.
Q. Do you remember when?
A. I don't recall.
Q. January, February -- first quarter, mid year?
A. Could have been the beginning of the year.
Q. I think you went into the Goli case -- did you go into it in December of last year or January or February of this year; do you recall?
A. I don't recall.
Q. You said you live in Greenacres. What's your address?
A. 6604 Adriatic Way, Greenacres, Florida 33413.
Q. And are you married?
A. No.
Q. Do you live with anyone?
A. My daughter and her boyfriend.
Q. Excuse me?
A. My daughter and her boyfriend.
Q. What's your daughter's name?
A. Isabella.
Q. How old is Isabella?
A. 20.
Q. What do you do for a living?

A. I work at a timeshare resort.
Q. What do you do at the timeshare resort?
A. The marketing director.
Q. Does that mean you sell timeshares?
A. No, I don't sell timeshare.
Q. What are your duties as marketing director?
A. I sign people up for timeshare presentations.
Q. Okay. So you're the one who says, "You get a free night if you go for a timeshare presentation"?
A. We don't give them free nights, no.
Q. A free dinner?
A. We give them a gift, yes.
Q. How long have you been there?
A. With the company?
Q. Yes, ma'am.
A. 23 years.
Q. When you say, "with the company" what company are you employed by?
A. The Berkley Group.
Q. Which resort is it?
A. Palm Beach Shores Resort.
Q. Is that the Marriott out on Palm Beach -- Singer Island?
A. It's by the Marriott on Singer Island.
Q. How long have you been the marketing

director?
A. I don't recall.
Q. Did you have a role -- you said you've been with the company for 23 years.
Have you been the marketing director all of the 23 years?
A. No.
Q. What did you do before the marketing director?
A. I was an OPC.
Q. What is an OPC?
A. Basically the same thing, except I have a few more responsibilities now.
Q. What are the differences between the jobs?
A. As a marketing director, I'm in charge of a few employees. I do payroll. I am on salary. I -- let's see -- I do inventory. So I do OPC work and then some extra stuff.
Q. When you say, "OPC work," what is OPC work? What does OPC stand for?
A. It depends. At our property, onsite -- on premises contact. At other places, it's off premises contact.
Q. How long have you been an OPC?
A. The 23 years.

Q. Have you always worked at the same property?
A. No.
Q. What other properties have you worked at?
A. Weston Vacation Village at Weston, Golden Strand, Fort Lauderdale Beach Resort.
Q. How long have you lived in Greenacres -- what did you do -- what did you do before that?
A. I was a student.
Q. Do you have a degree?
A. Yes.
Q. Where did you go to school?
A. For which?
Q. What is the last school that you went to?
A. Florida Atlantic University.
Q. Did you obtain a degree?
A. Excuse me?
Q. Did you obtain a degree?
A. Yes.
Q. What's your degree in?
A. A master's in health administration.
Q. When did you get your master's in health administration?
A. I don't recall the exact --
Q. Approximate date?
A. Maybe 2013.

Q. Prior to getting your master's in health administration, I assume you obtained a bachelor's degree?
A. Yes.
Q. Where did you get your bachelor's?
A. SUNY Purchase.
Q. Where at?
A. In New York.
Q. In what?
A. Sociology.
Q. Did you go right from your bachelor's to doing your master's program or did you work in between?
A. I worked in between.
Q. What did you do?
A. OPC.
Q. Were you working as an OPC while you were going to school?
A. No.
Q. So you obtained your master's degree -- I mean, your undergraduate degree at State University of New York. You then worked as an OPC?
A. Yes.
Q. How long did you do that?
A. I'm still doing that.

Q. And then you went to get your master's degree?
A. Yes, but I got my master's degree before the health administration degree.
Q. Okay. When did you get your other -- let me back up.
After you left the State University of New York, you became an OPC. Then what did you do?
A. At some point, I went to grad school and got a master's degree in school counseling.
Q. Where did you get that from?
A. Florida Atlantic University.
Q. What did you do after you got your master's in school counseling?
A. I continued working at my current job.
Q. Did you obtain any other degrees before you went to get your master's in health administration?
A. Degrees? No.
Q. Did you get any other education after your master's in school counseling?
A. Not -- actually, before.
Q. Tell me what other degrees you hold.
A. Not degrees. Licenses.
Q. What licenses do you hold?
A. Real estate.

Q. What real estate license do you hold?
A. What do you mean, what real estate --
Q. Are you a broker, associate --
A. Oh, Florida. No. Associate.
Q. With the State of Florida?
A. Yes.
Q. Do you still have an active real estate license?
A. Voluntary inactive.
Q. When did you obtain your license?
A. Early 2000s.
Q. Did you ever work selling real estate?
A. Yes.
Q. When did you work selling real estate?
A. During the pandemic.
Q. What company -- did you work for a company?
A. Yes.
Q. What company did you work for?
A. Chane Realty.
Q. Where is Chane Realty located?
A. Broward County.
Q. How long did you work for Chane Realty?
A. I think I was registered with them for a year and a half or two.
Q. Was that residential real estate, commercial

real estate?
A. Residential.
Q. You say you were with them for a year or two.
Did you work for anybody else in the real estate business?
A. No.
Q. Did you sell real estate -- do you hold any other licenses -- sorry.
What were the circumstances of you leaving Chane Realty?
A. Too expensive to buy leads.
Q. What do you mean by that?
A. In real estate, you have to buy leads if you don't know a lot of people, I guess.
Q. Okay. So you left -- let's back up then.
From the time you left the State University of New York, did you come to Florida directly from there?
A. Yes.
Q. What did you do when you -- what is the first thing you did when you came to Florida?
A. Picked out a job with the Berkley Group.
Q. The company you're still with?
A. Yes.
Q. When did you get your real estate license?

A. In the early 2000s.

Q. How does that relate to when you got down -- were you still with the Berkley Group at that time?

A. Yes.

Q. So you worked with the Berkley Group and held your real estate license at the same time?

A. Yes.

Q. Did you work for Chane Realty full-time or part-time?

A. On the side.

Q. At some point, you then went to work -- you then went to get your degree in school counseling at FAU?

A. Yes.

Q. Then your master's in health administration at FAU?

A. Yes.

Q. Have you ever worked in the healthcare industry?

A. No.

Q. Have you ever worked in the school counseling industry?

A. No. If I worked -- you mean, get paid? No.

Q. Have you ever worked in the school counseling industry where you haven't gotten paid?

A. Yes. We had to do an internship.
Q. What years did you -- what was involved in doing your internship?
A. I had to be a school counselor under a school counselor as part of my education program.
Q. Okay. Then you got your master's degree at FAU in health administration, but you've not worked in the healthcare industry?
A. Correct.
Q. Have you interned or done any volunteer work in the healthcare industry?
A. I did an internship, yes.
Q. What kind of internship did you do?
A. It was at Palm Beach Medical Society.
Q. What were your duties and responsibilities?
A. Pretty much stuffing envelopes and entering data.
Q. Have you done any work in the healthcare field at all?
A. No.
Q. Have you utilized either of your master's degrees for any employment?
A. No.
Q. Have you attempted to work in the healthcare industry?

A. No.
Q. Throughout this entire time period while you were getting these master's degrees, did you continue to work for the Berkley Group?
A. Yes.
Q. Did you get your degrees at night?
A. (No response.)
Q. Well, let me ask you this. Was the job at the Berkley Group full-time?
A. Yes.
Q. So you were working full-time and went and got your master's degrees?
A. Yes.
Q. Do you have any -- do you hold any other licenses?
A. I don't -- no, I don't think so.
Q. You seemed to hesitate. Do you think you might have another license?
A. No. I'm just wondering. I don't think I do, no.
Q. Do you hold any other degrees besides your master's in health administration and your master's in school counseling and your bachelor's degree in sociology?
A. No.

Q. Since the time of college, have you worked anywhere other than the Berkley Group or Chane Realty?
A. No.
Q. Who is your supervisor at the Berkley Group now?
A. Jessica Duran.
Q. Who is Jessica Duran?
A. My sister.
Q. How long has Jessica Duran been your supervisor?
A. I was pregnant, so 2003.
Q. Is Berkley Group a public company?
A. I don't think so. I don't know.
Q. What is your sister's position at the company?
A. I don't know her title. They recently changed it, so I don't know.
Q. What was the title your sister had at the company that you knew?
A. Actually, I don't know her last title. She used to be a marketing director at some point, but then she became in charge of the marketing directors. But I never knew her, like, title then once she became in charge of all of us.

Q. Since you've been with the Berkley Group, has she been your supervisor?
A. Not from the beginning, no.
Q. You said she's been your supervisor since probably around 2003?
A. Yes.
Q. Where does she live?
A. Windermere.
Q. Where are the Berkley Group offices located?
A. Corporate is in Fort Lauderdale.
Q. What business is the Berkley Group in?
A. Timeshare.
Q. Since the time of college, have I now covered your educational background and your employment background?
A. Yes.
Q. Have I missed any jobs or degrees that you have?
A. Not that I'm aware of.
Q. I guess, if you're not aware of any degrees or jobs, then I'm not aware of any other degrees. Okay.
Do you hold any other certifications?
A. No.
Q. You're not married? Oh, sorry. I --

A. Teaching certification, but you've already got that.
Q. Is that part of the school counseling?
A. Yeah.
Q. Do you have an active teaching certification in the State of Florida?
A. Yeah.
Q. So you could teach if you wanted to?
A. Yes.
Q. You're not married; right?
A. No.
Q. Have you ever been married?
A. Yes.
Q. When were you married?
A. The first time?
Q. We'll start with the first time.
A. College years. 1996 maybe.
Q. 'Til when?
A. When I graduated, 2000.
Q. What was your husband's name?
A. Nathan Crocker.
Q. Crawford?
A. Crocker, like Betty Crocker.
Q. Got it. What state were you married?
A. New York.

Q. What did your husband do for a living?
A. Student.
Q. What does he do now?
A. I don't know.
Q. You said you were married -- strike that.
In addition to your marriage to Mr. Crocker, you were married to somebody else?
A. Yes.
Q. Who is that?
A. Matthew King.
Q. Matthew?
A. King.
Q. As in king, K-I-N-G?
A. Uh-huh, yes.
Q. When were you married to Mr. King?
A. 20 -- 2006.
Q. 'Til when?
A. 2008, maybe.
Q. What did Mr. King do?
A. Something with pool plumbing.
Q. While you were married, he did something with pool plumbing?
A. Yes.
Q. Any other marriages?
A. No.

Q. What does your daughter do for a living?
A. She works at a store.
Q. What kind of store?
A. Clothing store.
Q. Does she live with you?
A. Yes.
MR. BIDEAU: Let's mark this as Exhibit 1 for today's deposition.
(Defendant's Exhibit 1 was marked.)
BY MR. BIDEAU:
Q. This is just a notice of today's deposition.
What did you do to prepare for today's deposition?
A. What do you mean?
Q. Did you do anything to prepare for today's deposition?
A. Can you clarify?
Q. Sure. Did you talk to anybody about today's deposition?
A. Yes.
Q. Who?
A. My counsel.
Q. When did you talk to your counselor about the deposition?
A. When, as in?

Q. As in when -- yesterday, the day before?
A. Yesterday.
Q. In person or by phone?
A. Video.
Q. Anybody else present?
A. Yes.
Q. Who?
A. A colleague.
Q. A colleague of?
A. Of Carly's.
Q. Anybody else present?
A. No.
Q. Was your daughter present?
A. No.
Q. Was your daughter there for any of the call?
A. No.
Q. How long did it last?
A. I don't know.
Q. Ten minutes?
A. No. Longer.
Q. An hour?
A. Probably.
Q. Longer than an hour?
A. I'm not sure.
Q. Longer than two hours?

A. No.
Q. Did you review any documents?
A. Did I do what?
Q. Did you review any documents?
A. Like, what kind of documents?
Q. Like, any kind of documents.
A. Just what I've seen before.
Q. What have you seen before -- strike that.
What documents did you look at as part of your preparation yesterday?
MS. KLIGLER: Objection. I'm going to object based on work product and instruct her not to answer.
BY MR. BIDEAU:
Q. Did you look at documents yesterday to prepare?
A. Yesterday?
Q. Yesterday.
A. Or in just general?
Q. First, I'm going to ask you about yesterday while you were talking to Carly and -- Ms. Kligler and her colleague -- did you look at any documents?
A. Yesterday, no.
Q. In connection with -- so yesterday, during the phone conversation, you didn't look at any

documents?
A. No.
Q. You weren't shown any documents yesterday?
A. I don't recall yesterday, no.
Q. You don't recall yesterday or --
A. I don't recall, yesterday, if I saw any documents.
Q. Have you looked at documents in connection with this case?
A. Yes.
Q. What documents have you looked at in connection with this case?
MS. KLIGLER: Objection, based on work product. I'm going to instruct her not to answer.
MR. BIDEAU: In connection with the preparation for the deposition, I would agree it's work product, but whether she's looked at any documents in this case, you're going to take work product and instruct her not to answer?
MS. KLIGLER: Well, I'm unclear on the question. You're asking her, has she ever looked at documents in relation to this case?
MR. BIDEAU: Yeah. Because she said she

doesn't remember looking at them during your call yesterday. So whatever you guys did yesterday, I'm not asking about anymore. I'm asking her, does she recall ever looking at documents in connection with this case.

MS. KLIGLER: You can answer.

THE WITNESS: Yes.

BY MR. BIDEAU:

Q. What documents do you recall looking at in connection with this case?

A. The claim.

Q. The complaint?

A. Yes.

Q. Do you recall looking at any other documents in connection with this case?

A. Yes.

Q. What?

A. I don't know what it's called. The questions.

Q. Interrogatories?

A. Yes.

Q. Questions is a better name for it.

Have you looked at any other documents in connection with this case?

A. No.

Q. Have you looked at any documents that were produced by Bragg in connection with their case?
A. No.
Q. Have you looked at any expert reports that have been prepared in connection with this case?
A. No.
Q. Have you ever heard of a Dr. Ryan?
A. Not that I recall.
Q. Have you ever met with a Dr. Ryan?
A. No.
Q. Other than the complaint and the questions, do you recall looking at any other documents that relate to this case?
A. No.
Q. Other than speaking with your counsel, have you spoken to anyone else about this case?
A. Yes.
Q. Who?
A. Sam Hudson.
Q. What did you talk to Sam Hudson about?
A. Just in the beginning. I mean, not about the case.
Q. Tell me about your conversation with Mr. Hudson that concerns the subject matter of this case.

A. He asked if I had ever taken apple cider vinegar, and then I said, "Yes." He said, "I have a client, Carly. Contact her."

That was the extent of it.

Q. Do you know why Mr. Hudson asked you if you ever took apple cider vinegar?

A. Because -- probably because I am into health and exercise and dieting.

Q. When you say you're into health, exercise and dieting, tell me what you mean.

A. I exercise, I diet.

Q. Okay. You say you're into health. You're somebody who takes supplements?

A. Yes.

Q. What supplements do you take?

A. Can you elaborate?

Q. Not really. Supplements are a broad field.

So what supplements do you take?

A. What do you consider supplements?

Q. I don't know. Do you take vitamins?

A. Sometimes.

Q. Do you currently take vitamins?

A. Yes, I think they're vitamins.

Q. What do you take?

A. Magnesium.

Q. Okay. At what quantity?
A. I don't know. They're gummies.
Q. A particular brand?
A. Yes. I don't know the name.
Q. Why do you take magnesium?
A. My doctor told me.
Q. Who is your doctor?
A. Dr. Senzon.
Q. Can you spell it?
A. No.
Q. Okay. Give it to me again?
A. Senzon.
Q. Senzon.
A. It could be S-E-N-Z-E-N or S-E-N-Z-O-N.
Q. Where is Dr. Senzon located?
A. Off of Belvedere.
Q. Is he part of a practice?
A. I don't know the name of the practice.
Q. First, is he part of a practice?
A. I don't know.
Q. Are there other doctors in his office?
A. Not that I'm aware of.
Q. What type of medicine does he practice?
A. Neurology.
Q. Neurology?

A. Uh-huh.
Q. Do you have a medical condition that deals with a neurologist?
A. Yes.
Q. What?
A. Migraines.
Q. Have you ever heard of Dr. Winner, Dr. Paul Winner?
A. No.
Q. I just asked because I know he's a migraine specialist.
How long have you seen Dr. Senzon?
A. I don't recall.
Q. Well, a year, five years, ten years?
A. It's been on and off.
Q. Do you currently see him. When -- do you currently see him?
A. Yes.
Q. He's the one that told you to take magnesium?
A. Yes.
Q. Do you have any other doctors?
A. Yes.
Q. Who?
A. What type of doctor?
Q. Any type of doctor.

A. Premier Health. That's a general doctor.
Q. Where is Premier Health located?
A. Wellington.
Q. What doctor do you see there?
A. Whoever they assign me to.
Q. Got it. That's sort of a general practice?
A. Yes.
Q. Regular doctor?
A. Yes.
Q. How often do you see doctors at Premier Health?
A. Definitely once a year.
Q. Any other doctors?
A. Yes.
Q. Who?
A. Dr. Gonzalez.
Q. What specialty does Dr. Gonzalez have?
A. Allergist.
Q. Do you have allergies?
A. Yes.
Q. What are you allergic to?
A. The environment.
Q. The whole environment?
A. Pretty much.
Q. Where is Dr. Gonzalez located?

A. Loxahatchee.
Q. How long have you seen Dr. Gonzalez?
A. At least five years. Probably longer.
Q. Okay. Any other doctors?
A. I just switched OB-GYNs, so I don't know her name.
Q. Who was your prior OB?
A. Dr. Valdescruz.
Q. Where is Dr. Valdescruz located?
A. Loxahatchee, but he just retired.
Q. And who are you now seeing?
A. I don't know her name, but it's in Wellington.
Q. With a group?
A. Yes.
Q. What group?
A. It's part of HCA.
Q. Any other doctors?
A. Dr. Perla.
Q. What is Dr. Perla?
A. Gastroenterologist.
Q. Okay. Do you have gastrointestinal issues?
A. Yes.
Q. Do you have a diagnosis for gastrointestinal issues?

A. Yes.
Q. What?
A. Gastritis.
Q. How long have you had gastritis?
A. I don't recall.
Q. A long time?
A. I'm not sure. I don't know how many years.
Q. How about migraines; how long have you suffered from migraines?
A. I don't know because I thought they were sinus headaches.
Q. How long have you been seeing a neurologist?
A. It's been on and off, so I'm not sure.
Q. Any other doctors?
A. I don't think so.
Q. We started down this path when we started with the magnesium gummies that you're taking.
Do you take any other supplements?
A. Riboflavin.
Q. How long have you taken riboflavin?
A. Same amount of time as the magnesium, so I don't know.
Q. Is that something else your neurologist prescribed?
A. Yes.

Q. Anything else? Any other supplements?
A. Probiotics.
Q. Was that suggested by your gastroenterologist?
A. I think that's suggested by every doctor.
Q. Any other supplements?
A. Yes. I don't know the names.
Q. What do you mean you don't know the names?
A. They're female things.
Q. Female supplements?
A. Yes.
Q. Who suggested those?
A. That's over -- just over-the-counter stuff.
Q. What do you mean by over-the-counter stuff?
A. Well, actually, one of them, a doctor did suggest.
Q. What?
A. I don't know the name of it, but it's a suppository, so I don't know if that's a supplement.
Q. What other -- I mean, you have to buy these supplements. What do you go to the store to buy?
A. Like, for urinary tract infections.
Q. What do you take for urinary tract infections?
A. Cranberry pills.

Q. Okay. How long have you been taking cranberry pills?
A. On and off, just probably a couple of years.
Q. Any other supplements?
A. Currently taking?
Q. Currently taking.
A. I think that's it.
Q. Tell me about supplements you were taking, but you are not currently taking. Strike that.
Are you on any other actual medications?
A. Yes.
Q. What?
A. Xolair. It's an injection -- allergies.
Q. Anything else?
A. Yes.
Q. Do you take boric acid?
A. Yes.
Q. Any other medications?
A. Yes.
Q. What?
A. I just said Xolair.
Q. Xolair. I got that.
A. Something for the migraines and eye twitch. Don't ask me the name because I don't know it.
Q. Okay. Anything else? Any other medications?

A. Allergy pills.
Q. What allergy pills do you take?
A. It starts with an L. It's a prescription.
Q. Anything else? Any other medications?
A. I think that's it. Oh, inhaler.
Q. What is the medical issue you're dealing with with the inhaler?
A. Asthma.
Q. How long have you had asthma?
A. My whole life.
Q. Do you have a doctor who treats your asthma?
A. My allergist.
Q. And what medication is in your inhaler?
A. It's ProAir and Trelegy. I think that's the name.
Q. Any other medications?
A. I think that's it.
Q. You said you've been taking the inhaler all your life?
A. As needed.
Q. Okay. Do you take all of these supplements and medications daily, other than the as-needed and the injection, obviously?
A. I try to.
Q. What do you mean you try to?

A. I don't always remember to.
Q. So at the time -- is it Mr. Hudson -- did I get that right?
A. Yes.
Q. You said he's a friend. Is he somebody you work with?
A. No.
Q. You said that you're into health, exercise, and diet and that he knew that. You said he's a personal trainer.
Does he train you?
A. Not -- I sometimes do his workouts, but not with him.
Q. Can you find his workouts somewhere online or something?
A. No.
Q. He just comes over and --
A. No.
Q. He tells you what the workout is?
A. Right.
Q. When you say that you're into health, is there something else that you do that you consider to mean that you're into health?
A. I mean --
Q. You told me you're into health, exercise, and

diet?
A. Exercise is part of health.
Q. I would agree with you.
A. That's what I mean.
Q. Are you a member of a gym?
A. Yes.
Q. Do you work out regularly?
A. Yes.
Q. Do you have a trainer?
A. No.
Q. You seemed to hesitate there.
A. Because it's not really a trainer. It's a coach.
Q. You have a coach?
A. It's a class coach.
Q. How often do you exercise?
A. Usually, five days a week.
Q. You said you're into diet. What do you mean you're into diet? Do you have a specific diet you're into?
A. I do intermittent fasting.
Q. What do you mean by intermittent fasting?
A. I fast intermittently.
Q. I guess that's why they call it that.
How often do you fast?

A. 16 hours a day. No -- yeah -- yeah.
Q. For how long have you been doing intermittent fasting?
A. I'm not sure. A year maybe.
Q. Any other dietary -- any other diet that you're on?
A. Well, anything we eat is a diet.
Q. Anything special you eat? Are you a vegan, vegetarian?
A. No.
Q. Mediterranean diet?
A. No.
Q. Okay. You do intermittent fasting.
Is there anything else you do that you consider to be a health, exercise, and diet regimen?
A. Sometimes I track my macros.
Q. What do you mean by track macros?
A. Track carbs, fats, protein.
Q. Do you keep a log?
A. Sometimes.
Q. Do you have a log?
A. Not currently.
Q. When is the last time you had a log?
A. Last year.
Q. Why did you stop?

A. It gets tedious.
Q. How often last year were you tracking your macros?
A. For -- consistently for probably five months.
Q. Why?
A. Because I paid for a five-month thing.
Q. Why did you do that?
A. I was trying to gain.
Q. You were trying to gain weight?
A. In certain areas.
Q. Where?
A. My glutes.
Q. Okay. So you're tracking -- you bought a five-month thing. What did you buy? What was it called? A product?
A. No. It was a person. I didn't buy a person.
Q. You didn't buy a person. All right. We'll be clear about this.
You bought a program; right?
A. A coach at the gym.
Q. A coach at the gym. Got it.
A. Her program.
Q. So you bought a program from a coach at the gym?
A. Yes.

Q. Got it. And that program included tracking your macros?
A. Yes.
Q. You did that for five months.
Had you ever done that before?
A. Yes, but not with someone helping me.
Q. Anything else that you do as part of your health, diet, and exercise routine?
A. No.
Q. Did you track any other of your health-related numbers -- cholesterol or lipids -- or is there anything else that you track regularly?
A. My doctors do that.
Q. When you say your doctors, you mean annual physicals and that sort of thing?
A. Yes.
Q. You don't do it outside of that?
A. No.
(Defendant's Exhibit 2 was marked.)
BY MR. BIDEAU:
Q. I'm going to hand you what I marked as Exhibit 2. Exhibit 2 is "Plaintiff's amended responses to defendant's first set of interrogatories."
Do you recognize that document?

A. Yes.
Q. And on the last page -- they didn't give me the signature page. I have to get one because I need the signature page on it.
Does yours have a signature page on it? Oh, you do. I don't. You don't have the actual verification page.
MR. BIDEAU: Why don't we take a short break? Let me get that.
THE VIDEOGRAPHER: Going off the video record. The time is 10:57 a.m.
(Brief recess.)
(Defendant's Exhibit 3 was marked.)
THE VIDEOGRAPHER: Coming back on the video record. The time is 11:08 a.m.
BY MR. BIDEAU:
Q. Ms. Duran, before the break, I handed you the plaintiff's response -- the amended response to the first set of interrogatories. I noticed that there's not a verification page on there.
But do you recognize that document as questions that you answered?
A. I'm looking at Exhibit 3.
Q. Look at Exhibit 2 first.
A. 2?

Q. Exhibit 2 is just an amended response to what is Exhibit 3.
A. Yes.
Q. You recognize that as questions you've answered?
A. Yes.
Q. Okay. Let's take a look at Exhibit 3 now, which is the original one. Go to the last page.
Is that your signature on the last page, or at least your electronic signature, under verification?
A. Yes.
Q. And you understood that you were signing these under penalty of perjury?
A. Yes.
Q. Let's look at interrogatory answer number 1, which I can tell you is the same in both this set and the amended set.
Interrogatory number 1 asked you to describe each purchase you made of the products, which are defined as the Bragg's Liquid Apple Cider Vinegar and its two supplement products, and then asked for information about those purchases.
And you indicate in your answer that -- about halfway down, you say that "Plaintiff estimates that

she purchased between six and twelve bottles of Bragg's products collectively over the last approximately seven years."

Do you see that?

A. Yes.

Q. "But she cannot remember the exact dates of purchase."

A. Correct.

Q. Is that correct, that you began purchasing Bragg Apple Cider Vinegar about seven years ago?

A. Within that timeframe.

Q. What do you mean within?

A. Around -- like, seven years ago or so.

Q. So six, seven years ago is when you started purchasing Bragg's Apple Cider Vinegar?

A. Yes.

Q. And you purchased the liquid apple cider vinegar like in the bottle that's on the table here?

A. It was a liquid form in a bottle, yes, apple cider vinegar.

Q. Okay. And you estimate that you purchased between six and twelve bottles between the time you started six or seven years ago and the time you stopped take apple cider vinegar?

A. Yes.

Q. By the way, do you still take apple cider vinegar?
A. No.
Q. When did you stop?
A. Do you mean the regular apple cider vinegar or including the one with cayenne?
Q. Well, let's try to clear that up.
Seven years ago -- six or seven years ago, when you started, what were you taking?
A. Just Bragg's Apple Cider Vinegar.
Q. So that would've been about 2016. That's seven years ago?
A. Yes.
Q. Roughly. All right. You were taking Bragg's Apple Cider Vinegar. Okay.
And did there come a time when you switched to a different apple cider vinegar?
A. Yes.
Q. Strike that.
Do you take any apple cider vinegar product today?
A. Take? No.
Q. Do you use any apple cider vinegar today?
A. Yes.
Q. What do you use apple cider vinegar -- first

of all, what apple cider vinegar do you buy today?
A. It's in a hair product.
Q. What's the brand name?
A. I don't know.
Q. Is it a Bragg product?
A. No.
Q. So let's start with -- so, today, you use apple cider vinegar in a hair product?
A. Yes. It contains apple cider vinegar.
Q. Do you remember the name of the product?
A. No. I mean, shampoo.
Q. For how long have you used a hair product that contained apple cider vinegar?
A. It's a clarifying shampoo, so you use it once, like -- I used it recently.
Q. But how many times have you used it -- for a number of years?
A. No.
Q. When did you start using the apple cider vinegar -- a hair product with apple cider vinegar in it?
A. Recently.
Q. Back in 2016, were you using a hair product with apple cider vinegar in it?
A. I've used -- I've poured Bragg's on my hair.

Q. Okay. So back in 2016 --
A. I don't know when.
Q. Back in 2016, when you first purchased the Bragg's Apple Cider Vinegar, what were you using it for?
A. For appetite suppressant, digestive issues, weight loss, which goes with, I guess, appetite suppressant.
Q. This was back in 2016?
A. When I originally bought it for -- that's what I bought it for.
Q. And it was liquid?
A. Yes.
Q. Okay. With the six to twelve -- okay. Did there come a time when you stopped -- how did you -- how did you take your apple cider vinegar in 2016?
A. I drank it.
Q. How often?
A. Usually twice a day.
Q. Okay. For how long did you drink Bragg's Apple Cider Vinegar?
A. I don't recall.
Q. When did you stop drinking Bragg's Apple Cider Vinegar?
A. Like completely?

Q. Completely.
A. Then I go back to that question. The regular one or --
Q. When did you stop drinking Bragg's Apple Cider Vinegar, the regular?
A. It was, I would say, sometime last year or either last year or the year before.
Q. So sometime in 2021?
A. Or in 2020.
Q. Sometime in 2020?
A. Between 2020 and 2021, I would think.
Q. You stopped drinking the Bragg's regular apple cider vinegar, and then did you start drinking the cayenne apple cider vinegar?
A. At some point after that, yes.
Q. So you stopped drinking Bragg's regular apple cider vinegar in either '20 or '21. Did you start --
A. We're in 2023, right?
Q. Yes.
A. 2021, 2022 would be --
Q. So '21, '22 is when you stopped drinking the regular apple cider vinegar?
A. I think so.
Q. And then did you start drinking the -- did you use any other apple cider vinegar product in '21,

'22?
A. '22 would be --
Q. Cayenne?
A. Yeah, yes.
Q. Do you still drink apple cider vinegar with cayenne?
A. No.
Q. When did you stop drinking apple cider vinegar with cayenne?
A. I didn't finish it. I don't recall when.
Q. Why didn't you finish it?
A. It messed up my stomach, so...
Q. Did you only buy one bottle of the apple cider vinegar with cayenne?
A. Yes.
Q. Is that the bottle that you gave to your lawyer to send to me?
A. Yes. I don't know if that's it, but I sent her a bottle, yes.
Q. Why did you switch to the cayenne product from the regular apple cider vinegar?
A. I read that cayenne is supposed to help burn fat and suppress appetite.
Q. So when you say six to twelve bottles of the Bragg's Apple Cider Vinegar, is the one bottle with

the cayenne included and that's roughly six to twelve bottles?

A. No.

Q. So it was six to twelve bottles of the regular apple cider vinegar?

A. Yes.

Q. And another bottle of the apple cider vinegar with cayenne?

A. Yes.

Q. Can you come closer than six to twelve bottles over the period of 2016 'til 2021, 2022?

A. What do you mean?

Q. Well, can you come -- you say from six to twelve in total.

A. I don't recall.

Q. You don't recall. You can't narrow that down any more?

A. No.

Q. Okay. Have you used any other Bragg products?

A. I don't recall.

Q. Have you ever used any of the Bragg supplements?

A. I don't recall.

Q. You --
A. I don't remember.
Q. Sitting here today, you have no recollection of having used a Bragg supplement?
A. No. I don't recall.
Q. So the only Bragg products you recall, sitting here -- sitting here today, the only Bragg products you recall ever using are the liquid products?
A. The only ones I recall, yes.
Q. You have no documents showing you ever used supplements; correct?
A. (No response.)
Q. Strike that. You have no documents showing you ever used Bragg supplements; correct?
A. What do you mean? Like, receipts?
Q. Receipts.
A. I don't have receipts for any of it.
Q. You don't have any recollection, sitting here today, of using Bragg supplements; correct?
A. Correct.
Q. And you're not claiming in this lawsuit that you ever used Bragg supplements; correct?
A. I don't recall using it, so,,,
Q. So you couldn't be suing us for using Bragg

supplements if you didn't use them; right?
MS. KLIGLER: Objection.
MR. BIDEAU: Strike that.
BY MR. BIDEAU:
Q. Are you suing us for your use of Bragg supplements?
A. I mean, wouldn't that be a supplement?
Q. You're right. That was a bad question.
Are you suing us for using any -- strike that.
Are you suing us for using any of Bragg's capsule products?
A. I don't recall whether I used them or not. It's a possibility I have used them. I just don't recall.
Q. It's a possibility. But are you suing us for you having used them? Are you claiming that you were damaged in any way by using Bragg capsule products?
A. I don't know how to answer that.
Q. Did you ever use Bragg capsule products?
A. I don't recall. It's a possibility I did use.
Q. Lots of things are possible. Okay?
A. I don't know.
Q. But you filed a lawsuit that's now in federal

court, so I'm asking you, are you claiming in that lawsuit that you used Bragg capsule products?

A. I'm claiming I don't recall whether I used it or not.

Q. Okay. When you answered this interrogatory, you said that you estimated you purchased between six and twelve bottles of Bragg products.

That six to twelve that you're talking about are the liquid products; correct?

A. Correct.

Q. And then there was one more bottle of cayenne.

In the sworn interrogatories answers, what you've identified for are solely liquid products that you've used; correct?

A. Correct.

Q. And you bought all of those liquid products at Publix?

A. Yes.

Q. You never bought Bragg products online from Bragg?

A. No.

Q. And you've never bought Bragg products online through Amazon?

A. I searched my records, and no.

Q. What records did you search?
A. Amazon.
Q. So you looked through your Amazon records to see if you ever purchased any Bragg products through Amazon and you had no record of it?
A. Correct.
Q. When you bought goods from Publix, did you use Instacart and get any deliveries?
A. No.
Q. You didn't during the pandemic?
A. No. I don't pay for deliveries.
Q. You identified two Publixes here, one on Okeechobee Boulevard and one on Royal Palm Beach.
Those are the two Publixes you shop at?
A. Yes.
Q. Now, you did use one bottle of Goli gummy apple cider vinegar, correct, back in 2019?
A. I did not use a full bottle.
Q. You purchased a bottle?
A. Yes.
Q. Why did you purchase a bottle of Goli gummies back in 2019?
A. For energy and appetite suppressant.
Q. At that time, you were also taking liquid apple cider vinegar from Bragg?

A. Most likely, yes.
Q. Were there times, during this period from 2016 to '21, '22, when you stopped taking the regular Bragg Apple Cider Vinegar, that you didn't take apple cider vinegar at all?
A. Yes.
Q. When were those times?
A. I don't recall.
Q. Why did you stop during this period of time?
A. Sometimes I would forget.
Q. Because if we do the math over a six-year period, six bottles of apple cider vinegar certainly wouldn't -- strike that.
How often were you taking apple cider vinegar back in 2016 to 2021?
A. What do you mean? Do you mean daily?
Q. Were you taking it daily?
A. Not continuously. There were times I was taking it daily.
Q. Were there certain events that would cause you to take it daily and other reasons why you wouldn't take it daily?
A. When I would remember and when I wouldn't remember.
Q. Sitting here today, as best you can tell me,

you purchased somewhere between six and twelve bottles of the liquid apple cider vinegar, one bottle of the liquid with cayenne in 2022, and you don't have a recollection of purchasing any of the capsules?
A. Correct.
Q. And you don't have any record of having purchased any of the capsules?
A. Correct.
MR. BIDEAU: Just for the record, I'm going to mark as Exhibit 4 this letter from Ms. Kligler to me which attached a bottle. We'll just put in the record, the November 14, 2023 letter, if that's okay, Carly.
MS. KLIGLER: Yeah.
MR. BIDEAU: Which is attached to a bottle of Bragg Organic Raw Unfiltered Apple Cider Vinegar, Honey Cayenne, Wellness Cleanse, 32 ounces, and it has a product code of 743050143.
You can mark it as Exhibit 4.
(Defendant's Exhibits 4 was marked.)
BY MR. BIDEAU:
Q. I'm looking at the bottle that was attached to Exhibit 4 and the instructions say, "Mix 2

tablespoons with 8 ounces of filtered sparkling water."
Is that how you drank --
A. Yes. I followed the instructions on the bottle.
Q. Then it says, "Take 2 to 3 times daily."
Did you take it 2 to 3 times --
A. While I was taking it, I did what the bottle said.
Q. There must have been significant periods of time when you forgot to take it.
A. No. I stopped taking it.
Q. During this period from 2016 to 2021 or '22, did you stop taking it in that period as well?
A. I only got this one time in 2022.
Q. I got that. Let me ask a question -- a better question.
The dosing instructions on the regular Bragg product that you were taking from 2016 to 2021 or 2022 are the same instructions -- 2 tablespoons with 8 ounces of water.
Is that how you took it?
A. I don't recall if those are the instructions on that one.
Q. Do you recall how you took it?

A. I diluted it in water. I know it said to dilute it in water, but I don't recall if it was 1 tablespoon or 2 tablespoons. I don't recall the dosage.
Q. Okay. Whatever the dosage was, you followed it?
A. Yeah.
Q. Did you take it once a day or more than that?
A. Twice a day most of the times.
Q. Okay. Were there periods of time during that period, other than when you forgot it, that you just decided you weren't going to take it?
A. Just times when I would -- like I said, I would forget at times to take it.
Q. Fair to say that you have no intention of buying Bragg Apple Cider Vinegar products again in the future?
A. Correct.
Q. Correct, you have no intention of buying them in the future?
A. Correct. I have no intention.
Q. Between 2016 and 2021 or '22 -- strike that.
Between 2016 and 2022, did you ever speak to any of your healthcare providers about taking apple cider vinegar?

A. No.
Q. Why not?
A. I didn't feel the need to.
Q. Did you ever speak to any other experts or healthcare providers during the period that you were taking apple cider vinegar about your use of apple cider vinegar?
A. No.
Q. Did you ever use any apple cider vinegars from any other companies?
A. Yes, shampoo.
Q. Did you ever use any liquid apple cider vinegars for drinking purposes manufactured by any other apple cider vinegar companies?
A. No.
Q. You know there's a lot of apple cider vinegar companies out there?
A. I know this one.
Q. Do you know that there are others?
A. Apple cider vinegar?
Q. Yes.
A. I know there's vinegar, like white vinegar, but I'm not aware about apple cider vinegar.
Q. Have you ever used any other apple cider vinegar products for ingestion?

A. No.
Q. What caused you to buy that one bottle of Goli in 2019?
A. I saw it on social media.
Q. When you say you saw it on social media, in 2019, what social media sites were you on? Strike that.
Where did you see the Goli thing on social media?
A. I don't recall.
Q. Let's back up. What caused you to buy apple cider vinegar in 2016?
A. I saw it on social media.
Q. When you say you saw -- are you talking about Bragg's Apple Cider Vinegar?
A. Yes.
Q. In 2016, what social media did you see Bragg's Apple Cider Vinegar on?
A. I don't recall.
Q. What social media sites were you on in 2016?
A. Facebook.
Q. Any others?
A. Instagram.
Q. Any others?
A. I think that's it for 2016.

Q. It's your best recollection that -- what did you see in 2016 on either Facebook or Instagram that led you to purchase Bragg's Apple Cider Vinegar?
A. What do you mean?
Q. Well, I asked you why you purchased Bragg's Apple Cider Vinegar in 2016. You said you saw something on social media.
A. Correct.
Q. So what did you see on social media in 2016 about Bragg's Apple Cider Vinegar?
A. Something about using it for an appetite supressant.
Q. And the only social media sites you were on at the time were Facebook and Instagram?
A. I believe so, yes.
Q. So whatever you saw would have had to have been on Facebook or Instagram?
A. Correct.
Q. Did you review any other websites about apple cider vinegar in 2016?
A. After seeing it, yes.
Q. After you saw -- what you saw on Facebook or Instagram, was that something from Bragg or was that just some person?
A. I don't recall.

Q. So in 2016, you don't recall whether you saw anything from Facebook -- you don't recall -- do you recall what you saw on Facebook or Instagram in 2016?
A. I don't recall.
Q. Okay. And then, do you recall anything about what you saw in 2016?
A. Just about being able to suppress your appetite using Bragg's.
Q. And you don't recall whether that was something from Bragg or that was something from just some random person talking about it?
A. I don't recall. It would have either been an influencer or -- I don't recall.
Q. Could it have been an influencer or it could have just been some person talking about it; correct?
A. No. You mean, like a friend?
Q. Not a friend, but just some other person on -- or it could it have been a friend.
Was it a friend?
A. No.
Q. And you have no record ever whatever this influencer said in 2016; correct?
A. No.
Q. Do you remember who the influencer was?
A. No.

Q. Do you remember the names of any influencers you've ever seen on social media regarding Bragg products?
A. No.
Q. So when the influencer talked about -- strike that.
When you saw something about Bragg's product in 2016 on Facebook or Instagram, what did you do?
A. I then looked up the product online.
Q. When you say you looked it up, what did you do to look it up?
A. I Googled it.
Q. And what sites did you go to?
A. The sites that came up on Google.
Q. Do you recall if, in 2016, you ever viewed a Bragg site on Google?
A. If it was on there, I would have gone on Bragg's site.
Q. Do you recall if you went on the Bragg site?
A. I don't recall if it was listed.
Q. So sitting here today, you don't recall what sites you went on in 2016 after you saw --
A. Correct.
Q. Do you ever have a recollection of being on Bragg's site?

A. Yes.
Q. When?
A. I don't know.
Q. Are we talking recently or are we talking back in the 2016, 2017, 2018 time period?
A. I don't recall when, but I have been on their website.
Q. Can you give me any rough timeframe between 2016 and today when you've been on Bragg's website?
A. No.
Q. How many times have you been on Bragg's website?
A. I don't recall.
Q. More than once?
A. Yes.
Q. More than twice?
A. It's possible.
Q. More than three times?
A. Maybe three. I don't really recall.
Q. You can't recall -- was it closer to 2016 or closer to today?
A. Maybe in the middle. I really don't recall.
Q. So you saw these influencers back in 2016 and you Googled apple cider vinegar?
A. Bragg's Apple Cider Vinegar.

Q. Bragg's Apple Cider Vinegar. And where did you purchase that first bottle?

A. Publix.

Q. After you purchased that, did you discuss the purchase of apple cider vinegar with anyone back in 2016?

A. I don't know if it was 2016; but at some point, I did.

Q. Okay. Well, tell me the first point you remember talking about Bragg's Apple Cider Vinegar with anyone.

A. I don't know when, but my daughter.

Q. Anyone else?

A. Well, I mean, obviously earlier this year -- Sam.

Q. Okay. Obviously your lawyers?

A. Well, yes. Sorry. Lawyers too.

Q. That much I got. Anybody else besides your daughter?

A. No.

Q. You never spoke to any of your doctors, who were treating you for any of your medical issues, about apple cider vinegar?

A. No.

Q. Did you ever speak to any of your doctors

about any of the supplements that you were taking?
A. The ones that they recommended.
Q. Other than the ones they recommended.
A. No.
Q. Do you take vitamin B12 or vitamin D?
A. Yes, occasionally.
Q. What is the occasion that gets you to take either of those products?
A. When I remember.
Q. For how long have you been taking them when you remember?
A. I don't know how long. Vitamin D was -- my doctor told me to.
Q. Is that your neurologist who told you that?
A. No. That would be the allergy doctor.
Q. Do you have a memory problem? The only reason I ask that is, you've said a number of times, "I take it when I remember."
A. I'm a human. I'm a single mother. I work full-time. Yeah, I have a lot on my mind.
Q. I'm just asking if you have any other memory problems, because you've used the phrase a lot.
A. Just like any typical human being.
Q. Okay. It's probably better than mine anyway.
From 2016 to 2022, can you remember

anything -- do you remember how many times after that first time you saw anything on Facebook or Instagram about Bragg's Apple Cider Vinegar?
A. I don't recall.
Q. Did you ever see anything on Instagram or Facebook after 2016 about Bragg's Apple Cider Vinegar?
A. I don't know if you're aware, when you search a product, it kind of pops up on your Instagram feed and Facebook feed.
Q. Does it still pop up on your feed?
A. I don't recall recently.
Q. In connection with this case, did you go back to look at your Facebook and Instagram feeds to see if there was anything about Bragg's Apple Cider Vinegar on it?
A. No.
Q. Did you go back and look on your computer to see if there were any records of websites you may have searched for Bragg's Apple Cider Vinegar?
A. No.
Q. Do you have a computer?
A. Yes.
Q. Do you have the same computer you had in 2016?
A. No.

Q. When did you change computers?
A. Well, this computer I got maybe two years ago.
Q. When you got this computer -- since the time you got this computer, have you -- by "this computer," the one you currently have -- do you recall being on any websites that talked about Bragg's Apple Cider Vinegar?
A. I don't think so. I don't recall.
Q. When is the last time you recall ever being on the Bragg website?
A. It's been a while.
Q. By a while, more than five years?
A. I don't recall.
Q. Would it be more than six years?
A. I don't recall. I don't recall more than five years, so I don't recall more than six years.
Q. Since you got your new computer, you don't recall being on the website; right?
A. Correct.
Q. That would take us back to 2021, '20 -- something like that?
A. Yes.
Q. So you don't have any recollection between 2020 and now of being on the Bragg website; right?

A. Correct.
Q. Do you have any recollection of being on the Bragg website in 2019?
A. I don't recall.
Q. Do you recall anything you ever saw -- do you recall specifically anything you ever saw on a Bragg website?
A. No.
Q. Looking again at interrogatory number 1, the last sentence, it says, "She purchased the products based on Bragg social media advertisements and conducted internet searches of the products for reviews."
When you said that, can you tell me any specific Bragg social media advertisement that induced you to purchase any Bragg product?
A. Like a specific ad?
Q. Yeah. Any --
A. I mean, I don't recall any specific ones. At the time, whenever I saw advertising -- weight loss -- like, it could help with appetite supressant -- is what got me to purchase the product.
Q. Do you know if what you saw was a Bragg social media advertisement or some other social media -- some other company's social media

advertisement?
A. I don't recall.
Q. You don't know if the advertisement you saw was actually sponsored by Bragg or not; correct?
A. I don't recall.
Q. So sitting here today, you can't tell me whether or not, whatever social media advertisement you saw regarding apple cider vinegar, it was something that was paid for or authorized by Bragg; correct?
A. Correct.
Q. When you say, "internet searches for product reviews," what kind of places did you look for product reviews? When you say, "product reviews," that's reviews by other customers?
A. Yes.
Q. I take it, if you purchased the product, the reviews you saw were positive?
A. Correct.
Q. At least, whatever other customers' reviews you saw were positive reviews of the Bragg product?
A. They must have been, yes.
Q. Because you wouldn't have purchased it if they weren't positive reviews; right?
A. Correct.

Q. Do you remember when you searched for product reviews of Bragg products?

A. It would've been before buying the product.

Q. So sometime -- so before 2016?

A. Well, in 2016.

Q. In 2016. Have you searched for product reviews after 2016?

A. For Bragg's?

Q. For Bragg.

A. No.

Q. So whatever searches you did would've been product reviews back in 2016 for Bragg products; correct?

A. Correct.

Q. And since 2016, would there have been any reason for you to go on the Bragg website to look for anything?

A. Only, like, instructions, if anything.

Q. Did you need instructions on how to take it? The instructions are on the bottle; right?

A. Sometimes they give you other ideas. Some products do.

Q. Okay. But do you have a recollection of ever going on the Bragg website to look for anything, after 2016, when you started buying the product?

A. I don't recall.
Q. Sitting here today, you don't have a specific recollection of ever being on the Bragg website after 2016. Fair?
A. I don't recall.
Q. So you don't have a recollection, sitting here today, of ever being on the Bragg website after 2016?
A. I don't recall when I went on Bragg's website.
Q. Okay. So you do have a recollection of being on the Bragg website after --
A. At some point. I'm sorry. I talked over you. I'm sorry.
Q. Again, I want to make sure our timeline is correct.
So I think you told me you had a recollection of being on the Bragg website at least once, maybe another time or two?
A. Correct.
Q. Okay. You don't remember when it was?
A. Correct.
Q. You don't remember anything you saw?
A. Correct.
Q. Okay. And you don't know -- and you don't

know when it was?
A. Correct.
Q. Where did you get the idea that apple cider vinegar helps with post-nasal drip?
A. I saw that on social media as well.
Q. Do you recall where on social media you saw that?
A. No.
Q. You never saw any Bragg advertisements about post-nasal drip; did you?
A. I don't know if it was a Bragg's advertisement or it was a social influencer, but it was on social media.
Q. Are you sure the post-nasal drip influencer wasn't a Goli post-nasal -- Goli influencer?
A. No. Sorry. I'm sure.
Q. You're sure.
By the way, tell me about you looking up -- tell me about when you switched to Goli for that one month.
A. I didn't switch. It was just another product I bought.
Q. So you used two at the same time?
A. It's possible they were at the same time. I don't recall if I was using both at the same time, but

I had them both at home at the same time.
Q. I think you told me you only purchased one thing of Goli?
A. Correct.
Q. Did you look up Goli online on social media?
A. I looked it up online after seeing it on social media.
Q. Do you recall what social media you saw it on?
A. No.
Q. The only person who would have knowledge about any of your alleged purchases of Bragg products would be your daughter?
A. No.
Q. Who else?
A. Sam and counsel.
Q. That's all based on things you said to them. But your daughter might have actually seen the product; correct?
A. Correct.
Q. Did your daughter use apple cider vinegar?
A. No, not that I'm aware of.
Q. In the years that you were taking the apple cider vinegar, did you find it suppressed your appetite?

A. No.
Q. Why did you keep taking it for six years?
A. I just kept trying it.
Q. So for six years, you took it, and you didn't think it was working, but you kept buying it?
A. I kept trying to see if it burned fat.
Q. During the six years you took it, did it burn fat?
A. No.
Q. But you kept buying it for six years?
A. Yes.
Q. In the six years that you took it, did it aid in your digestion?
A. No.
Q. So, as far as you're concerned, it didn't do anything in the six years, but you kept buying it?
A. Yes.
Q. By the way, you have a gastroenterologist.
Since you were having digestion issues, did you tell your gastroenterologist you were using apple cider vinegar to aid in digestion?
A. No.
Q. Wouldn't he have been a good person to ask?
A. I didn't think of it.
Q. He's kind of an expert in digestion; right?

A. Yes.

Q. But you didn't think to ask him how to help your digestion?

A. Well, yes, but not about stuff I buy outside of what they suggest.

Q. Don't your doctors tell you they want to know about every supplement you're taking?

A. They didn't ask.

Q. Your doctors don't ask about the supplements you're taking?

A. I didn't consider that a supplement.

Q. What did you consider it?

A. Vinegar.

Q. By the way, Bragg's Apple Cider Vinegar's price is priced basically like all the other apple cider vinegars; right?

A. I don't know. I don't know other apple cider vinegars.

Q. Okay. You don't see other apple cider vinegars at Publix?

A. I never looked for other apple cider vinegars.

Q. What do you take for an appetite supressant now?

A. I don't. Oh. Caffeine.

Q. So what do you mean you take caffeine?
A. I drink caffeine drinks. They work.
Q. Have you had a weight problem over the last six or seven years? You don't look like you have one now.
A. That's a tricky question to ask a woman.
Q. Okay. You said you were taking it to burn fat and lose weight.
Since you don't look either fat or heavy, I'm going to ask you -- were you -- did you weigh significantly more six years ago than you do today?
A. My weight fluctuates.
Q. What's your weight today?
A. Yesterday morning, I was 108.5 on my scale.
Q. You're serious. 100 -- how tall are you?
A. 5 feet.
Q. So you have a normal BMI?
A. I don't know my BMI.
Q. Since 2016, what's the most you've weighed?
A. 123.
Q. Back in 2016?
A. It's all over.
Q. It fluctuates?
A. Yes.
Q. What is the least you've weighed from 2016 to

now?
A. 102.
Q. So your weight has bounced around significantly during that six-year period or so?
A. Yes.
Q. Have you been engaged in any other diet activities to lose weight?
A. Intermittent fasting, exercising.
Q. How long have you done the intermittent fasting?
A. A couple of years, I think. A year and a half to two years. Maybe a year.
Q. Prior to that, what were you doing to lose weight?
A. Exercising.
Q. Anything else?
A. Sometimes track my macros. It just depends.
Q. Do you have any records of when you were tracking your macros?
A. When I was trying to gain. I don't think it's still on there, though.
Q. Where did you keep those records?
A. It's an app. MyFitnessPal.
Q. Now, when your friend, Sam, told you to connect up with Carly if you were taking apple cider

vinegar, was the first matter that you were involved in the Goli matter?
A. Yes.
Q. Did you have a fee agreement with Ms. Kligler?
A. What do you mean, a fee agreement?
Q. Did you have an attorney's fee agreement with her in connection with that case?
A. No.
Q. Did you have any written agreement with her in connection with that case, or her firm?
A. I mean, wouldn't these be --
Q. I'm talking about a written agreement regarding, like, who's going to pay the attorney's fees or what's going to happen in the case.
A. I don't recall what I -- I don't recall because I get confused with what the paperwork is.
Q. Do you have a written fee agreement in this case?
A. It would be the same answer. I don't know.
Q. You don't know if you have a fee agreement?
A. No, I don't -- like, I don't know what the paperwork is. I read everything, signed it, but I don't recall.
Q. Did you understand it when you read it?

A. Yes.
Q. But you don't recall if you had a fee agreement in the Goli case and you don't recall if you have a fee agreement here?
A. Correct.
Q. You don't recall if you have a fee agreement in connection with this case?
A. Yes.
Q. Did you receive money from the Goli case?
A. Yes.
Q. How much?
A. I don't recall.
MS. KLIGLER: Objection.
BY MR. BIDEAU:
Q. You don't recall?
A. I really don't recall.
MS. KLIGLER: Objection. It's a confidential settlement agreement.
MR. BIDEAU: We can mark this part confidential.
BY MR. BIDEAU:
Q. But you did receive money?
A. Yes.
Q. How much?
MS. KLIGLER: Objection. I'm going to

instruct her not to answer on the premise that it's a confidential settlement agreement.
BY MR. BIDEAU:
Q. Did the other class plaintiff receive money?
A. I don't know.
Q. Did your lawyers receive money?
A. I don't know.
Q. Did any member of the class receive money?
A. I don't know.
Q. You understand that you were in that other case as a proposed class representative?
A. Yes.
Q. Did you do anything to ensure that members -- that people who were proposed class members in the Goli case -- that their interests were taken care of?
A. What do you mean by that?
Q. Do you know what your responsibility is as a class representative?
A. No. Come and answer questions or -- to the best of my knowledge.
Q. Do you know of any other responsibilities you have as a class representative?
A. I don't know what you mean.
Q. Do you understand that you have any other

responsibilities as a proposed class representative in this case other than coming in and answering my questions?
A. I'm representing the other members of the class and I'm here to answer truthfully.
Q. What does it mean to you that you're representing other members of the class?
A. I'm confused by the question.
Q. You said -- I'm just taking your words. You said, "I'm representing other members of the class."
I'm asking you, what do you understand when you say, "I'm representing other members of the class"? What does that mean to you?
A. Basically they feel the same way as I do, that the product did not work, and I'm representing them and that I believe I'm answering the questions to the best of my knowledge of how the product did not work for me or them.
Q. How do you know that there's anybody else who thinks the product didn't work, other than your other proposed class representative? You just said, "They don't think the product worked." Who is they?
A. They wouldn't be part of a class action suit if they believe it worked.
Q. Do you think there's already other people as

part of this class action suit other than you?
A. I would think so.
Q. Have you ever met any of them?
A. No.
Q. Did you ever talk to any of them?
A. No.
Q. Have you ever asked any of them whether the product worked for them?
A. No.
Q. According to the product reviews online, the product must have worked for some people; right?
A. For some, I'm sure it might have worked. People also pay for reviews, so I don't know.
Q. Do you know if Bragg paid for reviews?
A. I don't know.
Q. Okay. You're not accusing Bragg of paying for reviews; right?
A. No.
Q. Some reviews are honest online; correct?
A. Yes.
Q. At least you told me, back in 2016, you looked at reviews and that caused you to purchase the product; right?
A. Yes.
Q. And you don't have any basis to say those

were not legitimate reviews; do you?
A. Correct.
Q. I think you told me, since then, since 2016, you haven't even looked online to look for product reviews; correct?
A. I didn't say since 2016. I said, I don't recall the last time.
Q. Since 2016, have you looked online for reviews of Bragg products?
A. I don't recall the last time.
Q. Do you recall having done it after 2016?
A. I don't recall.
MS. KLIGLER: Mark, it's 12:05. How long do you think before we break?
MR. BIDEAU: I can -- I just want to find out if lunch is here.
MS. PALACIO: The lunch is here.
MS. KLIGLER: I didn't mean to interrupt.
MR. BIDEAU: Give me a couple more minutes and we can break pretty soon.
MS. KLIGLER: Okay.
BY MR. BIDEAU:
Q. Do you recall if the amount you received in the Goli case is more than $10,000?
MS. KLIGLER: Objection. Confidential

settlement agreement. I'm going to instruct her not to answer.

BY MR. BIDEAU:

Q. Do you recall if there was anything other than your receipt of money -- do you recall if there was -- don't tell me what -- were there any other components to the Goli settlement that you're aware of besides you get money, the other plaintiff gets money, and the lawyer gets money?

A. No.

MS. KLIGLER: Objection to the question based on, assumes facts not in evidence.

BY MR. BIDEAU:

Q. Did you review the complaint that was filed on your behalf in this case before it was filed?

A. Yes.

Q. Did you make any changes or suggest any changes to it before it was filed?

A. Did I make any changes?

Q. Yeah. Did you suggest any changes to the complaint?

A. I don't recall.

Q. How many meetings have you been involved with in connection with this lawsuit with your counsel?

A. I don't know an exact number.

Q. More than two?
A. Does that include phone calls?
Q. Sure. Phone calls more than just "hi."
A. Yes.
Q. More than five?
A. Maybe.
Q. How many actual face-to-face meetings?
A. Would video be --
Q. Let's just do face-to-face right now, like we're doing right now.
A. Is that -- none.
Q. So was today the first time you actually had a face-to-face meeting with your counsel?
A. Yes.
Q. How many video meetings have you had?
A. A few.
Q. A few being two?
A. That's a couple.
Q. You're right. How about more than a couple?
A. Yes.
Q. How many more than a couple?
A. Maybe three.
Q. Other than the hour or so -- you said you had about an hour meeting in connection with this deposition by video -- have you had any other

meetings -- video meetings -- with any of your counsel that took more than a half hour?

A. Just our meetings for this.

Q. You told me about that meeting.

So putting that meeting aside, what's the length of -- you said you had a couple -- you said you had a few, not a couple -- a few other video conferences. How long have those video conferences generally been?

A. I don't recall.

Q. Have any of them been more than 15 minutes?

A. Yes.

Q. Have any of them been more than a half hour?

A. It's possible, yes.

Q. Do you remember any being more than a half hour?

A. I wasn't timing them, but I think so, yes.

Q. Do you know what the Florida Deceptive and Unfair Trade Practices Act is?

A. No.

Q. Did anyone ever discuss it with you?

A. No, not that I recall.

MS. KLIGLER: Objection. This kind of calls for attorney-client privilege.

BY MR. BIDEAU:

Q. Prior to the time -- other than when you met with Ms. Kligler, did you do anything to research her firm prior to retaining her?

A. No.

Q. You did retain her, correct, in two cases?

A. Yes. She's my lawyer.

Q. All right. We asked about fee agreements.

Do you have any written agreements in connection with anything you might receive for serving as a class representative in this case?

A. No.

Q. You don't know how much you've spent on the six to twelve or six to thirteen bottles of Bragg liquid; correct?

A. No. Whatever the price was at that time.

Q. Whatever the retail price of the liquid is --

A. Yeah.

Q. You don't know whether it's -- are you currently investigating any other supplement companies?

A. No.

Q. Do you have a blog?

A. No.

Q. You're still on Facebook and Instagram; correct?

A. Yes.
Q. Are you on any other social media?
A. TikTok.
Q. How long have you been on TikTok?
A. Since the pandemic.
Q. Ever seen anything about Bragg on TikTok?
A. I don't know.
Q. No recollection of seeing anything on Bragg?
A. Correct.
Q. Haven't taken any action based on anything you've seen on TikTok about Bragg; correct?
A. Correct.
Q. Other than that first social media post and what you did afterwards in 2016, you haven't taken any specific action based on anything seen on social media or a website regarding Bragg since 2016; correct?
A. What do you mean?
Q. You haven't changed your behavior or done anything different since -- strike that.
Have you changed -- have you done anything as a result of any -- strike that.
In 2016, you told me that you saw an influencer talk about Bragg Apple Cider Vinegar and you went online. You don't remember what website you went on; correct?

A. Well, I didn't necessarily say an influencer. I said, I don't recall.

Q. Oh, right. You saw something on Facebook and Instagram -- you don't recall what it was -- it led you to do some internet research. You saw some product reviews that were generally good back then and you saw some other things.

You don't remember what website you were on; correct?

A. Correct. I go on -- I went on different ones.

Q. You went on a bunch of different websites back in 2016.

Ultimately, then, you decided to start to buy the product; right?

A. Correct.

Q. Since that time, is there anything you saw on social media or on any websites you were on that caused you to take any specific action with respect to Bragg or Bragg products?

A. No.

MR. BIDEAU: Why don't we break for lunch now, if that works?

MS. KLIGLER: Sure.

THE VIDEOGRAPHER: Going off the video

record. The time is 12:14 p.m.
(Lunch recess.)
THE VIDEOGRAPHER: Coming back on the video record. The time is 1:07 p.m.
BY MR. BIDEAU:
Q. I hope you had a good lunch, Ms. Duran.
A. Yes.
Q. An acceptable lunch, anyway?
A. Yes.
Q. Over lunch, did you look at any documents related to this case?
A. No.
Q. We talked about the fact that your official purchase of Bragg Apple Cider Vinegar back in 2016 -- and fair to say that the only thing that caused you to buy Bragg's Apple Cider Vinegar back in 2016 were the things you saw online in 2016?
A. Yes.
Q. And those are the only things that have caused you to buy Bragg's Apple Cider Vinegar since then?
A. What do you mean?
Q. You continued buying Bragg's Apple Cider Vinegar since then; correct?
A. Until I stopped buying it, yes.

Q. Right. You told us you stopped.
And there was nothing else that you looked at or saw that caused you to continue buying; correct? You weren't out there constantly researching; were you?
A. Correct.
Q. I'm correct that you were not out there constantly researching apple cider vinegar; right?
A. Yes.
Q. So the reason you bought it all these years is because of what you saw in 2016 and then whatever your personal experience was after that?
A. I continued testing it, yes.
Q. By taking it; right?
A. Correct.
Q. When you say "testing it," did you ever measure -- after you took a dose of apple cider vinegar, did you ever measure your glucose levels?
A. No.
Q. Did you ever do a before-and-after measurement of your glucose levels after taking Bragg apple cider vinegar?
A. No.
Q. So you have no knowledge of whether your glucose levels changed after taking apple cider

vinegar?
A. No.
Q. Let me ask you the same thing with respect to lipids and cholesterol.
Did you ever check your lipid levels before you took apple cider vinegar and after to see if there was any impact or change?
A. No. Just my regular doctor visits.
Q. And every year or so, whenever you'd go to the doctor, they'd do regular lab work.
You said, "I continued testing it." By testing it, you took it?
A. Right.
Q. But you weren't measuring any of your body levels before and then after; right?
A. Correct.
Q. You don't have high cholesterol; do you?
A. No.
Q. You're not diabetic?
A. No.
Q. And you're not overweight?
A. That's depending on --
Q. Come on. Look --
A. I'm a woman.
Q. I could go off the record. You're not

overweight. Okay?
What are the account names for your Facebook and Instagram accounts?
A. My usernames?
Q. Your names, yeah.
A. Like, how to find me?
Q. Yeah.
A. That's a good question.
Q. I finally asked a good question.
A. No. I mean, I don't know. Maybe Julie Duran.
Q. Okay. You're aware, are you not, that people purchase apple cider vinegar for reasons other than to just drink it?
A. I am not aware about what other people purchase it for.
Q. Do you know that people purchase apple cider vinegar to cook? Have you seen that online or seen that on Instagram for recipes?
A. I don't recall.
Q. Do you recall ever seeing apple cider vinegar used for cocktails?
A. No.
Q. You say you used to rinse your hair with it sometimes?

A. I used it a couple times.
Q. Have you seen people sometimes utilize apple cider vinegar for hair care?
A. Yes.
Q. And have you ever done a study of why people in Florida are purchasing apple cider vinegar?
A. No.
Q. Are you aware of the existence of any studies as to why people in Florida are purchasing apple cider vinegar?
A. No.
Q. Now, your complaint seeks to recover actual damages.
Do you know what your actual damages are?
A. No.
Q. Have you ever done a calculation of any actual damages?
A. No.
Q. Have you ever seen a calculation of actual damages?
A. No.
Q. Do you know if, in your complaint, you're seeking anything besides damages?
A. No.
Q. No, you're not, or no, you don't know?

A. I don't know.
(Defendant's Exhibit 5 was marked.)
BY MR. BIDEAU:
Q. Just tell me if you've ever seen Exhibit 5.
A. I don't recall seeing it.
Q. You don't recall ever seeing Exhibit 5?
A. Yeah. I don't recall seeing it.
Q. You don't recall whether you ever saw it before it was filed?
A. Sorry. I didn't hear you.
Q. You don't recall whether you ever saw it before it was filed; right?
A. I don't recall.
Q. Okay. You can put that aside. I'm not going to ask a question on something you haven't seen before.
Do you know if apple cider vinegar has been been clinically proven to reduce the absorption of carbohydrates?
A. I don't know.
Q. You don't know if that's a true statement or a false statement?
A. Correct. I don't know.
Q. And you don't know if apple cider vinegar has been clinically proven to cause the body to burn more

fat as fuel and helps with the feeling of fullness?
A. I don't know if it's been clinically proven.
Q. You don't know if that's a true statement or a false statement?
A. Correct.
Q. And you don't know if apple cider vinegar has been clinically proven to help maintain healthy cholesterol levels?
A. Correct. I don't know if it's been clinically proven.
Q. So you don't know if that's true or false?
A. Correct.
Q. You don't know if any of the -- I may have asked you this -- you don't -- strike that.
How many influencers on social media have you seen talking about Bragg products?
A. I don't recall.
Q. You recall at least one back in 2016, you said?
A. I don't recall. I didn't say -- I said, I don't recall whether it was an ad or an influencer.
Q. It was something on Facebook, right, back in 2016?
A. I also don't recall which social media platform it was.

Q. It could have been what?
A. Facebook or Instagram.
Q. You had both in 2016?
A. Yes, I believe so.
Q. So you saw either an ad or an influencer; you don't remember which one. You don't remember which platform it was on, and you don't remember what they said, other than it caused you then to do some research online and you don't remember what website you went to?
A. Well, I know that it said something along, you know, it helping to suppress appetite and losing weight, but I don't know the exact words. And I don't recall whether it was a social influencer or an app.
Q. Okay. Then you went to, I think you said, a number of websites. You don't recall which websites you went to. But you do recall that you saw product reviews and other things that ultimately convinced you to buy it?
A. Correct.
Q. You don't know if you went to a Bragg website at that time?
A. If it was on there, I would have gone on it.
Q. But you don't have a specific recollection of having done that?

A. Correct.
Q. Of having gone on a Bragg website in 2016; right?
A. Correct.
Q. Do you have copies of any of your lab work?
A. No.
Q. You told me you never discussed with any of your doctors any of the supplements you're taking; right?
A. The ones that they recommended I take.
Q. You never discussed apple cider vinegar with any of your doctors?
A. I did not.
(Defendant's Exhibit 6 was marked.)
BY MR. BIDEAU:
Q. Exhibit 6 is the complaint.
First of all, do you recognize Exhibit 6?
A. Yes.
Q. Have you read Exhibit 6 before?
A. Yes.
Q. Did you read Exhibit 6 before it was filed?
A. Yes.
Q. Do you recall making any changes in Exhibit 6 before it was filed?
A. I don't recall.

Q. In paragraph 3 of your complaint, you talk about that "Plaintiff and thousands of consumers have been duped into buying Bragg's overpriced products for potential health benefits."

When you say "overpriced product," is Bragg's liquid apple cider vinegar priced higher than any other apple cider vinegar on the market today?

A. Again, I don't know any other apple cider vinegar.

Q. So you don't know whether it's priced higher?

A. Correct.

Q. Okay. And what do you mean by overpriced products?

A. I mean, it's an expensive product.

Q. What?

A. Compared to regular vinegar, it's expensive.

Q. But compared to other apple cider vinegar, you don't know?

A. I don't know.

Q. So when you use in your complaint "overpriced products," you're comparing it to regular vinegar?

A. Correct.

Q. Looking over at page 3 of your complaint, there are a number of footnotes. The first one has a web page, "Our story, Bragg."

Have you ever visited that web page?
A. Again, I have been to the Bragg website.
Q. Right. At least once; right?
A. A few times, yes.
Q. I think you told me you remembered one and there might be another time or two; right?
A. I recall saying a few times. Then you said, "Two times," and I said, "That's more than" --
Q. Okay. So have you -- but have you actually gone to the section on Bragg's, quote, story?
A. I don't recall.
Q. Okay. Looking over on page four, there's a footnote with a number of websites.
Do you recall going on any of those websites?
MS. KLIGLER: Just to be clear, which footnote are we talking about? Are you talking about all of them?
BY MR. BIDEAU:
Q. Let's look at footnote number 6, okay?
A. I need my reading glasses.
Q. It's on page 4, bottom of page 4.
A. I know. I'm trying to see -- I don't have my reading glasses. I don't recall number 6.
Q. You don't have any recollection of ever buying a 90-count bottle of True Energy ACV

supplement; correct?
A. I don't recall.
Q. You have no recollection of ever doing that; right?
A. I don't recall.
Q. And you have no recollection of ever buying the ACV supplement -- just a product called "ACV Supplement." Correct?
A. I don't recall.
Q. If you don't recall buying it, I guess you wouldn't recall why you bought it; right?
A. Correct.
Q. So you don't have any recollection of ever researching Bragg capsules and deciding whether or not to buy them or not buy them?
A. I don't recall.
Q. Sitting here today, you have absolutely no recollection of doing any research with respect to Bragg capsules; right?
A. Right. I don't have a recollection.
Q. Of ever doing that?
A. Correct. I don't remember.
Q. You can put that aside and we'll move on to another document.
Do you know what the active ingredients are

in Bragg's True Energy ACV supplement?
A. No.
Q. Do you know of any of the ingredients in that?
A. In which one?
Q. The True Energy ACV supplement.
A. No.
Q. And you have not been a regular purchaser of Bragg's True Energy capsules; correct?
A. Regular, no.
Q. You've not been a regular purchaser of Bragg's ACV supplements; correct?
A. Is the apple cider vinegar part of that?
Q. We're going to separate out the liquid now. Because I think you told me, with respect to the two capsules, you have no recollection of ever having purchased them; right?
A. I don't recall whether I purchased them or not. Is it possible? Yes. But I don't recall.
Q. Lots of things are possible.
Have you suffered any damages as a result of the capsule products?
A. If I was taking them, I stopped taking them, and I would have stopped taking them for a reason, but I don't recall taking them or not. So I don't know

how to answer that other than, I don't recall.
Q. Do you know why you included the capsules in your lawsuit against my client if you don't know if you've even taken them?
A. No. I don't recall.
Q. You filed the lawsuit. You're the plaintiff in the lawsuit and you sued my client, and you sued my client in connection with both the capsules, as well as the liquid. I get the liquid. We talked about the liquid. But sitting here today, you have no recollection of whether you've even taken the supplements.
So what's the basis for suing my clients over the supplements?
A. I don't recall whether or not I've taken them today.
Q. Okay. Have you ever recalled whether you've taken them or not?
A. I can't recall --
MS. KLIGLER: Objection.
A. -- today.
BY MR. BIDEAU:
Q. Well, today is my only chance to ask you questions about it. Okay? You don't have any documents that you've ever taken them -- taken the

supplements, taken the capsules -- but you've sued my clients for them -- you sued my clients for damages with respect to the capsules.

So I'm asking you, why? What's the basis?

A. I don't know. I don't recall whether I've taken it or not. It's possible that I did take it. I don't recall.

Q. Lots of things are possible. Okay?

Sitting here today, can you, under oath, tell the judge or the jury that you've taken Bragg capsules?

A. I don't recall.

Q. So sitting here today, can you swear to the jury that you've taken them?

A. No. I don't recall.

Q. Is there anything we could do to refresh your recollection?

A. No.

Q. Is there any document I can show you that might refresh your recollection?

A. No.

Q. Is there anything you can go look at when you leave here today -- because I don't want to hear six months from now that you recall taking them. So is there anything we can show you?

A. No.
Q. Okay. In truth, you never took the capsules; correct?
A. I did not say that.
Q. I understand that, but you can't tell me one way or the other?
A. Right. I don't recall.
Q. And there's nothing I can show you to refresh your recollection?
MS. KLIGLER: Objection; asked and answered.
A. (No response.)
BY MR. BIDEAU:
Q. You don't know, sitting here today, why you sued my clients in connection with the capsules; right?
A. I don't recall.
Q. Do you know how much Bragg's True Energy supplements cost?
A. No.
Q. Do you know how much they cost per pill?
A. No.
Q. Do you know if they cost more per pill than vitamins cost?
A. No.

Q. Do you know if there are vitamins in the capsules?
A. No.
Q. Did you ever buy the -- strike that.
Do you know if vitamin B3 costs more or less than Bragg's ACV supplement?
A. No.
Q. Do you know how much Bragg's ACV supplement costs?
A. No.
Q. Do you know how much the vitamins that are in the ACV products cost?
A. No.
Q. Do you know how much -- you make a statement in the complaint you filed against my client that Bragg's True Energy supplement is a 45,000 percent markup. I'm sorry. Yeah.
You make the statement in your complaint that Bragg's True Energy supplement is a 45,000 percent markup over the cost of vitamin B12.
Do you know what that's based on?
A. No.
Q. Did you ever do that calculation?
A. No.
Q. Did you ever ask whoever -- when you read

this, did you ever say, "Hey, is this true?"
A. I don't recall.
Q. Did you ever say, "Can you show me some proof before I file -- before I authorize you to file this under my name in court?"
A. I don't recall.
Q. Did you ever do anything to determine whether that allegation is true or not?
A. I don't recall.
Q. Do you think, as the proposed class representative, you should be sure that the allegations you're complaining of are true?
A. To the best of my knowledge, yes.
Q. So you agree that you would hope the allegations are true; right?
A. Yes.
Q. But you, yourself, don't know if they're true?
A. Certain things, I don't remember. I don't know.
Q. This one isn't that you don't recall, because you don't know the price of any of these products; correct?
MS. KLIGLER: Objection.
A. (No response.)

BY MR. BIDEAU:
Q. You can still answer. If you can't answer, Ms. Kligler will tell you.
A. I don't remember. I don't know the prices, no.
Q. And you don't recall -- strike that.
Sitting here today, you can't tell the jury that you ever purchased any Bragg capsules based on any representations made by Bragg; correct?
A. I don't recall whether I purchased or not.
Q. I understand that. So sitting here today, you can't tell the jury that you purchased capsules -- Bragg capsules -- based on any representations made by Bragg; right? You can't tell me that; can you?
A. I don't recall whether I purchased.
Q. When you answered the interrogatories in this case, which you did twice, the only product that you listed as purchased was the liquid; correct?
A. That's what I recall purchasing.
Q. So that's what you recall back in -- so the only Bragg product you recall purchasing back -- you answered the interrogatories on September 1st -- or you signed under penalty of perjury on September 15th of 2023.
When we asked you, under penalties of

perjury, in September of 2023 to tell us all of the Bragg products that you purchased, the only products you listed were the liquids; correct?
A. I don't recall, but I know I listed those two.
Q. Because you did recall taking the liquids; right?
A. Yes.
Q. In September of 2023, when we asked you to tell us under oath what Bragg products you took, the only things you listed were the liquid; right?
A. I don't recall, but I know I listed the liquids.
Q. You don't recall what you said or you don't recall --
A. I don't recall if those were the only ones that I listed. I do recall that I listed those.
Q. What you listed -- what you said specifically -- I'll read it to you. We talked about this earlier?
MS. KLIGLER: Mark -- I'm sorry -- can she have a copy of the document? She doesn't have it in front of her.
MR. BIDEAU: I'm sorry. I took the original.

BY MR. BIDEAU:

Q. There you go.

A. Thank you.

Q. So you said you purchased six to twelve bottles?

A. Yes.

Q. I asked you about that, and you said, "Yeah, that was the liquid." Then you said, "There was one more. That was the cayenne." So we said six to thirteen; right?

A. Yes.

Q. So those were the only things you remembered in your answers to interrogatories; right?

A. Yes.

Q. Then, when we get to the amended answers, the amended answers were the same, which were a couple months later; right?

MS. KLIGLER: Again, can you hand her that?

MR. BIDEAU: Sure. I'll be happy to.

BY MR. BIDEAU:

Q. Here are the amended responses and I'll look up the right page for you. It's the first question.

Again, you'll see that the only thing you listed was the six to twelve bottles, which is the

same six to twelve bottles we talked about this morning, which you told me this morning were the liquid. And then you said, "But you've got to add a 13th bottle because it was the cayenne." Right?

A. Yes.

Q. So that's all you remembered at the time you answered those questions; right?

A. Yes.

Q. And that's all you remember today?

A. Yes.

Q. Okay. Let's move to another topic.

Did you ever use any of the cayenne liquid here for any reason other than drinking?

A. No.

MR. BIDEAU: Let's mark this as the next exhibit.

(Defendant's Exhibit 7 was marked.)

BY MR. BIDEAU:

Q. This is a screenshot of the Bragg website.

Do you see at the bottom, there's a disclaimer? Oh, you said you didn't have your reading glasses, so it's probably unfair. I'll read it and ask you if you recall, on the times you looked at the Bragg website, whether you saw this.

"These statements have not been evaluated by

the Food and Drug Administration. Our products are not intended to diagnose, treat, cure, or prevent any disease."

A. I don't recall.

Q. You don't recall whether you saw that or read that at any time you might have looked at the Bragg website?

A. Correct.

Q. Do you have any -- have you participated in any medically assisted weight loss programs or services?

A. No.

Q. Have you used any diet, exercise, or weight loss app?

A. Yes.

Q. Do you still have that app?

A. Not active.

Q. But do you still have it on your phone or your computer?

A. No.

Q. So what app did you use?

A. The one I mentioned earlier, MyFitPal -- MyFitnessPal.

Q. When did you delete that app?

A. When I needed to make room in my phone.

Q. When?
A. I don't know. I delete different apps throughout as I'm not using them.
Q. Did you delete that in the last year?
A. No. Probably sometime last year.
Q. Sometime last year in 2022?
A. Yeah.
Q. What information was on that?
A. No. Timeout. Probably sometime this year.
Q. So in 2023?
A. Yeah.
Q. What information was on that?
A. My macros.
Q. Anything else?
A. You put in your weight and age. I think age.
Q. Do you have any documents that relate to your participation in any diet, exercise, or behavior modification program to lose weight or burn fat?
A. Just -- I don't have it anymore, but MyFitnessPal, to track my macros.
Q. Do you currently have any documents that relate to your participation in any diet, exercise, behavior modification program to lose weight or burn fat?
A. I go to CrossFit. I have to sign in every

day that I go.
Q. Do you see any doctor to treat you for your post-nasal drip?
A. Yes.
Q. Who?
A. My allergist.
Q. Is your post-nasal drip caused by allergies?
A. I don't know.
Q. Do you have records of the treatment by your allergist?
A. I don't. They do.
Q. Again, I know you said you see a gastroenterologist.
Do you have any records from your gastroenterologist?
A. No, not personally.
Q. Excuse me?
A. I don't. They do.
Q. You don't take records or get copies of your records?
A. No.
Q. In connection with this case, did you search your computer for any documents that related to Bragg?
A. No.
Q. Were you asked to search your computer for

any documents that related to Bragg?
A. I mean, I searched for receipts.
Q. I understand you searched for receipts and you didn't have any.
Did you search for any documents that were related to Bragg?
A. No.
Q. Do you know if there are any documents related to Bragg on your computer?
A. No.
Q. You don't know?
A. There shouldn't be any documents. Well, scratch that. Email --
Q. We'll take out any communications with your lawyer.
A. Okay.
Q. Do you know if there are any documents that relate to Bragg on your computer, other than may relate to your lawyer?
A. There are no documents.
Q. Did you go back and look at your search history to see if you have any records of searching for Bragg's website or for information about Bragg in your computer?
A. No.

Q. Your computer does have a search history function; correct?
A. Yes. I believe so.
Q. Did you look on your phone -- did you ever search your phone to see if you had any documents relating to Bragg?
A. No, other than the receipts.
Q. Did you ever search the search history on your phone to see whether or not it had any information about websites that you looked at that might relate to Bragg or Bragg's website?
A. No.
Q. You never looked?
A. No.
Q. How about on your Instagram account; did you look to see whether there's any likes or posts that relate to Bragg?
A. No.
Q. Did you ever look to see on your Facebook account if there are any likes or posts relating to Bragg?
A. No.
Q. Do you know if there are any likes or posts relating to Bragg on your Facebook or Instagram page?
A. No.

Q. You don't?
A. I don't.
Q. You don't know if there's anything in the search history of your phone that relates to any website or other things you may have looked at for Bragg either; right?
A. Correct.
Q. Do you have -- do you use the cloud to store information from your phone?
A. If it does it automatically. I don't know.
Q. Who is your cell phone provider?
A. Xfinity.
Q. How long have they been your cell phone provider?
A. I'm not sure.
Q. What's your cell phone number?
A. (954) 445-1080.
MR. BIDEAU: Mark this as the next number, please.
(Defendant's Exhibit 8 was marked.)
THE WITNESS: I need to use the bathroom.
MS. KLIGLER: Can we take a break for a second?
MR. BIDEAU: No problem. Absolutely.
THE VIDEOGRAPHER: Going off the video

record. The time is 1:51 p.m.
(Brief recess.)
(Defendant's Exhibit 9 was marked.)
THE VIDEOGRAPHER: Coming back on the video record. The time is 1:59 p.m.
BY MR. BIDEAU:
Q. Ms. Duran, I have in front of you Exhibit 9.
Can you confirm Exhibit 9 is just copies of the bottle that your lawyer had delivered?
A. Yes.
Q. That was the only Bragg product you had in your house as of now; correct?
A. Yes.
(Defendant's Exhibit 10 was marked.)
BY MR. BIDEAU:
Q. I've handed you Exhibit 10. Take a look. Those purport to be Plaintiff Julie Duran's responses and objections to defendant's first set of interrogatories in the Goli case.
Do you see that?
A. Yes.
Q. Take a look at the last page, page 14 -- I'm sorry -- page 15 -- page Duran 34, the last page -- and confirm that's your signature on May 4th of 2023?
A. Yes.

Q. Looking at page 5 of these documents, where it asks you to identify by caption, venue, document the various lawsuits that you were involved with, do you see that at the bottom of page 5?

A. Okay.

Q. What was Julie Duran vs. Heritage Property and Casualty Insurance Company? What was that case?

A. That was a homeowner's insurance case.

Q. Is that case still pending?

A. No.

Q. There's a case with the same name next called Julie Duran vs. Heritage. What is that case? You see there's two cases with the same name on them, but different numbers?

A. They would have both been insurance.

Q. Is that, like, a homeowner's insurance claim?

A. Yes.

Q. What is Citibank vs. Matthew King and Julie Duran?

A. Citibank?

Q. Oh, forget it. That's a 2008 case. I don't care.

All the rest of these cases look like traffic cases. Are they?

A. Traffic?

Q. State of Florida vs. Julie Duran, State of Florida vs. Julie Duran, they look like traffic cases.
A. Maybe speeding tickets.
Q. That's all I'm asking. Take a look at them and tell me, are they all traffic cases?
A. Yeah, I would assume that's what they are. Yes, I believe they're traffic cases.
Q. Okay. On page 3 of this document, you're answering a question about all facts relating to your purchase of Goli, and you indicated that you purchased the product at either Publix or Target in Palm Beach County in 2029. You don't have a receipt, and that you purchased the product to burn fat, gain energy, suppress appetite.
Do you see that?
A. Yes. 2019.
THE REPORTER: You said 2029.
BY MR. BIDEAU:
Q. I'm sorry. We didn't get there yet. 2019. You said you purchased the product based on Goli's social media advertisements and influencers like on Facebook; correct?
A. Yes.
Q. And you conducted internet searches for the product for reviews; right?

A. Yes.
Q. Do you remember the names of any of the influencers that you saw with respect to the Goli product?
A. No.
Q. In the Goli case, did you and your co-plaintiff, the other class rep, ever talk about certifying a settlement class?
A. No.
Q. Did you ever talk about doing anything to see if you could get money to any of the proposed class members from Goli?
A. No.
Q. Yesterday, you filed a new motion to compel in this case.
Did you review it before it was filed?
A. (No response.)
Q. Did you know that you filed a motion in this case yesterday?
A. I don't recall.
Q. You don't recall today whether you filed something yesterday?
A. Correct.
Q. Do you recall knowing that you were filing a motion in the case yesterday?

A. I don't recall.
MR. BIDEAU: Mark this as the next number.
(Defendant's Exhibit 11 was marked.)
BY MR. BIDEAU:
Q. Do you recognize Exhibit 11?
A. I'm looking through it.
Q. Thank you.
MS. KLIGLER: Take your time.
A. It looks familiar.
BY MR. BIDEAU:
Q. Do you recognize it?
A. I said, it looks familiar.
Q. What is it?
A. What is it called again? Is it the claim for Goli or --
Q. Is that the complaint you filed?
A. That's what I meant.
Q. Is that the complaint you filed against Goli?
A. That's what it looks like, yes.
Q. Do you know if it is or not?
A. (No response.)
Q. You were the plaintiff. You filed it.
A. I know. It looks like the complaint. I don't know the terms of these forms, but it looks like

the complaint.
Q. Did you discuss your decision to sue Bragg with anyone besides your lawyers?
A. Not a decision to sue, no.
Q. You told me you never used any other -- besides Goli, you never used any other apple cider vinegar products; correct?
A. I didn't say that.
Q. Except for the shampoo?
A. Correct.
Q. All right. Do you use any other products that contain apple cider vinegar?
A. The shampoo. The hair product, the shampoo.
Q. Other than that, any other products that you use apple cider vinegar?
A. Not that I'm aware of.
Q. And prior to your decision to sue Bragg, did you do any investigation concerning Bragg or its products or claims for the claims you were going to make?
A. Meaning, when I bought it, I researched it.
Q. I got that. You made a decision sometime earlier this year to sue Bragg.
Prior to suing Bragg, did you personally do any investigation of any of the claims that you were

going to make?
A. No.
Q. Or is this just, the complaint was presented to you and you said, "Okay. Go for it"?
MS. KLIGLER: Objection to the extent your response calls for attorney-client privilege. I would instruct you --
BY MR. BIDEAU:
Q. I don't want you to tell me anything that you guys talked about, but did you do any personal investigation before you made the decision to sue Bragg?
A. I just know the results I had from using Bragg's or the lack of results.
Q. When you say, "the lack of results," you don't know if you're -- you certainly don't have a weight problem. Correct?
A. In your opinion, correct.
Q. Well, I think, at 108 pounds, my opinion would be -- but -- okay -- you're right -- in my opinion.
And you don't know whether or not, after you took apple cider vinegar, if your glucose levels and your cholesterol levels went down; right? You never tested those?

A. Correct, but I wasn't taking it for these reasons.
Q. I understand. What reasons were you taking it?
A. It was to suppress appetite, burn fat, eventually for the post-nasal drip.
Q. Did you ever see an ad anywhere from Bragg that said Bragg's product does anything for post-nasal drip?
A. I saw something about it on social media, but I don't recall whether it was from Bragg's or an influencer.
Q. Well, before you sued Bragg then over the fact that their product didn't help your post-nasal drip, do you think it might be useful to look and see if there were any Bragg ads that dealt with post-nasal drip?
A. I did not, but I do know that it didn't help with burning fat or my weight or my appetite.
Q. When you say "burning fat," how would you know if fat got burned?
A. Because I still have fat around my belly.
Q. I know you told me you were trying to get fat in your glutes --
A. That's different. Well, not fat. Muscle.

That's different.

Q. Okay. So you expected by taking the Bragg product that -- solely by taking the Bragg product -- that any fat in your stomach would just go away?

A. I would expect it to help burn fat, so any fat that I had, along with exercise.

Q. How do you know it didn't help you burn fat? How do you know you wouldn't have had more fat if you hadn't taken it?

A. I mean, by body didn't change.

Q. The change you were looking for was how much fat was going to get burned?

A. I would notice a difference in the areas where I had fat.

Q. That's what you were looking for?

A. Yes.

Q. By the way, are you sure you saw ads from Bragg that said Bragg products were going to, quote, burn fat?

A. I saw stuff on social media. I don't recall if it was from Bragg's itself or social influence. At a point, there was -- I believe from Bragg's -- where it says it helps you lose weight.

Q. Well, we're talking about burning fat first.

A. It kind of goes hand in hand.

Q. To some people, it does; to some people, it doesn't.
A. To me, it does.
Q. To you, it does.
So did you ever talk to any professionals about whether or not the use of apple cider vinegar would help you lose weight?
A. No.
Q. By the way -- I think I asked this -- but you never reviewed any of the scientific materials that Bragg has produced in this case; right?
A. No. I don't recall.
Q. Do you recall reviewing before you filed suit -- did you review any research papers, any peer-reviewed journals to look at any testing of Bragg products before you filed suit?
A. Well, I don't recall -- like, in all the articles -- like, in different things that I looked at and websites when I was purchasing, there could have been a study or review.
Q. I'm talking about -- so before you filed suit --
A. No.
Q. -- did you do any research whatsoever into Bragg's products before you filed suit?

A. No.
Q. I'll ask you the same question about Goli.
Did you do any research -- in the Goli case, you only had one -- you only took one bottle.
Did you honestly expect one bottle to change your body?
A. I didn't finish the bottle.
Q. Right. You didn't even finish the bottle. So you sued Goli, but did you honestly expect half a bottle of Goli to change your body?
A. It was more for energy and stuff. It did not increase my energy.
Q. Okay. How would you know if your energy was increased at a particular time? Isn't that kind of a subjective standard? Like, you know, at 2:00 today, my energy is great. At 3:00, it might not be. At 4:00, it's better. How do you know when your energy goes up and down?
A. I can tell the difference when I have caffeine and my energy goes way up, or if I take a product that's supposed to give you energy and my energy goes up.
Q. So, now, instead of apple cider vinegar, what you're using for your energy is caffeine?
A. I didn't use Bragg's Apple Cider Vinegar for

energy.

Q. Right. I got that. Okay. Goli was for energy, and now you're using caffeine to give you energy?

A. Correct.

Q. Prior to the time that your personal trainer friend, Mr. Hudson, asked you if you were -- strike that.

At the point he asked you that question about whether you were taking apple cider vinegar, were you still using apple cider vinegar?

A. That one.

Q. You were still using it.

So at the time that Mr. Hudson asked you --

A. I mean, I had it in my house.

Q. Were you still taking it, though?

A. Well...

Q. That would've been in 2022.

A. In 2022, I was taking it.

Q. At the time Mr. Hudson suggested -- asked you if you were taking apple cider vinegar, and suggested you were to speak to Ms. Kligler, you were still taking apple cider vinegar; correct?

A. But I don't think he asked me in 2022.

Q. When do you think he asked you, because --

A. Was it -- this would have been -- I would've been taking this -- I don't think I was taking it when he asked me. No.
Q. Okay. Why did you stop taking the apple cider vinegar with the cayenne?
A. One, that one increased my post-nasal drip because of the cayenne, I think. Spicy food tends to increase -- and, two, it upset my stomach, so I stopped.
Q. Why did you switch from the non-cayenne to the cayenne one?
A. Cayenne is supposed to help you burn fat and lose weight.
Q. Where did you see that?
A. Social media, and then I looked it up.
Q. Where did you look it up?
A. I Googled it.
Q. Okay. You Googled it, but --
A. Different articles. I don't know.
Q. And you don't know if any of those articles were articles written by Bragg?
A. Yeah -- I don't recall.
Q. So you're not sitting here today saying that Bragg ever advertised that taking -- using -- cayenne would burn fat; right?

A. Yeah -- I don't recall.
Q. You don't recall ever seeing that Bragg said that; right?
A. Correct.
Q. And before Mr. Hudson suggested that you see Ms. Kligler, you weren't thinking about or considering suing Goli or Bragg; correct?
A. Correct.
Q. Do you know if Bragg has ever been -- strike that.
Do you know if Bragg, during the time you've been taking -- strike that.
Do you know if Bragg, during the time that you were taking apple cider vinegar, was ever investigated by any governmental agencies?
A. I don't know.
Q. Do you know if advertising and Bragg's representations are consistent with what is permitted by the Federal Trade Commission?
A. I don't know.
Q. Did you ever look at that?
A. No.
MR. BIDEAU: Let me chat with my client.
I may be close to being done.
THE VIDEOGRAPHER: Going off the video

record. The time is 2:25 p.m.

(Brief recess.)

THE VIDEOGRAPHER: Coming back on the video record. The time is 2:32 p.m.

BY MR. BIDEAU:

Q. One more question at this point. That is, you told me earlier that you thought the regular bottle of Bragg Apple Cider Vinegar was essentially 1 tablespoon per day with water. And if that's the case, then, if you bought twelve -- a total of twelve bottles -- that's basically one year's worth of apple cider vinegar; correct?

A. I didn't say that. I said I didn't know if it was 1 or 2 tablespoons --

Q. If we assume it was 1, which would mean it would go longer -- if it's 1 tablespoon, then 1 tablespoon would be essentially 1 fluid once. And these bottles are 32 ounces.

So that's basically 30 days per bottle; right?

A. Okay.

Q. Is that about right? Is that your experience, about 30 days a bottle?

A. I don't recall. If that's the math.

Q. Between 2006 and 20 -- 2016 and 2021 or '22,

when you switched to cayenne, you basically bought about one year's worth of Bragg Apple Cider Vinegar liquid; correct?

A. If that's the math.

Q. That's the math in that seven-year period. Right?

A. Okay.

Q. So you certainly weren't using it daily?

A. Correct. I said there were times I didn't use it. I would forget to use it.

Q. Not intentionally. You sort of forgot for whatever reason; right?

A. Correct.

MR. BIDEAU: So we're probably going to make a request to have her search her phone and/or a forensic search of her phone and computer for any ads.

Subject to that, I don't have any other questions.

MS. KLIGLER: I'm going to go ahead and ask my questions.

MR. BIDEAU: Go ahead.

CROSS-EXAMINATION

BY MS. KLIGLER:

Q. Ms. Duran, as you sit here today, is it

possible that you purchased the Bragg capsules between 2016 and 2022?

MR. BIDEAU: Object to the form.

A. Yes, yes, it's possible.

BY MS. KLIGLER:

Q. To the extent you did purchase them, would it have been for appetite supressant and weight loss?

MR. BIDEAU: Objection to form.

A. Yes.

BY MS. KLIGLER:

Q. At any point between 2016 and 2022, when you were taking any of the Bragg products, whether it be the liquid, the liquid cayenne, or the pill supplement, did you find them to be effective?

A. No.

MR. BIDEAU: Object to the form.

BY MS. KLIGLER:

Q. Your testimony today was that you originally learned of the Bragg product by social media, whether it be an ad or an influencer; is that correct?

A. Yes.

Q. And you said, after that, you would have gone on the internet and run a search of the product to further assess?

A. Yes.

Q. I think specifically you said you would have Googled it; is that correct?
A. Google or Yahoo search, yeah.
Q. I believe you said that, if the Bragg product -- if the Bragg website had come up as responsive to that search, that you would have accessed it; is that correct?
MR. BIDEAU: Object to the form.
A. Yes.
BY MS. KLIGLER:
Q. I know we talked a lot about what you looked at prior to initially purchasing the product, but there is a several-year window right between 2016 and 2022 where you were purchasing that product -- the Bragg product. Excuse me.
Is that correct?
A. What do you mean?
Q. If I understand your testimony today, you purchased the Bragg products, whether it be the cayenne, the liquid that isn't the cayenne, or the pill, you made those purchases at some point between 2016 and 2022. You just can't recall exactly when during that timeframe?
A. Yes.
Q. We talked about the research conducted prior

to you initially purchasing the product when you first learned of the Bragg product; is that correct?
A. Yes.
Q. At any point in that window from 2016 to 2022, when you were purchasing the product, did you conduct additional research, whether that be through internet searches or otherwise?
A. I don't recall.
Q. But you do recall at some point accessing the Bragg website during that timeframe?
MR. BIDEAU: Object to the form.
A. Yes.
BY MS. KLIGLER:
Q. You mentioned reviewing customer reviews prior to purchasing the Bragg products; is that correct?
A. Yes.
Q. You mentioned, perhaps not specific to Bragg, that customer reviews can be paid for; is that correct?
A. Yes.
Q. Would you have purchased the product -- the Bragg product specifically -- based on customer reviews alone?
MR. BIDEAU: Object to the form.

A. If they were all bad reviews, that would've affected my decision.

BY MS. KLIGLER:

Q. But since you ultimately did purchase the product, is it safe to assume that there were other research or factors that went into your purchase beyond customer reviews?

MR. BIDEAU: Object to the form.

A. Yes.

BY MS. KLIGLER:

Q. You said that your current hair product contains apple cider vinegar; is that correct?

A. Yes. One of them.

Q. Did you purchase the product because it contains apple cider vinegar?

A. No.

Q. You purchased it for some other reason, because it's a clarifying shampoo or --

A. It's a clarifying shampoo.

Q. Ms. Duran, did you review the complaint prior to our filing the complaint in this case?

A. Yes.

Q. Over the course of the case, have we had several meetings, whether it be by video or phone calls?

A. Yes.
Q. You reviewed your discovery responses, the interrogatory responses, and request for production responses prior to the filing in this case; is that correct?
A. Yes.
Q. Ms. Duran, do you have any reason to believe that the apple cider vinegar supplement pill would yield different results than that of the liquid?
MR. BIDEAU: Object to the form.
A. No.
BY MS. KLIGLER:
Q. Ms. Duran, when you accessed Bragg's website -- strike that.
Ms. Duran, when you accessed Bragg's website, do you recall seeing any representations about the products?
MR. BIDEAU: Object to the form.
A. I need clarification.
BY MS. KLIGLER:
Q. Do you remember at any point seeing on Bragg's website representations about weight loss?
MR. BIDEAU: Object to the form.
A. I believe I recall there being -- about aiding in weight loss and appetite suppressant.

BY MS. KLIGLER:

Q. Did you have any reason to believe that those representations were not true?

MR. BIDEAU: Object to the form.

A. No.

BY MS. KLIGLER:

Q. Ms. Duran, Mr. Bideau showed you the complaint in this case, which I believe is marked as Exhibit 6. He inquired about the representation in the complaint that the Bragg product was overpriced.

Do you recall?

A. Yes.

Q. Do you believe, in your personal opinion, that a product is overpriced when it does not yield the results promised?

MR. BIDEAU: Objection to the form of the question.

A. Yes.

MS. KLIGLER: I have no further questions.

REDIRECT EXAMINATION

BY MR. BIDEAU:

Q. Now I have some follow-up, as you might have imagined.

A. Okay.

Q. First, Ms. Kligler asked you if you had any reason to believe that the apple cider capsules would yield a different result than the apple cider liquid.
You're not a scientist; correct?
A. Correct.
Q. You have no idea what is in the apple cider capsules; correct?
A. Correct.
Q. You don't know if there's a different scientific formulation than the basic apple cider; right?
A. Correct.
Q. You have no idea whether there would be different results if you used the apple cider capsules than if you just took the liquid; correct?
A. Correct.
Q. You have no idea -- no basis -- to make any determination whether there would've been a different result; right?
A. Correct.
Q. And you don't even know if you took the apple cider capsules?
A. Correct.
Q. Well, you don't know. Sitting here today, you don't have any recollection of ever putting one of

those capsules in your mouth; correct?
A. Correct. I don't recall.
Q. Right. I want to be clear though. The answer to my question is -- sitting here today, do you have a recollection of putting even one Bragg capsule in your mouth?
MS. KLIGLER: Objection.
A. I don't recall.
BY MR. BIDEAU:
Q. So you have no recollection if you don't recall; right?
MS. KLIGLER: Objection.
A. Correct.
BY MR. BIDEAU:
Q. "I don't recall" is the same thing as "I have no recollection." Right?
A. Which is what I'm answering. I don't recall.
Q. So you have no recollection of ever putting one single Bragg capsule in your mouth?
MS. KLIGLER: Objection.
A. Correct.
BY MR. BIDEAU:
Q. And you don't have any memory problems; right?
MS. KLIGLER: Objection.

A. I have regular memory.
MS. KLIGLER: This is asked and answered.
BY MR. BIDEAU:
Q. Ms. Kligler asked you about the website you looked at back in 2016. At sort of the end of that, she said, "Well, if the Bragg site had been up, it would've come up."
You don't know -- can you tell me what it is you actually searched? Do you know what the search terms were that you put in?
A. I would have put "Bragg's Apple Cider Vinegar."
Q. Do you have a specific recollection of doing that?
A. I mean, that's what I was searching, so yes.
Q. Do you have a recollection of -- well, you don't even know if it was Google or Yahoo; do you?
A. No. Those are the search engines I used.
Q. Okay. So you don't know what search engines you used and you don't know exactly what search terms you put in; do you?
A. I would have put "Bragg's Apple Cider Vinegar" --
MS. KLIGLER: Objection.
A. -- because that's the product I was

searching.

BY MR. BIDEAU:

Q. I just want to be clear. You don't remember how much money you got from the Goli case three months ago, but you remember the search term you put in ten years ago?

MS. KLIGLER: Objection.

A. If I'm searching a specific product, I'll put the name of the specific product I'm searching.

BY MR. BIDEAU:

Q. So Ms. Kligler said to you, during the period of 2016 and 2003 [sic] -- she asked if you had done any additional research. Initially, you said "No." Then she said, "Well" -- let me ask you this.

I think you told me you think that you might have been on Bragg's site somewhere -- a few times -- somewhere between one and three, I think we got it down to?

MS. KLIGLER: Objection.

A. Well, I said, more than once.

BY MR. BIDEAU:

Q. More than once?

A. More than two, probably three.

Q. So probably over the course of the time, three. You don't remember when. You don't remember

what you saw. You don't remember what it said.
But if you didn't think -- Ms. Kligler asked, "Do you have any reason to think whatever representations you saw were not true?" I think you told us that the product didn't work because you didn't get rid of the fat and -- you hadn't gotten rid of the fat in 2017. I'm not trying to be pejorative, because I don't think you have any fat.
But was there any point in time between 2016 and 2022 when you said, "Well, this is just not working. The Bragg product is not working"?
A. Yeah, when I stopped taking it.
Q. So it took you all seven years to figure out that -- all seven years, when your weight actually went down -- because your weight is lower now. You told me your highest weight was what -- 128?
A. 128 when I was trying to -- I was consuming more food to build a booty, to put it in that respect, yes.
Q. So during that period -- there was a time during that period when you're actually consuming more food?
A. That was -- I wasn't taking Bragg. That was towards -- that is when I was doing -- following the macros program.

Q. Right. But you told me you were following the macro program in 2022; right?
A. It started at the end of 2022, I believe it was.
Q. But you told us you were still taking Bragg at the end of 2022.
A. Right, but's intermittent, so there were times that I wasn't taking Bragg's, because I would stop taking it or I would forget to take it, and then I would start again.
Q. Okay. And during some of the period when you were taking Bragg, you were consuming more food because you wanted to get more size to your gluteus maximus. Okay? How's that?
MS. KLIGLER: Objection.
A. Yes.
BY MR. BIDEAU:
Q. So it stands to reason that if you're actually consuming more food to try to gain weight, then anything you take to lose weight is going to be counteracted by the food; isn't it?
MS. KLIGLER: Objection.
A. That was this product.
BY MR. BIDEAU:
Q. That was this product, right.

A. Which is a cleanse.
Q. Okay. So back to my original question. You told me that, during the period of 2016 to 2023, your weight did fluctuate, but that, generally, the high was 128 and the low was what?
A. 102.
Q. 102. In 2016, what was your weight?
A. I don't recall. I do know I used to weigh myself every day and my weight was not changing.
Q. Is it possible you were at your ideal body weight?
A. No.
Q. No. Do you remember your weight in 2016? If we got your medical records, we'd know your weight in 2016; right?
A. I'm sure.
Q. And if we got your medical records, we would know if your weight went down during the period you were using the Bragg's product; correct?
A. I'm sure they would mark it down.
Q. If we wanted to see how your weight did during the period of time you were using Bragg products, all we need to do is get your medical records; right?
A. I mean, on my yearly check-ups, they do weigh

you.

Q. And you don't have a problem with us looking at those; do you?

A. There are certain things I'd rather people not see in my medical records, but...

MS. KLIGER: Objection.

BY MR. BIDEAU:

Q. Right. Okay. But that is one way we could figure out whether or not your weight went up or down during the period of time you were taking the Bragg product, right, when you said it wasn't working?

A. I mean, they mark down your weight when you go for your annual.

Q. Right. And if we looked at your medical records, we would see how your glucose levels were doing and how your cholesterol was doing too; wouldn't we?

A. Yes. I wasn't taking it for that.

Q. I understand. I understand. But that would be one way we could see that; right?

A. Correct.

Q. You have no specific recollection, sitting here today, of anything specifically you saw on the Bragg website after the first time you looked at it in 2016; correct?

A. What do you mean?
Q. You told us in 2016 -- strike that.
You're not sure if you looked at the Bragg website in 2016.
From 2018 to 2022, do you have a specific recollection of any specific time you looked at the Bragg website?
A. Not specifically the words, but I know there was something about weight management.
Q. There was something about weight management. Okay.
MR. BIDEAU: I don't have anything else. You have the right to read when we have this transcribed, which we'll have it transcribed, and I appreciate it.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: Would either party like a copy of the video?
MR. BIDEAU: Not at this point. Hang on to it.
MS. KLIGLER: We're the same.
THE VIDEOGRAPHER: This concludes the video deposition of Julie Duran. Going off the video record. The time is 2:53 p.m.
THE REPORTER: Would you like a copy of

the transcript?
MS. KLIGLER: Yes, please.
THE REPORTER: And do you want her to read?
MS. KLIGLER: Yes.
THE REPORTER: Thank you, everyone.
(The reading and signing of the transcript were not waived, and these proceedings concluded at 2:53 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF PALM BEACH

I, Lisa Gerlach, Shorthand Reporter and Notary Public, State of Florida, certify that Julie Duran personally appeared before me on the 8th of December 2023 and was duly sworn.

WITNESS my hand and official seal this 19th day of December 2023.

___________________________

Lisa Gerlach, FPR
Commission #HH41912
Expires 9/13/2024

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF PALM BEACH

I, Lisa Gerlach, Court Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; and that the transcript is a true and correct transcription of the testimony given by the witness.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 19th day of December 2023.

Lisa Gerlach, FPR

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or discretion of the certifying reporter.

Carly Kligler, Esquire
ckligler@hilgersgraben.com

December 19th, 2023

RE: Julie Duran v. Bragg Live Food Products, Julie Duran, December 8, 2023, Job #6306403

The above-referenced transcript is available for review.

The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet.

The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions:

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

RE: Julie Duran v. Bragg Live Food Products, Julie Duran, December 8, 2023, Job #6306403

E R R A T A S H E E T

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

PAGE______ LINE______ CHANGE________________________________

REASON__________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_______________________________ ________________

JULIE DURAN DATE

**1**

**1** 3:14 29:7,9 50:16,19 65:2 76:9 140:8,14 140:15,16,16,17
**1.310** 160:25
**10** 4:1 126:14,16
**10,000** 91:24
**100** 84:15
**102** 3:20 85:2 154:6,7
**106** 3:21
**108** 132:19
**108.5** 84:14
**10:01** 1:13 5:2
**10:57** 49:11
**11** 4:2 130:4,6
**119** 3:22
**11:08** 49:15
**123** 84:20
**125** 3:24
**126** 4:1
**128** 152:16,17 154:5
**129** 4:3
**12:05** 91:13
**12:14** 98:1
**13th** 119:4
**14** 63:13 126:22
**141** 3:5
**147** 3:6
**15** 94:11 126:23
**158** 3:7
**159** 3:8
**15th** 116:23
**16** 46:1
**160** 3:9
**161** 3:10
**1996** 27:17
**19th** 158:14 159:16 160:2
**1:07** 98:4
**1:51** 126:1
**1:59** 126:5
**1st** 116:22

**2**

**2** 3:15 48:19,22 48:22 49:24,25 50:1 63:25 64:6 64:7,20 65:3 140:14
**20** 14:24 28:16 55:17 75:21 140:25
**2000** 27:19
**2000s** 20:11
**2003** 25:12 26:5 151:12
**2006** 28:16 140:25
**2008** 28:18 127:21
**2013** 17:25
**2016** 52:11 53:23 54:1,3,9 54:16 57:11 62:3,15 64:13 64:19 65:22,23 67:12,17,20,25 68:2,6,9,20 69:1 69:3,6,22 70:8 70:15,22 71:5,9 71:20,23 72:6,7 73:25 74:6,24 78:4,5,6,7,12,15 78:25 79:4,8 84:19,21,25 90:21 91:3,6,8 91:11 96:14,16 96:22 97:13 98:14,16,17 99:11 104:18,23 105:3 106:2 140:25 142:2,11 143:13,22 144:4 150:5 151:12 152:9 154:3,7 154:13,15 155:25 156:2,4
**2017** 71:5 152:7
**2018** 71:5 156:5
**2019** 61:17,22 67:3,6 76:3 128:16,19
**2020** 55:9,10,11 75:25
**2021** 55:8,11,20 57:11 62:15 64:13,19 65:22 75:21 140:25
**2022** 55:20 57:12 63:3 64:15,19 65:23 73:25 121:6 137:18,19,24 142:2,11 143:14 143:22 144:5 152:10 153:2,3 153:6 156:5
**2023** 1:14 5:3 55:18 63:13 116:24 117:1,9 121:10 126:24 154:3 158:11,15 159:16 160:2,4 161:1
**2029** 128:12,17
**20oos** 22:1
**21** 55:17,21,25 62:3
**22** 55:21 56:1,2 62:3 64:13 65:22 140:25
**23** 1:2 15:16 16:4,6,25
**29** 3:14
**2:00** 136:15
**2:25** 140:1
**2:32** 140:4
**2:53** 1:13 156:24 157:9

**3**

**3** 3:17 49:13,23 50:2,7 64:6,7 107:1,23 128:8
**30** 140:19,23 160:17,25
**300** 1:12 5:15

**300e** 2:10
**3055** 158:17 159:18
**32** 63:19 140:18
**33401-6161** 2:5
**33401-6167** 2:10
**33413** 14:14
**34** 126:23
**3:00** 136:16

**4**

**4** 3:18 63:10,21 63:22,25 108:21 108:21
**445-1080** 125:17
**45,000** 114:16 114:19
**48** 3:16
**49** 3:17
**4:00** 136:17
**4th** 126:24

**5**

**5** 3:20 84:16 103:2,4,6 127:1 127:4

**6**

**6** 3:4,21 106:14 106:16,17,19,21 106:23 108:19 108:23 147:9
**60812** 1:2
**63** 3:19
**6306403** 160:4 161:1
**6604** 14:14

**7**

**7** 3:22 119:17
**743050143** 63:20
**777** 1:12 2:4,9 5:14

**8**

**8** 1:14 3:23 5:3 64:1,20 125:20 160:4 161:1
**800** 2:4
**8th** 158:10

**9**

**9** 3:25 126:3,7,8
**9/13/2024** 158:19
**90** 108:25
**954** 125:17

**a**

**a.m.** 1:13 5:2 49:11,15
**ability** 9:6
**able** 69:7
**above** 1:22 160:5
**absolutely** 109:17 125:24
**absorption** 103:18
**acceptable** 98:8
**accessed** 143:7 146:13,15
**accessing** 144:9
**account** 101:2 124:15,20
**accounts** 101:3
**accuracy** 160:8
**accurate** 9:3
**accusing** 90:16
**acid** 42:16
**acknowledged** 6:9
**act** 94:19
**action** 89:23 90:1 96:10,15 97:19 159:14,15
**actions** 11:14
**active** 20:7 27:5 109:25 120:17
**activities** 85:7
**actual** 42:10 49:6 93:7 102:12,14,17,19
**actually** 19:21 25:21 41:15 77:4 81:18 93:12 108:9 150:9 152:14,21 153:19
**acv** 3:18,25 108:25 109:7,7 110:1,6,12 114:6,8,12
**ad** 76:17 104:21 105:5 133:7 142:20
**add** 119:3
**addition** 28:6
**additional** 144:6 151:13
**address** 13:21 14:13
**administration** 17:20,22 18:2 19:4,17 22:15 23:7 24:22 120:1
**adriatic** 14:14
**ads** 133:16 134:17 141:17
**advertised** 138:24
**advertisement** 76:15,24 77:1,3 77:7 80:12
**advertisements** 76:11 80:9 128:21
**advertising** 76:20 139:17
**affected** 145:2
**age** 121:15,15
**agencies** 139:15
**ago** 51:10,13,14 51:23 52:8,8,12 75:3 84:11 151:5,6
**agree** 5:8 32:17 45:3 115:14

**agreement** 86:4 86:6,7,10,13,18 86:21 87:3,4,6 87:18 88:3 92:1
**agreements** 95:7,8
**ahead** 141:20,22
**ahs** 1:2
**aid** 82:12,21
**aiding** 146:25
**allegation** 115:8
**allegations** 115:12,15
**alleged** 81:12
**allergic** 38:21
**allergies** 38:19 42:13 122:7
**allergist** 38:18 43:12 122:6,10
**allergy** 43:1,2 73:15
**amazon** 60:24 61:2,3,5
**amended** 3:15 3:23 4:2 48:22 49:18 50:1,18 118:15,16,22
**amount** 40:21 91:23
**annual** 48:14 155:13
**answer** 8:1,15 10:22,25 31:13 32:15,21 33:6 50:16,24 59:19 86:20 88:1,20 89:5 92:2 111:1 116:2,2 149:4
**answered** 49:22 50:5 60:5 113:11 116:16 116:22 119:7 150:2
**answering** 89:2 89:16 128:9 149:17
**answers** 60:13 118:13,15,16
**anybody** 21:4 29:18 30:5,11 72:18 89:19
**anymore** 8:22 33:3 121:19
**anyway** 73:24 98:8
**app** 85:23 105:14 120:14 120:16,21,24
**appearances** 2:1
**appeared** 158:10
**appetite** 54:6,7 56:23 61:23 68:11 69:8 76:21 81:25 83:23 105:12 128:14 133:5,19 142:7 146:25
**apple** 13:25 35:1,6 50:21 51:10,15,17,19 51:24 52:1,5,10 52:15,17,20,23 52:25 53:1,8,9 53:13,19,20,24 54:4,16,21,23 55:4,13,14,16 55:22,25 56:5,8 56:13,21,25 57:5,7 61:17,25 62:4,4,12,14 63:2,17 65:16 65:24 66:6,6,9 66:12,14,16,20 66:23,24 67:11 67:15,18 68:3,6 68:10,19 71:24 71:25 72:1,5,10 72:23 74:3,6,14 74:19 75:7 77:8 80:3 81:21,23 82:20 83:14,15 83:17,19,21 85:25 96:23 98:14,16,20,23 99:8,17,22,25 100:6 101:13,17 101:21 102:2,6 102:9 103:17,24 104:6 106:11 107:6,7,8,17 110:13 131:6,12 131:15 132:23 135:6 136:23,25 137:10,11,21,23 138:4 139:14 140:8,11 141:2 145:12,15 146:8 148:2,3,6,10,14 148:21 150:11 150:22
**apply** 159:22
**appreciate** 156:15
**approximate** 17:24
**approximately** 51:3
**apps** 121:2
**arbitration** 9:23
**areas** 47:10 134:13
**articles** 135:18 138:19,20,21
**aside** 94:5 103:14 109:23
**asked** 13:25 35:1,5 37:10 50:19,22 68:5 90:7 95:7 101:9 104:14 113:10 116:25 117:9 118:7 122:25 135:9 137:7,9 137:14,20,24,25 138:3 148:1 150:2,4 151:12 152:2
**asking** 7:16 32:23 33:3,4

60:1 73:21 89:11 112:4 128:4
**asks** 127:2
**assess** 142:24
**assign** 38:5
**assisted** 120:10
**associate** 20:3,4
**assume** 18:2 128:6 140:15 145:5
**assumes** 92:12
**asthma** 43:8,9 43:11
**atlantic** 17:14 19:12
**attached** 63:11 63:16,24 160:10
**attempted** 23:24
**attend** 11:3,6
**attended** 10:17
**attorney** 94:24 132:6 159:12,14 160:13
**attorney's** 86:7 86:14
**audio** 5:6
**authorize** 115:4
**authorized** 77:9 159:7
**automatically** 125:10
**available** 160:5
**aware** 9:24 11:15 13:12 26:19,20,21 36:22 66:23 74:7 81:22 92:7 101:12,15 102:8 131:16

**b**

**b12** 73:5 114:20
**b3** 114:5
**bachelor's** 18:2 18:5,11 24:23
**back** 19:6 21:15 49:14 53:23 54:1,3,9 55:2 61:17,22 62:15 67:11 71:5,23 72:5 74:12,17 75:21 78:12 84:21 90:21 97:6,13 98:3,14 98:16 104:18,22 116:20,21 123:21 126:4 140:3 150:5 154:2
**background** 26:14,15
**bad** 59:8 145:1
**based** 31:12 32:13 76:11 81:17 92:12 96:10,15 114:21 116:8,13 128:20 144:23
**basic** 148:10
**basically** 16:12 83:15 89:14 140:11,19 141:1
**basis** 90:25 111:13 112:4 148:17
**bathroom** 125:21
**beach** 1:13 2:5 2:10 5:16 13:7,8 13:8,10,16,19 13:21 15:21,22 17:5 23:14 61:13 128:11 158:4 159:4
**began** 51:9
**beginning** 14:7 26:3 34:21
**behalf** 1:19 6:1 6:4 92:15
**behavior** 96:18 121:17,23
**believe** 7:1 11:2 12:4 68:15 89:16,24 105:4 124:3 128:7 134:22 143:4 146:7,24 147:2 147:8,13 148:2 153:3
**belly** 133:22
**belvedere** 36:16
**benefits** 107:4
**berkley** 15:19 21:22 22:3,5 24:4,9 25:2,5,13 26:1,9,11
**best** 7:20 8:7 62:25 68:1 88:21 89:17 115:13
**better** 33:22 64:17 73:24 136:17
**betty** 27:23
**beyond** 145:7
**bideau** 2:8 3:4,6 3:19 6:3,3,14,17 29:7,10 31:14 32:16,25 33:8 48:20 49:8,16 59:3,4 63:9,16 63:23 87:14,19 87:21 88:4 91:15,19,22 92:3,13 94:25 97:22 98:5 103:3 106:15 108:18 111:22 113:13 116:1 117:24 118:1,20 118:21 119:15 119:18 125:18 125:24 126:6,15 128:18 130:2,5 130:11 132:8 139:23 140:5 141:14,22 142:3 142:8,16 143:8 144:11,25 145:8

146:10,18,23 147:4,7,16,22 149:9,14,22 150:3 151:2,10 151:21 153:17 153:24 155:7 156:12,19
**bideaum** 2:11
**blog** 95:22
**bmi** 84:17,18
**boardman** 2:15 6:6
**body** 100:14 103:25 134:10 136:6,10 154:10
**booty** 152:18
**boric** 42:16
**bottle** 3:19 51:18,19 56:13 56:16,19,25 57:7 60:11 61:16,18,19,21 63:2,11,17,24 64:5,8 67:2 72:2 78:20 108:25 119:4 126:9 136:4,5,7,8,10 140:8,19,23
**bottle125** 3:25
**bottles** 51:1,22 56:24 57:2,4,11 60:7 62:12 63:1 95:13 118:5,25 119:1 140:11,18
**bottom** 108:21 119:20 127:4
**bought** 47:13,19 47:23 54:10,11 60:17,20,23 61:7 80:22 99:10 109:11 131:21 140:10 141:1
**boulevard** 1:12 61:13
**bounced** 85:3
**boyfriend** 14:18 14:20
**bragg** 1:7 2:15 3:22 5:12 6:5,19 6:22 7:17 34:2 51:10 53:5 57:20,23 58:4,6 58:7,15,20,23 58:25 59:5,18 59:20 60:2,7,20 60:21,23 61:4 61:25 62:4 63:17 64:18 65:16 68:23 69:10 70:2,16 70:19 75:11,25 76:3,6,11,15,16 76:23 77:4,9,21 78:2,9,12,16,24 79:3,7,12,18 80:9 81:12 90:14,16 91:9 95:13 96:6,8,11 96:16,23 97:20 97:20 98:14 99:21 104:16 105:21 106:2 107:25 108:2 109:14,19 112:10 116:8,9 116:13,14,21 117:2,10 119:19 119:24 120:6 122:23 123:1,6 123:9,18,23 124:6,11,17,21 124:24 125:6 126:11 131:2,17 131:18,23,24 132:12 133:7,13 133:16 134:2,3 134:18,18 135:11,15 138:21,24 139:2 139:7,9,11,13 140:8 141:2 142:1,12,19 143:4,5,15,19 144:2,10,15,18 144:23 147:10 149:5,19 150:6 152:11,23 153:5 153:12 154:22 155:10,24 156:3 156:7 160:3 161:1
**bragg's** 3:18,25 50:21 51:2,15 52:10,14 53:25 54:4,20,23 55:4 55:12,16 56:25 59:11 67:15,18 68:3,5,10 69:8 70:7,18,25 71:9 71:11,25 72:1 72:10 74:3,6,14 74:19 75:7 78:8 79:9 80:11 83:14 98:16,20 98:23 107:3,5 108:10 110:1,9 110:12 113:18 114:6,8,16,19 123:23 124:11 132:14 133:8,11 134:21,22 135:25 136:25 139:17 146:13 146:15,22 150:11,22 151:16 153:8 154:19
**brand** 36:3 53:3
**break** 8:11,13 8:16 49:9,17 91:14,20 97:22 125:22
**brief** 49:12 126:2 140:2
**briefly** 12:11
**broad** 35:17
**broker** 20:3

**brought** 8:20
**broward** 20:21
**build** 152:18
**building** 8:22
**bunch** 97:12
**burn** 56:22 82:7 84:7 103:25 121:18,23 128:13 133:5 134:5,7,19 138:12,25
**burned** 82:6 133:21 134:12
**burning** 133:19 133:20 134:24
**business** 21:5 26:11
**but's** 153:7
**buy** 21:11,13 41:20,21 47:14 47:16,17 53:1 56:13 67:2,11 83:4 97:14 98:16,20 105:19 109:15,15 114:4
**buying** 65:16,19 78:3,25 82:5,10 82:16 98:23,25 99:3 107:3 108:25 109:6,10

**c**

**caffeine** 83:25 84:1,2 136:20 136:24 137:3
**calculation** 102:16,19 114:23
**call** 30:15 33:2 45:24
**called** 10:1 33:18 47:15 109:7 127:11 130:15
**calls** 93:2,3 94:24 132:6 145:25
**capsule** 59:12 59:18,20 60:2 110:22 149:5,19
**capsules** 63:4,7 109:14,19 110:9 110:16 111:2,8 112:1,3,11 113:2,15 114:2 116:8,12,13 142:1 148:2,7 148:14,22 149:1
**caption** 127:2
**carbohydrates** 103:19
**carbs** 46:18
**care** 88:16 102:3 127:22
**carly** 2:3 5:25 12:15 14:1 31:21 35:3 63:14 85:25 160:1
**carly's** 30:10
**case** 1:2 10:1,5 10:17,20,22 11:1,7,10,13,14 11:17,24 12:6 12:10 14:8 32:9 32:12,19,24 33:5,10,15,24 34:2,5,13,16,22 34:25 74:12 86:8,11,15,19 87:3,7,9 88:12 88:16 89:2 91:24 92:15 95:10 98:11 116:17 122:22 126:19 127:7,8 127:9,11,12,21 129:6,15,19,25 135:11 136:3 140:10 145:21 145:23 146:4 147:8 151:4
**cases** 95:5 127:13,23,24 128:2,5,7
**casualty** 127:7
**cause** 1:23 62:20 103:25
**caused** 67:2,11 90:22 97:19 98:15,20 99:3 105:8 122:7
**cayenne** 52:6 55:14 56:3,6,9 56:14,20,22 57:1,8 60:12 63:3,18 118:9 119:4,12 138:5 138:7,10,11,12 138:24 141:1 142:13 143:20 143:20
**cell** 125:11,13 125:16
**certain** 47:10 62:20 115:19 155:4
**certainly** 8:20 62:12 132:16 141:8
**certificate** 3:7,8 158:1 159:1
**certification** 27:1,5 159:21
**certifications** 26:23
**certify** 158:9 159:7,11
**certifying** 129:8 159:24
**chance** 111:23
**chane** 20:19,20 20:22 21:10 22:8 25:2
**change** 75:1 100:7 134:10,11 136:5,10 161:3 161:5,7,9,11,13 161:15,17,19

**changed** 25:18 96:18,20 99:25
**changes** 92:17 92:18,19,20 106:23 160:8
**changing** 154:9
**charge** 16:15 25:23,25
**chat** 139:23
**check** 100:5 154:25
**cholesterol** 48:11 100:4,17 104:8 132:24 155:16
**chris** 2:14 5:17
**cider** 13:25 35:1 35:6 50:21 51:10,15,17,20 51:24 52:1,5,10 52:15,17,20,23 52:25 53:1,8,9 53:13,19,20,24 54:4,16,21,24 55:5,13,14,17 55:22,25 56:5,8 56:14,21,25 57:5,7 61:17,25 62:4,5,12,14 63:2,18 65:16 65:25 66:6,7,9 66:12,14,16,20 66:23,24 67:12 67:15,18 68:3,6 68:10,20 71:24 71:25 72:1,5,10 72:23 74:3,6,14 74:19 75:7 77:8 80:3 81:21,24 82:21 83:14,16 83:17,19,21 85:25 96:23 98:14,16,20,23 99:8,17,22,25 100:6 101:13,17 101:21 102:3,6 102:9 103:17,24 104:6 106:11 107:6,7,8,17 110:13 131:6,12 131:15 132:23 135:6 136:23,25 137:10,11,21,23 138:5 139:14 140:8,12 141:2 145:12,15 146:8 148:2,3,6,10,14 148:22 150:11 150:22
**circumstances** 21:9
**citibank** 127:18 127:20
**civil** 160:25,25
**ckligler** 2:5 160:1
**claim** 7:5 9:14 9:16,18 33:11 127:16 130:15
**claiming** 58:22 59:17 60:1,3
**claims** 131:19 131:19,25
**clarification** 146:19
**clarify** 10:6,21 29:17
**clarifying** 53:14 145:18,19
**class** 9:25 11:16 11:25 12:2 45:15 88:5,9,12 88:15,19,23 89:1,5,7,10,13 89:21,23 90:1 95:10 115:10 129:7,8,11
**cleanse** 3:18,25 63:19 154:1
**clear** 47:18 52:7 108:15 149:3 151:3
**client** 6:6 35:3 94:24 111:3,7,8 114:15 132:6 139:23
**clients** 111:13 112:2,2 113:15
**clinically** 103:18,25 104:2 104:7,10
**close** 139:24
**closer** 57:10 71:20,21
**clothing** 29:4
**cloud** 125:8
**coach** 45:13,14 45:15 47:20,21 47:23
**cocktails** 101:22
**code** 63:19
**colleague** 30:8,9 31:22
**collectively** 51:2
**college** 25:1 26:13 27:17
**come** 9:8 21:17 52:16 54:15 57:10,14 88:20 100:23 143:5 150:7
**comes** 44:17
**coming** 49:14 89:2 98:3 126:4 140:3
**commercial** 20:25
**commission** 139:19 158:19
**communicatio...** 123:14
**companies** 66:10,14,17 95:20
**company** 7:8 10:1 15:14,17 15:17 16:4 20:16,16,18 21:23 25:13,16

25:20 127:7
**company's** 76:25
**compared** 107:16,17
**comparing** 107:21
**compel** 129:14
**complaining** 115:12
**complaint** 3:21 4:3 33:12 34:11 92:14,21 102:12 102:22 106:16 107:1,20,23 114:15,18 130:17,19,24 131:1 132:3 145:20,21 147:8 147:10
**completed** 160:16
**completely** 54:25 55:1
**components** 92:7
**computer** 74:17 74:21,23 75:2,4 75:5,5,18 120:19 122:23 122:25 123:9,18 123:24 124:1 141:17
**computers** 75:1
**concerned** 82:15
**concerning** 131:18
**concerns** 34:24
**concluded** 157:9
**concludes** 156:22
**condition** 37:2
**conduct** 10:13 144:6
**conducted** 76:12 128:24 143:25
**conferences** 94:8,8
**confidential** 87:18,20 88:2 91:25
**confirm** 126:8 126:24
**confused** 86:17 89:8
**connect** 85:25
**connected** 159:14
**connection** 9:13 10:20 11:14 31:24 32:8,12 32:16 33:5,10 33:15,24 34:2,5 74:12 86:8,11 87:7 92:24 93:24 95:9
111:8 113:15 122:22
**consider** 35:19 44:22 46:15 83:11,12
**considered** 160:18
**considering** 139:6
**consistent** 139:18
**consistently** 47:4
**constantly** 99:4 99:8
**consumers** 107:2
**consuming** 152:17,21 153:12,19
**contact** 14:1 16:22,23 35:3
**contain** 131:12
**contained** 53:13
**contains** 53:9 145:12,15
**context** 7:2
**continue** 5:7 24:3 99:3
**continued** 19:15 98:23 99:13 100:11
**continuously** 62:18
**control** 159:23
**conversation** 14:2 31:25 34:23
**conversations** 5:5 10:12 12:5,9
**convinced** 105:18
**cook** 101:18
**copies** 106:5 122:19 126:8 160:14
**copy** 117:22 156:18,25
**corporate** 26:10
**correct** 9:11,15 23:9 51:8,9 58:12,15,20,21 58:23 60:9,10 60:15,16 61:6 61:17 63:5,8 65:18,19,21 68:8,18 69:15 69:22 70:23 75:20 76:1 77:4 77:10,11,19,25 78:13,14 79:16 79:20,22,24 80:2 81:4,19,20 87:5 90:19 91:2 91:5 95:5,14,25 96:9,11,12,16 96:25 97:9,10 97:16 98:24 99:3,6,7,15

100:16 103:23 104:5,9,12 105:20 106:1,4 107:11,22 109:1 109:8,12,22 110:9,12 113:3 115:23 116:9,18 117:3 120:8 124:2 125:7 126:12 128:22 129:23 131:7,10 132:17,18 133:1 137:5,23 139:4 139:7,8 140:12 141:3,9,13 142:20 143:2,7 143:16 144:2,16 144:20 145:12 146:5 148:4,5,7 148:8,12,15,16 148:20,23 149:1 149:2,13,21 154:19 155:21 155:25 159:9
**cost** 113:19,21 113:23,24 114:12,20
**costs** 114:5,9
**counsel** 2:2,7 5:21 11:12 12:8 29:22 34:15 81:16 92:24 93:13 94:1 159:12,14
**counseling** 19:10,14,20 22:12,21,24 24:23 27:3
**counselor** 23:4 23:5 29:23
**count** 108:25
**counter** 41:13 41:14
**counteracted** 153:21
**county** 13:9,10 13:16,20 20:21 128:12 158:4 159:4
**couple** 42:3 85:11 91:19 93:18,19,21 94:6,7 102:1 118:16
**course** 145:23 151:24
**court** 1:1 5:18 5:23 7:10 8:3 10:8,16 11:6 60:1 115:5 159:6
**courtesy** 7:25 8:8
**courtroom** 9:21
**covered** 26:13
**cranberry** 41:25 42:2
**crawford** 27:22
**crocker** 27:21 27:23,23 28:6
**cross** 3:5 141:23
**crossfit** 121:25
**cure** 120:2
**current** 19:15 145:11
**currently** 35:22 37:16,17 42:5,6 42:9 46:22 75:6 95:19 121:21
**customer** 144:14,19,23 145:7
**customers** 77:15 77:20
**cv** 1:2

**d**

**d** 73:5,12
**daily** 43:22 62:16,17,19,21 62:22 64:6 141:8
**damaged** 59:18
**damages** 102:13 102:14,17,20,23 110:21 112:2
**data** 23:17
**date** 17:24 160:11 161:24
**dated** 159:16
**dates** 51:6
**daughter** 14:18 14:20 29:1 30:13,15 72:12 72:19 81:13,18 81:21
**daughter's** 14:21
**day** 30:1 46:1 54:19 65:8,9 122:1 140:9 154:9 158:15 159:16
**days** 45:17 140:19,23 160:17
**dealing** 43:6
**deals** 37:2
**dealt** 133:16
**december** 1:14 5:3 14:9 158:11 158:15 159:16 160:2,4 161:1
**deceptive** 94:18
**decided** 65:12 97:14
**deciding** 109:14
**decision** 131:2,4 131:17,22 132:11 145:2
**declare** 161:21
**defendant** 1:8 1:19 2:7
**defendant's** 3:13 29:9 48:19 48:23 49:13 63:22 103:2 106:14 119:17 125:20 126:3,14

126:18 130:4
**defined** 50:21
**definitely** 38:12
**degree** 17:9,15 17:17,19 18:3 18:20,21 19:2,3 19:4,10 22:12 23:6 24:23
**degrees** 19:16 19:18,22,23 23:22 24:3,6,12 24:21 26:17,20 26:21
**delete** 120:24 121:2,4
**delivered** 126:9
**deliveries** 61:8 61:11
**demand** 3:21
**depending** 100:22
**depends** 13:20 16:21 85:17
**deposed** 9:11
**deposing** 160:12
**deposition** 1:17 1:22 3:14 5:11 5:14 6:18,19,24 7:3,6 11:9 29:8 29:11,13,16,19 29:24 32:17 93:25 156:23 159:8
**depositions** 10:7
**describe** 50:19
**determination** 148:18
**determine** 115:7
**diabetic** 100:19
**diagnose** 120:2
**diagnosis** 39:24
**diet** 35:11 44:9 45:1,18,19,19 46:5,7,11,15 48:8 85:6 120:13 121:17 121:22
**dietary** 46:5
**dieting** 35:8,10
**difference** 134:13 136:19
**differences** 16:14
**different** 52:17 96:19 97:10,12 121:2 127:14 133:25 134:1 135:18 138:19 146:9 148:3,9 148:14,18
**digestion** 82:13 82:19,21,25 83:3
**digestive** 54:6
**dilute** 65:2
**diluted** 65:1
**dinner** 15:11
**direct** 3:4 6:13 159:23
**directly** 21:17
**director** 15:3,6 16:1,5,9,15 25:22
**directors** 25:23
**disclaimer** 119:21
**disclosures** 3:20
**discovery** 146:2
**discretion** 159:23
**discuss** 72:4 94:21 131:2
**discussed** 106:7 106:11
**disease** 120:3
**distance** 13:14
**district** 1:1,1
**doctor** 36:6,7 37:24,25 38:1,4 38:8 41:5,15 43:11 73:13,15 100:8,10 122:2
**doctors** 36:21 37:21 38:10,13 39:4,18 40:14 48:13,14 72:21 72:25 83:6,9 106:8,12
**document** 48:25 49:21 109:24 112:19 117:22 127:2 128:8 161:22
**documents** 31:2 31:4,5,6,9,15,22 32:1,3,7,8,11,19 32:24 33:5,9,14 33:23 34:1,12 58:11,14 98:10 111:25 121:16 121:21 122:23 123:1,5,8,12,17 123:20 124:5 127:1
**doing** 18:12,25 23:3 46:2 85:13 93:10 109:3,18 109:21 129:10 150:13 152:24 155:16,16
**dosage** 65:4,5
**dose** 99:17
**dosing** 64:18
**dr** 34:7,9 36:8 36:15 37:7,7,12 38:16,17,25 39:2,8,9,19,20
**drank** 54:17 64:3
**drink** 54:20 56:5 84:2 101:14
**drinking** 54:23 55:4,12,13,16 55:21,24 56:8 66:13 119:13
**drinks** 8:13 84:2

**drip** 80:4,10,14 122:3,7 133:6,9 133:15,17 138:6
**drive** 2:4,9 5:15
**drug** 120:1
**duly** 6:10 158:11
**duped** 107:3
**duran** 1:4,17 3:3 5:11,12 6:2 6:8,16,17 25:7,8 25:10 49:17 98:6 101:11 126:7,23 127:6 127:12,19 128:1 128:2 141:25 145:20 146:7,13 146:15 147:7 156:23 158:10 160:3,4 161:1,1 161:24
**duran's** 126:17
**duties** 15:6 23:15

**e**

**e** 36:14,14,14 160:25,25 161:2 161:2,2
**earlier** 14:3 72:14 117:20 120:22 131:23 140:7
**early** 20:11 22:1
**eat** 8:22 46:7,8
**education** 19:19 23:5
**educational** 26:14
**effective** 142:14
**either** 23:21 55:7,17 68:2 69:12 73:8 84:9 105:5 125:6 128:11 156:17
**elaborate** 35:16
**electronic** 50:10
**email** 123:13 160:12
**emailed** 160:15
**employed** 15:18
**employee** 159:12,13
**employees** 16:16
**employment** 23:22 26:14
**energy** 61:23 108:25 110:1,6 110:9 113:18 114:16,19 128:13 136:11 136:12,13,16,17 136:20,21,22,24 137:1,3,4
**engaged** 85:6
**engines** 150:18 150:19
**ensure** 88:14
**entering** 23:16
**entire** 24:2
**envelopes** 23:16
**environment** 38:22,23
**errata** 3:10 160:10,12,16
**esquire** 2:3,8,8 160:1
**essentially** 140:8,17
**estate** 19:25 20:1,2,7,12,14 20:25 21:1,5,7 21:13,25 22:6
**estimate** 51:21
**estimated** 60:6
**estimates** 50:25
**evaluated** 119:25
**event** 7:12
**events** 9:7 62:20
**eventually** 133:6
**evidence** 92:12
**exact** 17:23 51:6 92:25 105:13
**exactly** 143:22 150:20
**examination** 3:2 6:13 141:23 147:21
**except** 16:12 131:9
**excuse** 14:19 17:16 122:17 143:15
**exercise** 35:8,9 35:11 44:8,25 45:2,16 46:15 48:8 120:13 121:17,22 134:6
**exercising** 85:8 85:15
**exhibit** 3:14,15 3:17,18,20,21 3:22,23,25 4:1,2 29:7,9 48:19,22 48:22 49:13,23 49:24 50:1,2,7 63:10,21,25 103:2,4,6 106:14,16,17,19 106:21,23 119:16,17 125:20 126:3,7 126:8,14,16 130:4,6 147:9
**exhibits** 3:11,13 63:22
**existence** 102:8
**expand** 10:24
**expect** 134:5 136:5,9
**expected** 134:2
**expensive** 21:11 107:14,16
**experience** 99:12 140:23

**expert** 34:4 82:25
**experts** 66:4
**expires** 158:19
**explain** 13:23
**extent** 35:4 132:5 142:6
**extra** 16:18
**eye** 42:23

**f**

**face** 93:7,7,9,9 93:13,13
**facebook** 67:21 68:2,14,17,22 69:2,3 70:8 74:2 74:6,9,13 95:24 97:3 101:2 104:22 105:2 124:19,24 128:22
**fact** 98:13 133:14
**factors** 145:6
**facts** 92:12 128:9 161:22
**fails** 160:20
**fair** 65:15 79:4 98:15
**false** 103:22 104:4,11
**familiar** 130:10 130:13
**far** 82:15
**fast** 45:23,25
**fasting** 45:21,22 46:3,13 85:8,10
**fat** 56:23 82:6,8 84:8,9 104:1 121:18,24 128:13 133:5,19 133:20,21,22,23 133:25 134:4,5 134:6,7,8,12,14 134:19,24 138:12,25 152:6 152:7,8
**fats** 46:18
**fau** 22:13,16 23:7
**february** 14:6 14:10
**federal** 59:25 139:19 160:18 160:25
**fee** 86:4,6,7,18 86:21 87:2,4,6 95:7
**feed** 74:8,9,10
**feeds** 74:13
**feel** 8:11 66:3 89:14
**feeling** 104:1
**fees** 86:15
**feet** 84:16
**female** 41:9,10
**field** 23:19 35:17
**figure** 152:13 155:9
**file** 115:4,4
**filed** 7:17 59:25 92:14,15,18 103:9,12 106:21 106:24 111:6 114:15 129:14 129:16,18,21 130:17,19,23 135:13,16,21,25
**filing** 4:2 129:24 145:21 146:4
**filtered** 64:1
**finally** 101:9
**financially** 159:15
**find** 44:14 81:24 91:15 101:6 142:14
**fine** 8:12
**finish** 8:1 56:10 56:11 136:7,8
**firm** 5:19 86:11 95:3
**first** 3:16,17,23 4:1,2 14:6 21:20 27:15,16 31:20 36:19 48:23 49:19,24 52:25 54:3 72:2,9 74:2 86:1 93:12 96:13 106:17 107:24 118:23 126:18 134:24 144:1 148:1 155:24
**five** 37:14 39:3 45:17 47:4,6,14 48:4 75:13,17 93:5
**fl** 2:5,10 160:14
**flagler** 1:12 2:4 2:9 5:15
**florida** 1:1,13 1:21 5:16 14:14 17:14 19:12 20:4,5 21:17,21 27:6 94:18 102:6,9 128:1,2 158:3,9 159:3 160:19,25
**fluctuate** 154:4
**fluctuates** 84:12 84:23
**fluid** 140:17
**follow** 147:23
**followed** 64:4 65:5
**following** 152:24 153:1
**follows** 6:11
**food** 1:7 2:15 5:13 6:5,20 120:1 138:7 152:18,22 153:12,19,21 160:3 161:1
**footnote** 108:13 108:16,19
**footnotes** 107:24

**foregoing** 159:8 159:21 161:22
**forensic** 141:16
**forget** 62:10 65:14 127:21 141:10 153:9
**forgot** 64:11 65:11 141:11
**form** 51:19 142:3,8,16 143:8 144:11,25 145:8 146:10,18 146:23 147:4,16
**forms** 130:25
**formulation** 148:10
**fort** 17:5 26:10
**four** 108:12
**fpr** 1:20 158:18 159:19
**free** 15:9,10,11
**friday** 1:13
**friend** 12:13,14 12:25 13:1 44:5 69:16,17,18,19 85:24 137:7
**front** 117:23 126:7
**fuel** 104:1
**full** 6:15 22:8 24:9,11 61:18 73:20
**fullness** 104:1
**function** 124:2
**further** 142:24 147:19 159:11
**future** 65:17,20

**g**

**g** 28:13
**gain** 47:8,9 85:20 128:13 153:19
**gastritis** 40:3,4
**gastroenterolo...** 39:21 41:4 82:18,20 122:13 122:15
**gastrointestinal** 39:22,24
**gendron** 2:14 5:17
**general** 31:19 38:1,6
**generally** 94:9 97:6 154:4
**gerlach** 1:20 5:19 158:8,18 159:6,19
**getting** 18:1 24:3
**gift** 15:12
**give** 7:13,25 8:8 8:12 9:2 10:4,7 10:10,13 15:10 15:12 36:11 49:2 71:8 78:21 91:19 136:21 137:3
**given** 7:14 159:10
**glasses** 108:20 108:23 119:22
**glucose** 99:18 99:21,25 132:23 155:15
**glutes** 47:12 133:24
**gluteus** 153:13
**go** 5:8 8:19 14:9 15:9 17:11 18:11 41:21 50:8 55:2 70:13 74:12,17 78:16 97:10 100:9,25 112:22 118:2 121:25 122:1 123:21 132:4 134:4 140:16 141:20,22 155:13
**goes** 54:7 134:25 136:18 136:20,22
**going** 5:2 6:18 7:12,15,16 18:18 31:11,20 32:14,19 48:21 49:10 63:10 65:12 78:24 84:10 86:14,15 87:25 92:1 97:25 103:14 108:14 110:14 125:25 131:19 132:1 134:12,18 139:25 141:14 141:20 153:20 156:23
**golden** 17:4
**goli** 10:1,11,14 11:4 12:10 14:8 61:16,21 67:3,8 80:15,15,19 81:3,5 86:2 87:3 87:9 88:16 91:24 92:7 126:19 128:10 129:3,6,12 130:16,19 131:6 136:2,3,9,10 137:2 139:7 151:4
**goli's** 128:20
**gonzalez** 38:16 38:17,25 39:2
**good** 5:1 8:4 82:23 97:6 98:6 101:8,9
**goods** 61:7
**google** 70:14,16 143:3 150:17
**googled** 70:12 71:24 138:17,18 143:2
**gotten** 22:25 152:6
**governmental** 139:15

**graben** 2:3 6:1
**grad** 19:9
**graduated** 27:19
**great** 136:16
**greenacres** 13:19,21 14:12 14:14 17:6
**greenberg** 1:11 2:9 5:14 6:4
**group** 15:19 21:22 22:3,5 24:4,9 25:2,5,13 26:1,9,11 39:14 39:16
**gtlaw.com** 2:11 2:11
**guess** 21:14 26:20 45:24 54:7 109:10
**gummies** 36:2 40:17 61:21
**gummy** 61:16
**guys** 33:2 132:10
**gym** 45:5 47:20 47:21,24
**gyns** 39:5

**h**

**h** 161:2
**hair** 53:2,8,12 53:20,23,25 101:24 102:3 131:13 145:11
**half** 20:24 85:12 94:2,13,15 136:9
**halfway** 50:25
**hand** 48:21 118:18 134:25 134:25 158:14
**handed** 49:17 126:16
**hang** 156:19
**happen** 7:15 86:15
**happy** 8:12 118:20
**hard** 7:24
**hca** 39:17
**headaches** 40:11
**health** 17:20,21 18:1 19:4,17 22:15 23:7 24:22 35:7,9,12 38:1,2,11 44:8 44:21,23,25 45:2 46:15 48:8 48:11 107:4
**healthcare** 22:18 23:8,11 23:18,24 65:24 66:5
**healthy** 104:7
**hear** 7:18 103:10 112:23
**heard** 34:7 37:7
**heavy** 84:9
**held** 22:5
**help** 56:22 76:21 83:2 104:7 133:14,18 134:5,7 135:7 138:12
**helping** 48:6 105:12
**helps** 80:4 104:1 134:23
**heritage** 127:6 127:12
**hesitate** 24:17 45:11
**hey** 115:1
**hh41912** 158:19
**hi** 93:3
**high** 100:17 154:4
**higher** 107:6,10
**highest** 152:16
**hilgers** 2:3 5:25
**hilgersgraben....** 2:5 160:1
**history** 123:22 124:1,8 125:4
**hold** 19:22,24 20:1 21:7 24:14 24:21 26:23
**home** 81:1
**homeowner's** 127:8,16
**honest** 90:19
**honestly** 136:5,9
**honey** 63:18
**hope** 98:6 115:14
**hour** 30:21,23 93:23,24 94:2 94:13,16
**hours** 30:25 46:1
**house** 126:12 137:15
**how's** 153:14
**hudson** 12:19 34:19,20,24 35:5 44:2 137:7 137:14,20 139:5
**huh** 28:14 37:1
**human** 73:19,23
**husband** 28:1
**husband's** 27:20

**i**

**idea** 80:3 148:6 148:13,17
**ideal** 154:10
**ideas** 78:21
**identified** 60:14 61:12
**identify** 127:2
**imagined** 147:24
**impact** 9:5,6 100:7
**inactive** 20:9

**include** 93:2
**included** 48:1 57:1 111:2
**including** 52:6
**increase** 136:12 138:8
**increased** 136:14 138:6
**independent** 12:21
**index** 3:1
**indicate** 50:24
**indicated** 128:10
**indication** 7:14
**induced** 76:15
**industry** 22:19 22:22,25 23:8 23:11,25
**infections** 41:22 41:24
**influence** 134:21
**influencer** 69:13 69:14,22,24 70:5 80:12,14 80:15 96:23 97:1 104:21 105:5,14 133:12 142:20
**influencers** 70:1 71:23 104:15 128:21 129:3
**information** 50:23 121:8,12 123:23 124:10 125:9
**ingestion** 66:25
**ingredients** 109:25 110:3
**inhaler** 43:5,7 43:13,18
**initial** 3:20
**initially** 143:12 144:1 151:13
**injection** 42:13 43:23
**inquired** 147:9
**instacart** 61:8
**instagram** 67:23 68:2,14,17,23 69:3 70:8 74:2,5 74:8,13 95:24 97:4 101:3,19 105:2 124:15,24
**instruct** 31:12 32:14,20 88:1 92:1 132:7
**instruction** 7:13
**instructions** 63:25 64:4,18 64:20,23 78:18 78:19,20
**insurance** 7:5,8 9:14 127:7,8,15 127:16
**intended** 120:2
**intention** 65:15 65:19,21
**intentionally** 141:11
**interactions** 11:12
**interested** 159:15
**interests** 88:16
**intermittent** 45:21,22 46:2 46:13 85:8,9 153:7
**intermittently** 45:23
**interned** 23:10
**internet** 76:12 77:12 97:5 128:24 142:23 144:7
**internship** 23:1 23:3,12,13
**interrogatories** 3:16,17 4:1 10:25 33:20 48:24 49:19 60:13 116:16,22 118:13 126:19
**interrogatory** 50:16,19 60:5 76:9 146:3
**interrupt** 91:18
**interviews** 10:14
**introduce** 5:21
**inventory** 16:17
**investigated** 139:15
**investigating** 95:19
**investigation** 131:18,25 132:11
**involved** 23:2 86:1 92:23 127:3
**isabella** 14:22 14:23
**island** 15:23,24
**issue** 43:6
**issues** 9:7 39:22 39:25 54:6 72:22 82:19

**j**

**january** 14:6,9
**jessica** 25:7,8,10
**job** 19:15 21:22 24:8 160:4 161:1
**jobs** 16:14 26:17 26:21
**journals** 135:15
**judge** 112:10
**julie** 1:4,17 3:3 5:11,12 6:2,8,16 101:10 126:17 127:6,12,18 128:1,2 156:23 158:9 160:3,3 161:1,1,24

**jury** 3:21 112:10,14 116:7 116:12

**k**

**k** 28:13
**keep** 46:19 82:2 85:22
**kept** 82:3,5,6,10 82:16
**kind** 23:13 29:3 31:5,6 74:8 77:13 82:25 94:23 134:25 136:14
**king** 28:10,12 28:13,15,19 127:18
**kliger** 155:6
**kligler** 2:3 3:5 5:25,25 7:14 12:22 13:22,24 31:11,21 32:13 32:22 33:6 59:2 63:11,15 86:5 87:13,17,25 91:13,18,21,25 92:11 94:23 95:2 97:24 108:15 111:20 113:10 115:24 116:3 117:21 118:18 125:22 130:9 132:5 137:22 139:6 141:20,24 142:5 142:10,17 143:10 144:13 145:3,10 146:12 146:20 147:1,6 147:19 148:1 149:7,12,20,25 150:2,4,24 151:7,11,19 152:2 153:15,22 156:21 157:2,5 160:1
**knew** 25:20,24 44:9
**know** 7:5,20 8:10,12,14 9:12 10:11 11:18,24 13:14,15 21:14 25:14,17,18,21 28:4 30:18 33:18 35:5,20 36:2,4,18,20 37:10 39:5,12 40:7,10,22 41:7 41:8,18,19 42:24 53:4 54:2 56:18 59:19,24 65:1 66:16,18 66:19,22 71:3 72:7,12 73:12 74:7 76:23 77:3 79:25 80:1,11 83:6,17,17 84:18 86:20,21 86:22 88:6,8,10 88:18,22,24 89:19 90:13,14 90:15 92:25 94:18 95:12,18 96:7 101:10,17 102:14,22,25 103:1,17,20,21 103:23,24 104:2 104:3,6,9,11,13 105:11,12,13,21 107:8,10,18,19 108:22 109:25 110:3,25 111:2 111:3 112:5 113:14,18,21,23 114:1,5,8,11,14 114:21 115:17 115:20,22 116:4 117:4,12 121:2 122:8,12 123:8 123:11,17 124:23 125:3,10 129:18 130:21 130:24,25 132:13,16,22 133:18,21,23 134:7,8 136:13 136:15,17 138:19,20 139:9 139:11,13,16,17 139:20 140:13 143:11 148:9,21 148:24 150:8,9 150:17,19,20 154:8,14,18 156:8
**knowing** 129:24
**knowledge** 81:11 88:21 89:17 99:24 115:13

**l**

**l** 43:3
**lab** 100:10 106:5
**lack** 132:14,15
**lantana** 13:16
**large** 1:21
**lauderdale** 17:5 26:10
**lawsuit** 7:17 58:22 59:25 60:2 92:24 111:3,6,7
**lawsuits** 127:3
**lawyer** 56:17 92:9 95:6 123:15,19 126:9
**lawyers** 7:7 10:11,13,14 72:16,17 88:7 131:3
**leads** 21:11,13
**learned** 142:19 144:2
**leave** 112:23
**leaving** 21:9
**led** 68:3 97:4
**left** 19:7 21:15 21:16

**legal** 5:19 160:24
**legitimate** 91:1
**length** 94:6
**letter** 3:9,18 63:10,13
**levels** 99:18,21 99:25 100:5,15 104:8 132:23,24 155:15
**license** 20:1,8,10 21:25 22:6 24:18
**licenses** 19:23 19:24 21:8 24:15
**life** 43:10,19
**likely** 62:1
**likes** 124:16,20 124:23
**linda** 2:15 6:6
**line** 161:3,5,7,9 161:11,13,15,17 161:19
**lipid** 100:5
**lipids** 48:11 100:4
**liquid** 50:21 51:17,19 54:12 58:8 60:9,14,17 61:24 63:2,3 66:12 95:14,16 107:6 110:14 111:9,9,10 116:18 117:11 118:8 119:3,12 141:3 142:13,13 143:20 146:9 148:3,15
**liquids** 117:3,6 117:13
**lisa** 1:20 5:18 158:8,18 159:6 159:19
**listed** 70:20 116:18 117:3,4 117:11,12,17,17 117:18 118:25
**little** 7:13
**live** 1:7 2:15 5:13 6:5,19 13:6 13:13,18 14:12 14:17 26:7 29:5 160:3 161:1
**lived** 17:6
**lives** 13:15
**living** 14:25 28:1 29:1
**llc** 1:7 2:15 5:13 6:5
**located** 20:20 26:9 36:15 38:2 38:25 39:9
**location** 5:13
**log** 46:19,21,23
**long** 8:10 15:13 15:25 16:24 17:6 18:24 20:22 25:10 30:17 37:12 39:2 40:4,6,8,12 40:20 42:1 43:9 46:2 53:12 54:20 73:10,12 85:9 91:13 94:8 96:4 125:13
**longer** 30:20,23 30:25 39:3 140:16
**look** 31:9,15,22 31:25 49:24 50:7,16 70:11 74:13,17 77:13 78:16,24 81:5 84:4,9 91:4 98:10 100:23 108:19 112:22 118:22 123:21 124:4,16,19 126:16,22 127:23 128:2,4 133:15 135:15 138:16 139:21
**looked** 32:8,11 32:18,24 33:23 34:1,4 61:3 70:9 70:10 81:6 83:21 90:22 91:4,8 99:2 119:23 120:6 124:10,13 125:5 135:18 138:15 143:11 150:5 155:14,24 156:3 156:6
**looking** 33:1,4,9 33:14 34:12 49:23 63:24 76:9 80:18 107:23 108:12 127:1 130:7 134:11,15 155:2
**looks** 130:10,13 130:20,24,25
**lose** 84:8 85:7 85:13 121:18,23 134:23 135:7 138:13 153:20
**losing** 105:12
**loss** 54:7 76:20 120:10,14 142:7 146:22,25
**lot** 8:21 21:14 66:16 73:20,22 143:11
**lots** 59:23 110:20 112:8
**low** 154:5
**lower** 152:15
**loxahatchee** 39:1,10
**lunch** 8:19,20 91:16,17 97:22 98:2,6,8,10

**m**

**ma'am** 15:15
**macro** 153:2
**macros** 46:16 46:17 47:3 48:2 85:17,19 121:13

121:20 152:25
**made** 50:20 116:9,13 131:22 132:11 143:21
**magnesium** 35:25 36:5 37:19 40:17,21
**maintain** 104:7
**make** 7:19 79:15 92:17,19 114:14,18 120:25 131:20 132:1 141:15 148:17
**making** 9:16,18 106:23
**management** 156:9,10
**manufactured** 66:13
**mark** 2:8 6:3,17 29:7 63:10,21 87:19 91:13 117:21 119:15 125:18 130:2 154:20 155:12
**marked** 29:9 48:19,21 49:13 63:22 103:2 106:14 119:17 125:20 126:3,14 130:4 147:8
**market** 107:7
**marketing** 15:3 15:6,25 16:5,8 16:15 25:22,23
**markup** 114:17 114:20
**marriage** 28:6
**marriages** 28:24
**married** 14:15 26:25 27:10,12 27:14,24 28:5,7 28:15,21
**marriott** 15:22 15:24
**master's** 17:20 17:21 18:1,12 18:20 19:1,3,10 19:13,17,20 22:15 23:6,21 24:3,12,22,22
**materials** 135:10
**math** 62:11 140:24 141:4,5
**matter** 5:12 34:24 86:1,2
**matters** 8:2
**matthew** 28:10 28:11 127:18
**maximus** 153:14
**mean** 12:23 15:4 18:21 20:2 21:12 22:23 29:14 34:21 35:10 41:8,14 41:20 43:25 44:23,24 45:4 45:18,22 46:17 48:14 51:12 52:5 53:11 57:13 58:16 59:7 62:16,16 68:4 69:16 72:14 76:19 84:1 86:6,12 88:17,24 89:6 89:13 91:18 96:17 98:22 101:10 107:12 107:14 123:2 134:10 137:15 140:15 143:17 150:15 154:25 155:12 156:1
**meaning** 131:21
**means** 159:22
**meant** 130:18
**measure** 99:17 99:18
**measurement** 99:21
**measuring** 100:14
**media** 5:10 67:4 67:5,6,9,13,17 67:20 68:7,9,13 70:2 76:11,15 76:24,25,25 77:7 80:5,6,13 81:5,7,8 96:2,13 96:15 97:18 104:15,24 128:21 133:10 134:20 138:15 142:19
**medical** 23:14 37:2 43:6 72:22 154:14,17,23 155:5,14
**medically** 120:10
**medication** 8:25 43:13
**medications** 42:10,18,25 43:4,16,22
**medicine** 36:23
**mediterranean** 46:11
**meet** 11:22 13:24
**meeting** 93:13 93:24 94:4,5
**meetings** 11:3 92:23 93:7,15 94:1,1,3 145:24
**member** 45:5 88:9
**members** 88:14 88:15 89:4,7,10 89:12 129:12
**memory** 9:5,5,7 73:16,21 149:23 150:1
**mentioned** 120:22 144:14 144:18

**messed** 56:12
**met** 6:17 12:15 13:22 34:9 90:3 95:1
**microphones** 5:4
**mid** 14:6
**middle** 71:22
**might've** 10:12
**migraine** 37:10
**migraines** 37:6 40:8,9 42:23
**mind** 73:20
**mine** 73:24
**minutes** 30:19 91:20 94:11
**missed** 26:17
**mix** 63:25
**modification** 121:18,23
**money** 87:9,22 88:5,7,9 92:5,8 92:8,9 129:11 151:4
**month** 47:6,14 80:20
**months** 47:4 48:4 112:24 118:17 151:4
**morning** 5:1 84:14 119:2,2
**mother** 73:19
**motion** 129:14 129:18,25
**mouth** 149:1,6 149:19
**move** 109:23 119:11
**muscle** 133:25
**mute** 5:6
**myfitnesspal** 85:23 120:23 121:20
**myfitpal** 120:22

**n**

**n** 28:13 36:14 36:14,14,14
**name** 5:17 6:15 6:17 12:18,18 14:21 27:20 33:22 36:4,18 39:6,12 41:18 42:24 43:15 53:3,10 115:5 127:11,13 151:9
**names** 41:7,8 70:1 101:2,5 129:2
**narrow** 57:17
**nasal** 80:4,10,14 80:15 122:3,7 133:6,8,14,16 138:6
**nathan** 27:21
**near** 13:13
**necessarily** 97:1
**need** 8:11 49:3 66:3 78:19 108:20 125:21 146:19 154:23
**needed** 43:20,22 120:25
**neurologist** 37:3 40:12,23 73:14
**neurology** 36:24 36:25
**never** 25:24 60:20,23 72:21 80:9 83:21 106:7,11 113:2 124:13 131:5,6 132:24 135:10
**new** 18:8,22 19:7 21:17 27:25 75:18 129:14
**night** 15:9 24:6
**nights** 15:10
**non** 138:10
**normal** 9:7 84:17
**notary** 1:20 158:9
**note** 5:3 160:9
**notice** 1:22 3:14 4:2 29:11 134:13
**noticed** 49:19
**november** 63:13
**number** 50:16 50:19 53:17 73:17 76:9 92:25 105:16 107:24 108:13 108:19,23 125:16,19 130:3
**numbers** 48:11 127:14

**o**

**o** 36:14
**oath** 3:7 6:10 7:8 112:9 117:10 158:1
**ob** 39:5,7
**object** 31:12 142:3,16 143:8 144:11,25 145:8 146:10,18,23 147:4
**objection** 31:11 32:13 59:2 87:13,17,25 91:25 92:11 94:23 111:20 113:10 115:24 132:5 142:8 147:16 149:7,12 149:20,25 150:24 151:7,19 153:15,22 155:6
**objections** 4:1 126:18
**obtain** 17:15,17 19:16 20:10
**obtained** 18:2 18:20
**obviously** 43:23 72:14,16

**occasion** 73:7
**occasionally** 73:6
**office** 13:11 36:21
**offices** 26:9
**official** 98:13 158:14
**oh** 20:4 26:25 43:5 49:5 83:25 97:3 119:21 127:21
**okay** 6:20,23 7:2,22 8:8,9,18 13:5,18 15:8 19:5 21:15 23:6 26:22 35:12 36:1,11 39:4,22 42:1,25 43:21 46:13 47:13 50:7 51:21 52:15 54:1,14 54:14,20 57:20 59:23 60:5 63:13 65:5,10 69:5 72:9,16 73:24 78:23 79:11,21,25 83:19 84:7 90:16 91:21 101:1,12 103:14 105:15 107:12 108:9,12,19 111:17,24 112:8 113:2 119:11 123:16 127:5 128:8 132:4,20 134:2 136:13 137:2 138:4,18 140:21 141:7 147:25 150:19 153:11,14 154:2 155:8 156:11
**okeechobee** 61:13
**old** 14:23
**once** 25:24 38:12 53:15 65:8 71:14 79:18 108:3 140:17 151:20 151:22
**ones** 58:10 73:2 73:3 76:19 97:11 106:10 117:16
**online** 44:14 60:20,23 70:9 81:5,6 90:10,19 91:4,8 96:24 98:17 101:18 105:9
**onsite** 16:21
**opc** 16:10,11,17 16:19,19,20,24 18:16,17,22 19:8
**opinion** 132:18 132:19,21 147:13
**ordering** 160:15
**organic** 63:17
**original** 50:8 117:25 154:2
**originally** 54:10 142:18
**ounces** 63:19 64:1,21 140:18
**outside** 48:17 83:4
**overpriced** 107:3,5,12,20 147:10,14
**overweight** 100:21 101:1
**own** 10:12 11:12

**p**

**p.m.** 1:13 98:1,4 126:1,5 140:1,4 156:24 157:9
**pa** 1:11 2:9 5:14
**page** 3:2,22 49:2 49:3,4,5,7,20 50:8,9 107:23 107:25 108:1,12 108:21,21 118:23 124:24 126:22,22,23,23 126:23 127:1,4 128:8 161:3,5,7 161:9,11,13,15 161:17,19
**paid** 22:23,25 47:6 77:9 90:14 144:19
**palacio** 2:8 6:4 91:17
**palaciov** 2:11
**palm** 1:13 2:5 2:10 5:15 13:7,8 13:8,10,16,19 13:20 15:21,22 23:14 61:13 128:11 158:4 159:4
**pandemic** 20:15 61:10 96:5
**papers** 135:14
**paperwork** 86:17,23
**paragraph** 107:1
**part** 22:9 23:5 27:3 31:9 36:17 36:19 39:17 45:2 48:7 87:19 89:23 90:1 110:13
**participated** 120:9
**participation** 121:17,22
**particular** 36:3 136:14
**parties** 5:8 159:12,13 160:15
**party** 156:17

**path** 40:16
**paul** 37:7
**pay** 61:11 86:14 90:13
**paying** 90:16
**payroll** 16:16
**peer** 135:15
**pejorative** 152:7
**penalties** 116:25 161:21
**penalty** 50:14 116:23
**pending** 8:16 127:9
**people** 8:5 15:7 21:14 88:15 89:25 90:11,13 101:12,15,17 102:2,5,9 135:1 135:1 155:4
**percent** 114:16 114:19
**period** 24:2 57:11 62:2,9,12 64:13,14 65:11 66:5 71:5 85:4 141:5 151:11 152:20,21 153:11 154:3,18 154:22 155:10
**periods** 64:10 65:10
**perjury** 50:14 116:23 117:1 161:21
**perla** 39:19,20
**permitted** 139:18
**person** 9:16 30:3 47:16,16 47:17 68:24 69:11,15,17 81:11 82:23
**personal** 12:17 12:20,24 13:3 44:10 99:12 132:10 137:6 147:13
**personally** 11:19 122:16 131:24 158:10
**phone** 30:3 31:25 93:2,3 120:18,25 124:4 124:5,9 125:4,9 125:11,13,16 141:15,16 145:24
**phones** 5:6
**photo** 3:25
**phrase** 73:22
**physicals** 48:15
**pick** 5:4
**picked** 21:22
**pill** 113:21,23 142:13 143:21 146:8
**pills** 41:25 42:2 43:1,2
**place** 5:7 10:17
**places** 8:21 16:22 77:13
**plaintiff** 1:5 2:2 6:1 11:16 50:25 88:5 92:8 107:2 111:6 126:17 129:7 130:23
**plaintiff's** 3:11 3:15,17,20,23 4:1 48:22 49:18
**platform** 104:25 105:7
**play** 10:19
**plc** 6:1
**please** 5:3,5,21 5:23 6:15 7:20 125:19 157:2 160:11
**pllc** 2:3
**plumbing** 28:20 28:22
**point** 8:14 19:9 22:11 25:22 55:15 72:8,9 79:13 134:22 137:9 140:6 142:11 143:21 144:4,9 146:21 152:9 156:19
**pool** 28:20,22
**pop** 74:10
**pops** 74:8
**position** 25:15
**positive** 77:18 77:21,24
**possibility** 59:14,16,21
**possible** 59:23 71:17 80:24 94:14 110:19,20 112:6,8 142:1,4 154:10
**post** 80:4,10,14 80:15 96:13 122:3,7 133:6,8 133:14,16 138:6
**posts** 124:16,20 124:23
**potential** 107:4
**pounds** 132:19
**poured** 53:25
**practice** 36:17 36:18,19,23 38:6
**practices** 94:19
**pregnant** 25:12
**premier** 38:1,2 38:10
**premise** 88:1
**premises** 16:22 16:22
**preparation** 31:10 32:17
**prepare** 29:12 29:15 31:16
**prepared** 34:5
**prescribed** 40:24

**prescription** 43:3
**prescriptions** 8:24
**present** 2:13 30:5,11,13
**presentation** 15:9
**presentations** 15:7
**presented** 132:3
**pretty** 23:16 38:24 91:20
**prevent** 120:2
**price** 83:15 95:15,16 115:22
**priced** 83:15 107:6,10
**prices** 116:4
**prior** 12:2 18:1 39:7 85:13 95:1 95:3 131:17,24 137:6 143:12,25 144:15 145:20 146:4
**private** 5:5
**privilege** 94:24 132:7
**proair** 43:14
**probably** 26:5 30:22 35:7 39:3 42:3 47:4 73:24 119:22 121:5,9 141:14 151:23 151:24
**probiotics** 41:2
**problem** 73:16 84:3 125:24 132:17 155:2
**problems** 9:6 73:22 149:23
**procedure** 160:25,25
**proceeding** 9:23
**proceedings** 10:16 11:6 157:9
**produced** 34:2 135:11
**product** 12:1 31:12 32:14,18 32:20 47:15 52:20 53:2,5,8 53:10,12,20,23 55:25 56:20 63:19 64:19 70:7,9 74:8 76:16,22 77:12 77:13,14,17,21 78:1,3,6,12,25 80:21 81:19 89:15,17,20,22 90:8,10,11,23 91:4 97:6,15 105:17 107:5,14 109:7 116:17,21 126:11 128:11 128:13,20,25 129:4 131:13 133:8,14 134:3 134:3 136:21 142:19,23 143:5 143:12,14,15 144:1,2,5,22,23 145:5,11,14 147:10,14 150:25 151:8,9 152:5,11 153:23 153:25 154:19 155:11
**production** 3:24 146:3
**products** 1:7 2:15 5:13 6:5,20 50:20,22 51:2 57:21 58:6,8,9 59:12,18,20 60:2,7,9,14,17 60:20,23 61:4 65:16 66:25 70:3 73:8 76:10 76:12 78:2,12 78:22 81:12 91:9 97:20 104:16 107:3,13 107:21 110:22 114:12 115:22 117:2,2,10 120:1 131:7,11 131:14,19 134:18 135:16 135:25 142:12 143:19 144:15 146:17 154:23 160:3 161:1
**professionals** 135:5
**program** 18:12 23:5 47:19,22 47:23 48:1 121:18,23 152:25 153:2
**programs** 120:10
**promised** 147:15
**proof** 115:3
**properties** 17:3
**property** 16:21 17:1 127:6
**proposed** 9:25 88:12,15 89:1 89:21 115:10 129:11
**protein** 46:18
**proven** 103:18 103:25 104:2,7 104:10
**provider** 125:11 125:14
**providers** 65:24 66:5
**public** 1:20 25:13 158:9
**publix** 60:18 61:7 72:3 83:20 128:11
**publixes** 61:12 61:14

**purchase** 18:6 50:20 51:7 61:21 68:3 72:2 72:5 76:16,22 90:22 98:14 101:13,16,17 128:10 142:6 145:4,6,14
**purchased** 51:1 51:17,21 54:3 60:6 61:4,19 63:1,7 68:5 72:4 76:10 77:17,23 81:2 110:17,18 116:8,10,12,15 116:18 117:2 118:4 128:10,13 128:20 142:1 143:19 144:22 145:17
**purchaser** 110:8 110:11
**purchases** 50:23 81:12 143:21
**purchasing** 51:9 51:15 63:4 102:6,9 116:19 116:21 135:19 143:12,14 144:1 144:5,15
**purport** 126:17
**purposes** 66:13
**pursuant** 1:21
**put** 63:12 103:14 109:23 121:15 150:10 150:11,21,22 151:5,8 152:18
**putting** 94:5 148:25 149:5,18

**q**

**quantity** 36:1
**quarter** 14:6
**question** 8:1,16 32:23 55:2 59:8 64:16,17 84:6 89:8 92:11 101:8,9 103:15 118:23 128:9 136:2 137:9 140:6 147:17 149:4 154:2
**questioned** 7:7 9:13
**questions** 7:17 7:18 10:22 33:19,22 34:11 49:22 50:4 88:20 89:3,16 111:24 119:7 141:19,21 147:20
**quote** 108:10 134:18

**r**

**r** 161:2,2
**random** 69:11
**rather** 155:4
**raw** 63:17
**read** 56:22 86:23,25 106:19 106:21 114:25 117:19 119:22 120:5 156:13 157:4 160:7 161:22
**reading** 108:20 108:23 119:21 157:7
**real** 19:25 20:1 20:2,7,12,14,25 21:1,4,7,13,25 22:6
**really** 8:2,5 35:17 45:12 71:19,22 87:16
**realty** 20:19,20 20:22 21:10 22:8 25:3
**reason** 9:2 73:17 78:16 99:10 110:24 119:13 141:12 145:17 146:7 147:2 148:2 152:3 153:18 160:9 161:4,6,8 161:10,12,14,16 161:18,20
**reasonable** 160:18
**reasons** 62:21 101:13 133:2,3
**recall** 10:2,6 14:5,10,11 16:2 17:23 32:4,5,6 33:4,9,14 34:8 34:12 37:13 40:5 54:22 56:10 57:16,17 57:22,25 58:5,6 58:8,10,24 59:13,15,21 60:3 62:8 64:23 64:25 65:2,3 67:10,19 68:25 69:1,2,3,4,5,9 69:12,13 70:15 70:19,20,21 71:6,13,19,20 71:22 74:4,11 75:6,9,10,14,16 75:16,17,19 76:4,5,6,19 77:2 77:5 79:1,5,9 80:6,25 81:8 86:16,16,24 87:2,3,6,12,15 87:16 91:7,10 91:11,12,23 92:4,5,22 94:10 94:22 97:2,4 101:20,21 103:5 103:6,7,8,11,13 104:17,18,20,21 104:24 105:14 105:16,17 106:23,25 108:7

108:11,14,23 109:2,5,9,10,11 109:16 110:18 110:19,25 111:1 111:5,15,19 112:5,7,12,15 112:24 113:7,17 115:2,6,9,21 116:6,10,15,19 116:20,21 117:4 117:6,12,14,15 117:16,17 119:23 120:4,5 129:20,21,24 130:1 133:11 134:20 135:12 135:13,17 138:22 139:1,2 140:24 143:22 144:8,9 146:16 146:24 147:11 149:2,8,11,15 149:17 154:8
**recalled** 111:17
**receipt** 92:5 128:12 160:17
**receipts** 58:16 58:17,18 123:2 123:3 124:7
**receive** 87:9,22 88:5,7,9 95:9
**received** 91:23
**recently** 25:17 53:15,22 71:4 74:11
**recess** 49:12 98:2 126:2 140:2
**recipes** 101:19
**recognize** 48:25 49:21 50:4 106:17 130:6,12
**recollection** 58:3,19 63:4 68:1 70:24 75:24 76:2 78:23 79:3,6,11 79:17 96:8 105:24 108:24 109:3,6,13,18 109:20 110:16 111:11 112:17 112:20 113:9 148:25 149:5,10 149:16,18 150:13,16 155:22 156:6
**recommended** 73:2,3 106:10
**record** 5:2,9 8:3 49:11,15 61:5 63:6,9,12 69:21 98:1,4 100:25 126:1,5 140:1,4 156:24
**recorded** 5:11 8:2
**recording** 5:7
**records** 60:25 61:1,3 74:18
85:18,22 122:9 122:14,19,20 123:22 154:14 154:17,24 155:5 155:15
**recover** 102:12
**redirect** 3:6 147:21
**reduce** 103:18
**refer** 6:22
**referenced** 160:5
**refresh** 112:16 112:20 113:8
**regard** 160:19
**regarding** 70:2 77:8 86:14 96:16
**regimen** 46:15
**registered** 20:23
**regular** 38:8 52:5 55:2,5,12 55:16,22 56:21 57:5 62:3 64:18 100:8,10 107:16 107:21 110:8,10 110:11 140:7 150:1
**regularly** 45:7 48:12
**relate** 22:2 34:13 121:16,22 123:18,19 124:11,17
**related** 48:11 98:11 122:23 123:1,6,9
**relates** 125:4
**relating** 124:6 124:20,24 128:9
**relation** 32:24
**relative** 159:11 159:13
**remember** 9:6 14:4 33:1 44:1 51:6 53:10 58:2 62:23,24 69:24 70:1 72:10 73:9 73:11,18,25 74:1 78:1 79:21 79:23 94:15 96:24 97:8 105:6,6,7,9 109:22 115:19 116:4 119:9 129:2 146:21 151:3,5,25,25 152:1 154:13
**remembered** 108:5 118:12 119:6
**rep** 11:25 129:7
**rephrase** 7:21
**replace** 12:2
**report** 159:8
**reporter** 3:8 5:18,23 7:10 8:4 10:8 128:17 156:25 157:3,6

158:8 159:1,6 159:24
**reports** 34:4
**represent** 5:22 6:19 10:14
**representation** 147:9
**representations** 116:9,13 139:18 146:16,22 147:3 152:4
**representative** 9:25 12:3 88:12 88:19,23 89:1 89:21 95:10 115:11
**representatives** 11:4
**representing** 10:11 89:4,7,10 89:12,15
**reproduction** 159:22
**request** 141:15 146:3
**requests** 3:23
**research** 95:2 97:5 105:9 109:18 135:14 135:24 136:3 143:25 144:6 145:6 151:13
**researched** 131:21
**researching** 99:4,8 109:14
**residential** 20:25 21:2
**resort** 15:1,2,20 15:21 17:5
**respect** 97:19 100:3 109:18 110:15 112:3 129:3 152:18
**response** 24:7 49:18,18 50:1 58:13 113:12 115:25 129:17 130:22 132:6
**responses** 3:15 3:17,23 4:1 48:23 118:22 126:17 146:2,3 146:4
**responsibilities** 16:13 23:15 88:22 89:1
**responsibility** 88:18
**responsive** 143:6
**rest** 127:23
**result** 96:21 110:21 148:3,19
**results** 132:13 132:14,15 146:9 147:15 148:14
**retail** 95:16
**retain** 95:5
**retained** 3:19
**retaining** 95:3
**retired** 39:10
**returned** 160:17
**review** 3:9 31:2 31:4 68:19 92:14 129:16 135:14,20 145:20 160:6
**reviewed** 135:10,15 146:2
**reviewing** 135:13 144:14
**reviews** 76:13 77:13,14,14,15 77:18,20,21,24 78:2,7,12 90:10 90:13,14,17,19 90:22 91:1,5,9 97:6 105:18 128:25 144:14 144:19,24 145:1 145:7
**riboflavin** 40:19 40:20
**rid** 152:6,6
**right** 6:22 8:17 11:10 18:11 27:10 44:3,20 47:17,19 52:14 55:18 59:1,8 75:19,25 77:24 78:20 82:25 83:16 90:11,17 90:23 93:9,10 93:19 95:7 97:3 97:15 99:1,8,14 100:13,15 103:12 104:22 106:3,9 108:3,3 108:6 109:4,11 109:19,20 110:17 113:7,16 115:15 116:14 117:7,11 118:10 118:13,17,23 119:4,7 125:6 128:25 131:11 132:20,24 135:11 136:8 137:2 138:25 139:3 140:20,22 141:6,12 143:13 148:11,19 149:3 149:11,16,24 153:1,2,7,25 154:15,24 155:8 155:11,14,20 156:13
**rinse** 101:24
**role** 10:19 16:3
**room** 10:7 120:25
**rough** 71:8
**roughly** 52:14 57:1
**routine** 48:8
**royal** 61:13

**rule** 160:25,25
**rules** 160:18
**run** 142:23
**ryan** 34:7,9

**s**

**s** 36:14,14 161:2
**safe** 145:5
**salary** 16:16
**sam** 12:13,14,16 13:25 34:19,20 72:15 81:16 85:24
**saw** 32:6 67:4,5 67:13,14 68:6 68:16,22,22 69:1,3,6 70:7,22 71:23 74:2 76:5 76:6,20,23 77:3 77:8,18,21 79:23 80:5,6,9 81:8 96:22 97:3 97:5,7,17 98:17 99:3,11 103:8 103:11 105:5,17 119:24 120:5 129:3 133:10 134:17,20 152:1 152:4 155:23
**saying** 8:6 108:7 138:23
**says** 13:20 15:8 64:6 76:10 134:23
**scale** 84:14
**school** 17:11,13 18:18 19:9,10 19:14,20 22:12 22:21,24 23:4,4 24:23 27:3
**scientific** 135:10 148:10
**scientist** 148:4
**scratch** 123:13
**screenshot** 119:19
**seal** 158:14
**search** 61:1 74:7 122:22,25 123:5 123:21 124:1,5 124:8,8 125:4 141:15,16 142:23 143:3,6 150:9,18,19,20 151:5
**searched** 60:25 74:19 78:1,6 123:2,3 150:9
**searches** 76:12 77:12 78:11 128:24 144:7
**searching** 123:22 150:15 151:1,8,9
**second** 125:23
**section** 108:10
**see** 8:23 16:17 37:16,17 38:4 38:10 51:4 61:4 67:8,17 68:2,9 74:5,13,18 82:6 83:19 100:6 108:22 118:24 119:20 122:2,12 123:22 124:5,9 124:16,19 126:20 127:4,12 128:15 129:10 133:7,15 138:14 139:5 154:21 155:5,15,20
**seeing** 39:11 40:12 68:21 81:6 96:8 101:21 103:5,6 103:7 139:2 146:16,21
**seeking** 102:23
**seeks** 102:12
**seemed** 24:17 45:11
**seen** 31:7,8 37:12 39:2 70:2 81:18 96:6,11 96:15 101:18,18 102:2,19 103:4 103:15 104:16
**sell** 15:4,5 21:7
**selling** 20:12,14
**send** 56:17
**sending** 3:18
**sense** 7:19
**sensitive** 5:4
**sent** 56:18
**sentence** 76:10
**senzon** 36:8,12 36:13,15 37:12
**separate** 110:14
**september** 116:22,23 117:1 117:9
**series** 7:16
**serious** 84:15
**services** 120:11
**serving** 95:9
**set** 3:16,17,23 4:1 48:23 49:19 50:17,18 126:18
**settlement** 87:18 88:2 92:1 92:7 129:8
**seven** 51:3,10 51:13,14,23 52:8,8,12 84:4 141:5 152:13,14
**several** 143:13 145:24
**shampoo** 53:11 53:14 66:11 131:9,13,13 145:18,19
**share** 12:22,23
**sheet** 3:10 160:10,12
**shop** 61:14
**shores** 15:21
**short** 49:8
**shorthand** 158:8

**show** 112:19,25 113:8 115:3
**showed** 147:7
**showing** 58:11 58:14
**shown** 32:3
**sic** 151:12
**side** 22:10
**sign** 15:7 121:25 160:12
**signature** 49:3,4 49:5 50:9,10 126:24 158:17 159:18
**signed** 86:23 116:23 160:21
**significant** 64:10
**significantly** 84:11 85:4
**signing** 50:13 157:7
**similar** 6:2
**singer** 15:23,24
**single** 73:19 149:19
**sinus** 40:11
**sister** 25:9,19
**sister's** 25:15
**sit** 141:25
**site** 70:16,18,19 70:25 150:6 151:16
**sites** 67:6,20 68:13 70:13,14 70:22
**sitting** 58:3,7,7 58:19 62:25 70:21 77:6 79:2 79:6 109:17 111:10 112:9,13 113:14 116:7,11 138:23 148:24 149:4 155:22
**situated** 6:2
**six** 51:1,14,22 51:23 52:8 54:14 56:24 57:1,4,10,14 60:6,8 62:11,12 63:1 75:15,17 82:2,4,7,10,12 82:16 84:4,11 85:4 95:13,13 112:23 118:4,9 118:25 119:1
**size** 153:13
**social** 67:4,5,6,8 67:13,17,20 68:7,9,13 70:2 76:11,15,24,24 76:25 77:7 80:5 80:6,12,13 81:5 81:7,8 96:2,13 96:15 97:18 104:15,24 105:14 128:21 133:10 134:20 134:21 138:15 142:19
**society** 23:14
**sociology** 18:10 24:24
**soft** 8:13
**solely** 60:14 134:3
**solutions** 5:20 160:24
**somebody** 28:7 35:13 44:5
**soon** 91:20
**sorry** 21:8 26:25 72:17 79:13,14 80:16 103:10 114:17 117:21 117:24 126:23 128:19
**sort** 38:6 48:15 141:11 150:5
**south** 1:12 2:4,9 5:15
**southern** 1:1
**sparkling** 64:1
**speak** 65:23 66:4 72:25 137:22
**speaking** 34:15
**special** 46:8
**specialist** 37:11
**specialty** 38:17
**specific** 45:19 76:15,17,19 79:2 96:15 97:19 105:24 144:18 150:13 151:8,9 155:22 156:5,6
**specifically** 76:6 117:19 143:1 144:23 155:23 156:8
**speeding** 128:3
**spell** 36:9
**spent** 95:12
**spicy** 138:7
**spoke** 72:21
**spoken** 34:16
**sponsored** 77:4
**stand** 16:20
**standard** 136:15
**stands** 153:18
**start** 27:16 53:7 53:19 55:13,17 55:24 97:14 153:10
**started** 6:18 40:16,16 51:14 51:23 52:9 78:25 153:3
**starts** 43:3
**state** 1:21 5:22 6:15 18:21 19:7 20:5 21:16 27:6 27:24 128:1,1 158:3,9 159:3
**stated** 161:22
**statement** 103:21,22 104:3 104:4 114:14,18

**statements** 10:4 10:10,13 119:25
**states** 1:1
**statute** 160:19
**stenographica...** 159:8
**stomach** 56:12 134:4 138:8
**stop** 46:25 52:4 54:23 55:4 56:8 62:9 64:14 138:4 153:9
**stopped** 51:24 54:15 55:12,16 55:21 62:3 64:12 98:25 99:1 110:23,24 138:9 152:12
**store** 29:2,3,4 41:21 125:8
**story** 107:25 108:10
**strand** 17:5
**strike** 28:5 31:8 42:9 52:19 58:14 59:3,9 62:13 65:22 67:6 70:5 96:19 96:21 104:14 114:4 116:6 137:7 139:9,12 146:14 156:2
**student** 17:8 28:2
**studies** 102:8
**study** 102:5 135:20
**stuff** 16:18 41:13,14 83:4 134:20 136:11
**stuffing** 23:16
**subject** 34:24 141:18
**subjective** 136:15
**sue** 131:2,4,17 131:23 132:11
**sued** 111:7,7 112:1,2 113:15 133:13 136:9
**suffered** 40:9 110:21
**suggest** 41:16 83:5 92:17,20
**suggested** 41:3 41:5,12 137:20 137:21 139:5 160:16
**suing** 58:25 59:5 59:9,11,16 111:13 131:24 139:7
**suit** 89:23 90:1 135:14,16,22,25
**suite** 1:12 2:4,10 5:15
**suny** 18:6
**supervisor** 25:5 25:11 26:2,4
**supplement** 41:19 50:22 58:4 59:7 83:7 83:11 95:19 109:1,7,8 110:1 110:6 114:6,8 114:16,19 142:14 146:8
**supplements** 8:25 35:13,15 35:17,18,19 40:18 41:1,6,10 41:21 42:4,8 43:21 57:24 58:12,15,20,23 59:1,6 73:1 83:9 106:8 110:12 111:12,14 112:1 113:19
**supposed** 56:22 136:21 138:12
**suppository** 41:19
**suppress** 56:23 69:7 105:12 128:14 133:5
**suppressant** 54:6,8 61:23 146:25
**suppressed** 81:24
**supressant** 68:12 76:21 83:23 142:7
**sure** 7:3,14 10:7 10:22,24,25 29:18 30:24 40:7,13 46:4 79:15 80:14,16 80:17 90:12 93:3 97:24 115:11 118:20 125:15 134:17 154:16,20 156:3
**suspect** 8:19
**swear** 5:24 112:13
**switch** 56:20 80:21 138:10
**switched** 39:5 52:16 80:19 141:1
**sworn** 6:10 10:4 10:10 60:13 158:11

**t**

**t** 161:2,2
**table** 51:18
**tablespoon** 65:3 140:9,16,17
**tablespoons** 64:1,20 65:3 140:14
**take** 5:7 8:5,11 8:16 11:13 13:25 32:20 35:15,18,20,22 35:24 36:5 37:19 40:18

41:23 42:16 43:2,21 49:8 50:7 51:24 52:1 52:20,22 54:16 62:4,21,22 64:6 64:7,11 65:8,12 65:14 73:5,7,18 75:21 77:17 78:19 83:23 84:1 97:19 106:10 112:6 122:19 123:14 125:22 126:16 126:22 128:4 130:9 136:20 153:9,20
**taken** 1:19 5:12 6:24 8:3 12:1 35:1 40:20 88:16 96:10,14 111:4,11,15,18 111:25,25 112:1 112:6,10,14 134:9
**takes** 35:13
**talk** 7:24 8:7 29:18,23 34:20 90:5 96:23 107:1 129:7,10 135:5
**talked** 70:5 75:7 79:13 98:13 111:9 117:19 119:1 132:10 143:11,25
**talking** 31:21 60:8 67:14 69:11,15 71:4,4 72:10 86:13 104:16 108:16 108:17 134:24 135:21
**tall** 84:15
**target** 128:11
**teach** 27:8
**teaching** 27:1,5
**tedious** 47:1
**tell** 19:22 34:23 35:10 42:8 50:17 62:25 72:9 76:14 77:6 80:18,19 82:20 83:6 92:6 103:4 112:9 113:5 116:3,7,12,14 117:1,10 128:5 132:9 136:19 150:8
**tells** 44:19
**ten** 30:19 37:14 151:5
**tends** 138:7
**term** 151:5
**terms** 130:25 150:10,20
**tested** 132:25
**testified** 6:10 9:19,21
**testimony** 9:3 10:5 142:18
143:18 159:10 160:7,17
**testing** 99:13,16 100:11,12 135:15
**thank** 118:3 130:8 156:16 157:6
**thing** 8:4 16:12 21:21 47:6,14 48:15 67:8 81:3 98:15 100:3 118:24 149:15
**things** 41:9 59:23 81:17 97:7 98:17,19 105:18 110:20 112:8 115:19 117:11 118:12 125:5 135:18 155:4
**think** 9:10 14:8 20:23 24:16,17 24:19 25:14 35:23 40:15 41:5 42:7 43:5 43:14,17 55:11 55:23 67:25 75:9 79:17 81:2 82:5,24 83:2 85:11,20 89:22 89:25 90:2 91:3 91:14 94:17 105:15 108:5 110:15 115:10
121:15 132:19 133:15 135:9 137:24,25 138:2 138:7 143:1 151:15,15,17 152:2,3,4,8
**thinking** 139:6
**thinks** 89:20
**thirteen** 95:13 118:10
**thought** 40:10 140:7
**thousands** 107:2
**three** 71:18,19 93:22 151:4,17 151:23,25
**tickets** 128:3
**tiktok** 96:3,4,6 96:11
**time** 5:6 7:18 8:6,11 21:16 22:3,6,8,9 24:2 24:9,11 25:1 26:13 27:15,16 40:6,21 44:2 46:23 49:11,15 51:22,23 52:16 54:15 61:24 62:9 64:11,15 65:10 68:14 71:5 73:20 74:2 75:4,10 76:20 79:19 80:23,24 80:25 81:1 91:7

91:10 93:12 95:1,15 97:17 98:1,4 105:22 108:6 119:6 120:6 126:1,5 130:9 136:14 137:6,14,20 139:11,13 140:1 140:4 151:24 152:9,20 154:22 155:10,24 156:6 156:24
**timeframe** 51:11 71:8 143:23 144:10
**timeline** 79:15
**timeout** 121:9
**times** 53:16 62:2 62:7,18 64:6,7 65:9,13,14 71:11,18 73:17 74:1 102:1 108:4,7,8 119:23 141:9 151:16 153:8
**timeshare** 15:1 15:2,5,7,9 26:12
**timeshares** 15:4
**timing** 94:17
**title** 25:17,19,21 25:24
**today** 6:5,19 7:13,15 8:25 9:3 52:21,23 53:1,7 58:3,7,20 62:25 70:21 71:9,21 77:6 79:2,7 84:11,13 93:12 107:7 109:17 111:10,16,21,23 112:9,13,23 113:14 116:7,11 119:9 129:21 136:15 138:23 141:25 142:18 143:18 148:24 149:4 155:23
**today's** 29:8,11 29:12,15,18
**told** 14:1 36:6 37:19 44:25 73:13,14 79:17 81:2 85:24 90:21 91:3 94:4 96:22 99:1 106:7 108:5 110:15 119:2 131:5 133:23 140:7 151:15 152:5,16 153:1 153:5 154:3 156:2
**took** 10:16 35:6 64:22,25 82:4,7 82:12 94:2 99:17 100:6,12 113:2 117:10,24 132:23 136:4 148:15,21 152:13
**topic** 119:11
**total** 57:15 140:10
**towards** 152:24
**town** 13:8,15
**track** 46:16,17 46:18 48:10,12 85:17 121:20
**tracking** 47:2 47:13 48:1 85:19
**tract** 41:22,23
**trade** 94:19 139:19
**traffic** 127:23 127:25 128:2,5 128:7
**train** 44:11
**trainer** 12:17,20 12:24 13:3 44:10 45:9,12 137:6
**transcribed** 156:14,14
**transcript** 157:1 157:8 159:9,21 160:5,20
**transcription** 159:10
**transcripts** 160:14
**traurig** 1:11 2:9 5:14 6:4
**treat** 120:2 122:2
**treating** 72:22
**treatment** 122:9
**treats** 43:11
**trelegy** 43:14
**trial** 9:19
**tricky** 84:6
**true** 103:21 104:3,11 108:25 110:1,6,9 113:18 114:16 114:19 115:1,8 115:12,15,18 147:3 152:4 159:9 161:22
**truth** 113:2
**truthful** 9:3
**truthfully** 89:5
**try** 7:24 43:24 43:25 52:7 153:19
**trying** 47:8,9 82:3,6 85:20 108:22 133:23 152:7,17
**twelve** 51:1,22 54:14 56:24 57:2,4,11,15 60:7,8 63:1 95:13 118:4,25 119:1 140:10,10
**twice** 54:19 65:9 71:16 116:17
**twitch** 42:23
**two** 8:5 12:3,4 20:24 21:3

30:25 50:22 61:12,14 75:2 79:19 80:23 85:12 93:1,17 95:5 108:6,8 110:15 117:5 127:13 138:8 151:23
**type** 36:23 37:24,25
**typical** 73:23

**u**

**uh** 28:14 37:1
**ultimately** 97:14 105:18 145:4
**unclear** 32:22
**under** 7:8 23:4 50:10,14 112:9 115:5 116:23,25 117:10 159:23 160:18 161:21
**undergraduate** 18:21
**understand** 7:20 86:25 88:11,25 89:11 113:5 116:11 123:3 133:3 143:18 155:19 155:19
**understood** 50:13
**unfair** 94:19 119:22
**unfiltered** 63:17
**unit** 5:10
**united** 1:1
**university** 17:14 18:21 19:7,12 21:16
**ups** 154:25
**upset** 138:8
**urinary** 41:22 41:23
**use** 52:23,25 53:7,14 55:25 59:1,5,20,22 61:8,16,18 66:6 66:9,12 81:21 107:20 119:12 120:21 125:8,21 131:11,15 135:6 136:25 141:10 141:10
**used** 25:22 53:12,15,16,25 57:20,23 58:4 58:11,15,23 59:13,14,17 60:2,3,15 66:24 73:22 80:23 101:22,24 102:1 120:13 131:5,6 148:14 150:18 150:20 154:8 160:21
**useful** 133:15
**usernames** 101:4
**using** 53:19,23 54:4 58:8,20,24 58:25 59:9,11 59:18 68:11 69:8 80:25 82:20 121:3 132:13 136:24 137:3,11,13 138:24 141:8 154:19,22
**usually** 45:17 54:19
**utilize** 102:2
**utilized** 23:21

**v**

**v** 160:3 161:1
**vacation** 17:4
**valdescruz** 39:8 39:9
**vanessa** 2:8 6:3
**various** 127:3
**vegan** 46:8
**vegetarian** 46:9
**venue** 127:2
**verification** 49:7,20 50:11
**verify** 160:8
**veritext** 5:19 160:13,24
**veritext.com** 160:14
**video** 5:7,11 7:11 30:4 49:10 49:15 93:8,15 93:25 94:1,7,8 97:25 98:4 125:25 126:5 139:25 140:4 145:24 156:18 156:23,24
**videographer** 2:14 5:1,18 49:10,14 97:25 98:3 125:25 126:4 139:25 140:3 156:17,22
**videotaped** 1:17 3:14
**viewed** 70:15
**village** 17:4
**vinegar** 13:25 35:2,6 50:21 51:10,15,18,20 51:24 52:2,5,10 52:15,17,20,23 52:25 53:1,8,9 53:13,20,20,24 54:4,16,21,24 55:5,13,14,17 55:22,25 56:5,9 56:14,21,25 57:5,7 61:17,25 62:4,5,12,14 63:2,18 65:16 65:25 66:6,7,14 66:16,20,22,22 66:23,25 67:12 67:15,18 68:3,6 68:10,20 71:24 71:25 72:1,5,10

72:23 74:3,6,14 74:19 75:8 77:8 80:4 81:21,24 82:21 83:13 86:1 96:23 98:14,16,20,24 99:8,18,22 100:1,6 101:13 101:18,21 102:3 102:6,10 103:17 103:24 104:6 106:11 107:6,7 107:9,16,17,21 110:13 131:7,12 131:15 132:23 135:6 136:23,25 137:10,11,21,23 138:5 139:14 140:8,12 141:2 145:12,15 146:8 150:12,23
**vinegar's** 83:14
**vinegars** 66:9 66:13 83:16,18 83:20,22
**visited** 108:1
**visits** 100:8
**vitamin** 73:5,5 73:12 114:5,20
**vitamins** 35:20 35:22,23 113:24 114:1,11
**voluntary** 20:9
**volunteer** 23:10
**vs** 1:6 5:12 127:6,12,18 128:1,2

**w**

**waived** 157:8
**want** 8:14 10:11 79:15 83:6 91:15 112:23 132:9 149:3 151:3 157:3
**wanted** 27:8 153:13 154:21
**water** 8:13 64:2 64:21 65:1,2 140:9
**way** 7:12 14:14 52:1 59:18 80:18 82:18 83:14 89:14 113:6 134:17 135:9 136:20 155:8,20
**web** 107:25 108:1
**website** 3:22 71:7,9,12 75:11 75:19,25 76:3,7 78:16,24 79:3,7 79:10,12,18 96:16,24 97:8 105:9,21 106:2 108:2 119:19,24 120:7 123:23 124:11 125:5 143:5 144:10 146:14,15,22 150:4 155:24 156:4,7
**websites** 68:19 74:18 75:7 97:12,18 105:16 105:16 108:13 108:14 124:10 135:19
**week** 45:17
**weigh** 84:10 154:8,25
**weighed** 84:19 84:25
**weight** 47:9 54:7 76:20 84:3 84:8,12,13 85:3 85:7,14 105:13 120:10,13 121:15,18,23 132:17 133:19 134:23 135:7 138:13 142:7 146:22,25 152:14,15,16 153:19,20 154:4 154:7,9,11,13 154:14,18,21 155:9,12 156:9 156:10
**welcome** 8:21
**wellington** 38:3 39:13
**wellness** 63:18
**went** 14:8 17:13 19:1,9,17 22:11 22:12 24:11 70:19,22 79:9 96:24,25 97:10 97:12 105:10,15 105:17,21 132:24 145:6 152:15 154:18 155:9
**west** 1:13 2:4,5 2:10 5:15 13:19 13:20
**weston** 17:4,4
**whatsoever** 135:24
**whispering** 5:5
**white** 66:22
**windermere** 26:8
**window** 143:13 144:4
**winner** 37:7,8
**witness** 3:2,9 5:24 6:9,12 9:17 33:7 125:21 156:16 158:14 159:10 160:7,9 160:11,20
**woman** 84:6 100:24
**wondering** 24:19
**words** 89:9 105:13 156:8

**work** 7:13 15:1 16:17,19,19 18:12 20:12,14 20:16,18,22 21:4 22:8,11 23:10,18,24 24:4 31:12 32:13,18,20 44:6 45:7 73:19 84:2 89:15,18 89:20 100:10 106:5 152:5
**worked** 17:1,3 18:14,22 22:5 22:18,21,23,24 23:7 25:1 89:22 89:24 90:8,11 90:12
**working** 18:17 19:15 24:11 82:5 152:11,11 155:11
**workout** 44:19
**workouts** 44:12 44:14
**works** 29:2 97:23
**worth** 140:11 141:2
**would've** 52:11 78:3,11 137:18 138:1 145:1 148:18 150:7
**writing** 10:23
**written** 86:10 86:13,18 95:8 138:21

**x**

**xfinity** 125:12
**xolair** 42:13,21 42:22

**y**

**yahoo** 143:3 150:17
**yeah** 27:4,7 32:25 46:1,1 56:4 63:15 65:7 73:20 76:18 92:20 95:17 101:5,7 103:7 114:17 118:7 121:7,11 128:6 138:22 139:1 143:3 152:12
**year** 14:3,6,7,9 14:10 20:23 21:3 37:14 38:12 46:4,24 47:2 55:6,7,7 62:11 72:14 85:4,11,12 100:9 121:4,5,6 121:9 131:23 141:5 143:13
**year's** 140:11 141:2
**yearly** 154:25
**years** 15:16 16:4 16:6,25 23:2 27:17 37:14,14 39:3 40:7 42:3 51:3,10,13,14 51:23 52:8,8,12 53:17 75:2,13 75:15,17,17 81:23 82:2,4,7 82:10,12,16 84:4,11 85:11 85:12 99:10 151:6 152:13,14
**yesterday** 30:1 30:2 31:10,15 31:17,18,20,23 31:24 32:3,4,5,6 33:2,3 84:14 129:14,19,22,25
**yield** 146:9 147:14 148:3
**york** 18:8,22 19:8 21:17 27:25

**z**

**z** 36:14,14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.